*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WHEEL PROS, LLC, *et al.*,[1] | ) | Case No. 24-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

# DISCLOSURE
# STATEMENT RELATING
# TO THE JOINT PREPACKAGED PLAN OF
# REORGANIZATION OF WHEEL PROS, LLC AND ITS DEBTOR
# AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
tcairns@pszjlaw.com
ecorma@pszjlaw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Erica Clark (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  steven.serajeddini@kirkland.com
erica.clark@kirkland.com

-and-

Anup Sathy, P.C. (*pro hac vice* pending)
Yusuf Salloum (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:  anup.sathy@kirkland.com
yusuf.salloum@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

---

[1]   The last four digits of Debtor Wheel Pros, LLC's federal tax identification number are 5738.  A complete list of each of the Debtors in these Chapter 11 Cases and each such Debtor's federal tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/WheelPros.  The location of Debtor Wheel Pros, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 5347 S Valentia Way, Suite 200, Greenwood Village, Colorado 80111.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION THEREOF AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

SOLICITATION OF VOTES ON THE *JOINT PREPACKAGED PLAN OF REORGANIZATION OF WHEEL PROS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* FROM THE HOLDERS OF OUTSTANDING:

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 5 | FIRST LIEN CLAIMS |
| CLASS 6 | JUNIOR FUNDED DEBT CLAIMS |

IF YOU ARE IN CLASS 5 OR CLASS 6, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

**DELIVERY OF BALLOTS**

**CLASS 5 AND CLASS 6 BALLOTS MAY BE RETURNED BY THE FOLLOWING METHODS:**

**BY REGULAR MAIL, OVERNIGHT MAIL, OR HAND DELIVERY AT:**

**WHEEL PROS, LLC, ET AL. BALLOT PROCESSING**
**C/O STRETTO**
**410 EXCHANGE, SUITE 100**
**IRVINE, CA 92602**

**BY ELECTRONIC ONLINE SUBMISSION VIA STRETTO'S ONLINE PORTAL**

PLEASE VISIT HTTPS://BALLOTING.STRETTO.COM/WHEELPROSOPTOUTIMPAIRED AND FOLLOW THE DIRECTIONS TO SUBMIT YOUR BALLOT. IF YOU CHOOSE TO SUBMIT YOUR BALLOT VIA STRETTO'S E-BALLOT SYSTEM, YOU SHOULD NOT ALSO RETURN A HARD COPY OF YOUR BALLOT.

PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT TO STRETTO, INC. ("STRETTO" OR THE "SOLICITATION AGENT").

FOR HOLDERS OF CLASS 6 JUNIOR FUNDED DEBT CLAIMS:

IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, PLEASE COMPLETE, SIGN, AND DATE THE BENEFICIAL HOLDER BALLOT AND RETURN IT PROMPTLY IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY STRETTO ON OR BEFORE THE VOTING DEADLINE.

IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO STRETTO, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY STRETTO BY THE VOTING DEADLINE.

TO VOTE ON THE PLAN, CLASS 5 AND CLASS 6 BALLOTS MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING EASTERN TIME) ON OCTOBER 10, 2024, AS DIRECTED ON YOUR BALLOT.

---

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN:**

YOU CAN CONTACT THE SOLICITATION AGENT BY E-MAIL AT: TEAMWHEELPROS@STRETTO.COM (REFERENCING "HOONIGAN" IN THE SUBJECT LINE).

**YOU CAN ALSO CONTACT THE SOLICITATION AGENT BY PHONE TOLL-FREE AT (855)- 371-7511 OR (714)-716-1978 (INTERNATIONAL).**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PREPACKAGED PLAN OF REORGANIZATION OF WHEEL PROS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "<u>PLAN</u>").[2] NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO SUCH RIGHTS SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE IX</u> HEREIN, AND RELATED DOCUMENTS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (WHEN AND IF APPROVED) DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS REGARDING THE DEBTORS FORTHCOMING CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, THE RSA, OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN, THE RSA, OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AS OF THE DATE HEREOF OR SPECIFIED THEREIN. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING

---

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan or the RSA, as applicable. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan shall govern**.

FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE OR DISTRIBUTE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT, OR TO FILE OR DISTRIBUTE AN AMENDED OR MODIFIED RSA, AS WELL AS ANY APPLICABLE PROCEDURES WITH RESPECT TO THE TRANSACTIONS THAT MAY BE RELATED THERETO, IN EACH CASE, FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OR THE RSA OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY DISCLOSURE CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

**YOU ARE ENCOURAGED TO READ THE PLAN, THE RSA, AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING <u>ARTICLE IX</u> HEREIN, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

<u>**FORWARD-LOOKING STATEMENTS**</u>

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- BUSINESS STRATEGY;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- PRODUCT DEMAND;

- DEPENDENCE ON THIRD PARTIES FOR CERTAIN INVENTORY;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- RISKS IN CONNECTION WITH ACQUISITIONS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' OR COMPANY'S FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' OR COMPANY'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:   THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED**

**ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; PANDEMICS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS.**

---

**RECOMMENDATION BY THE DEBTORS**

**EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH DEBTOR'S ASSETS, AND PROVIDE THE BEST RECOVERY TO THE DEBTORS' STAKEHOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

**EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ON THE PLAN ARE BEING SOLICITED <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOT (ACCEPTING THE PLAN) SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN THE VOTING DEADLINE <u>(OCTOBER 10, 2024, AT 4:00 P.M. (PREVAILING EASTERN TIME))</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE SOLICITATION MATERIALS, INCLUDING IN YOUR BALLOT.**

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued pursuant to the Plan on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws"). The Plan has not been approved or disapproved by the SEC or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense.

The Debtors are relying on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act and Blue-Sky Laws provisions to exempt from registration under the Securities Act and Blue-Sky Laws all New Equity Interests offered to Exit Term Loan Facility Backstop Parties or the Holders of First Lien Claims prior to the Petition Date in connection with the Solicitation of votes to accept or reject the Plan. The New Equity Interests may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions. Hedging transactions involving such securities may not be conducted unless in compliance with the Securities Act.

After the Petition Date, the Debtors expect to rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution of New Equity Interests under the Plan, and to the extent such exemption is not available, then the Debtors expect to offer, issue, and distribute such New Equity Interests under the Plan in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act.

EXCEPT TO THE EXTENT PUBLICLY AVAILABLE, THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PLAN, AND THE INFORMATION SET FORTH HEREIN AND THEREIN ARE CONFIDENTIAL. THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE DEBTORS, THEIR SUBSIDIARIES, AND THEIR RESPECTIVE DEBT AND SECURITIES. EACH RECIPIENT HEREBY ACKNOWLEDGES THAT IT (A) IS AWARE THAT THE FEDERAL SECURITIES LAWS OF THE UNITED STATES PROHIBIT ANY PERSON (AS DEFINED IN SECTION 101(41) OF THE BANKRUPTCY CODE, A "PERSON") WHO HAS MATERIAL NON-PUBLIC INFORMATION ABOUT A COMPANY, WHICH IS OBTAINED FROM THE COMPANY OR ITS REPRESENTATIVES, FROM PURCHASING OR SELLING SECURITIES OF SUCH COMPANY OR FROM COMMUNICATING THE INFORMATION TO ANY OTHER PERSON UNDER CIRCUMSTANCES IN WHICH IT IS REASONABLY FORESEEABLE THAT SUCH PERSON IS LIKELY TO PURCHASE OR SELL SUCH SECURITIES AND (B) IS FAMILIAR WITH THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT"), AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND AGREES THAT IT WILL NOT USE OR COMMUNICATE TO ANY PERSON OR ENTITY, UNDER CIRCUMSTANCES WHERE IT IS REASONABLY LIKELY THAT SUCH PERSON OR ENTITY IS LIKELY TO USE OR CAUSE ANY PERSON OR ENTITY TO USE, ANY CONFIDENTIAL INFORMATION IN CONTRAVENTION OF THE EXCHANGE

**ACT OR ANY OF ITS RULES AND REGULATIONS, INCLUDING RULE 10B-5 PROMULGATED THEREUNDER.**

## Disclaimer

This Disclosure Statement contains summaries of certain provisions of the RSA, the Plan, and certain other documents and financial information.  The information included in this Disclosure Statement is provided solely for the purpose of soliciting votes on the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan.  All Holders of Claims entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement, the RSA, and the Plan and any other related documents in their entirety before voting to accept or reject the Plan.  The Debtors believe that the summaries contained in this Disclosure Statement are fair and accurate.  The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan, the RSA or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan, the RSA, or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.  The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan.  The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified.  Holders of Claims reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement.  No Holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan.  This Disclosure Statement does not constitute legal, business, financial, or tax advice.  Any Person or Entity desiring any such advice should consult with their own advisors.  Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state or locality.  The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise.  The Debtors' management, in consultation with the Debtors' advisors, has also prepared the financial projections attached hereto as **Exhibit C** and described in this Disclosure Statement (the "Financial Projections").  The Financial Projections, while presented with numerical specificity, necessarily are based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management.  Important factors that may affect actual results and cause management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' business (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, failure to obtain required regulatory approval of products, general business and economic conditions, and other factors.  The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved.  Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with

Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules.  To the extent applicable, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest.  This Disclosure Statement shall not be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against the Debtors or any other party in interest.  Please refer to <u>Article IX</u> of this Disclosure Statement entitled "Risk Factors" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors.  No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.  If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.  The Debtors are not soliciting votes to accept or decline the Plan in any jurisdiction in which an offer or solicitation may not be deemed authorized or in which the person making such offer or solicitation is not qualified to do so to anyone to whom it is unlawful to make an offer or solicitation.

Please see the section entitled "Forward-Looking Statements" for additional considerations related to the Solicitation.

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................... 1

II.  PRELIMINARY STATEMENT ............................................................................... 1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
     AND THE PLAN ....................................................................................................... 4

     A.   What is chapter 11? ............................................................................................ 4
     B.   Why are the Debtors sending me this Disclosure Statement? ........................... 4
     C.   Why are votes being Solicited prior to Bankruptcy Court approval of the
          Disclosure Statement? ....................................................................................... 4
     D.   Am I entitled to vote on the Plan? ..................................................................... 5
     E.   What is the deadline to vote on the Plan? .......................................................... 6
     F.   How do I vote for or against the Plan? ............................................................... 6
     G.   Why is the Bankruptcy Court holding a Confirmation Hearing? ...................... 6
     H.   What is the purpose of the Confirmation Hearing? ........................................... 6
     I.   Who do I contact if I have additional questions with respect to this Disclosure
          Statement or the Plan? ....................................................................................... 6
     J.   What will I receive from the Debtors if the Plan is consummated? ................... 7
     K.   What will I receive from the Debtors if I hold an Allowed Administrative Claim,
          DIP Claim, Professional Fee Claim, or a Priority Tax Claim? ......................... 9
     L.   Are any regulatory approvals required to consummate the Plan? .................... 12
     M.   What happens to my recovery if the Plan is not confirmed or does not go effective?
          ........................................................................................................................... 13
     N.   If the Plan provides that I get a distribution, do I get it upon Confirmation or when
          the Plan goes effective, and what is meant by "Confirmation," "Effective Date,"
          and "Consummation?" ...................................................................................... 13
     O.   What are the sources of Cash and other consideration required to fund the Plan? .......... 13
     P.   Are there risks to owning the New Equity Interests upon the Debtors' emergence
          from chapter 11? .............................................................................................. 13
     Q.   Is there potential litigation related to the Plan? .............................................. 13
     R.   What is the Management Incentive Plan ("MIP") and how will it affect the
          distribution I receive under the Plan? .............................................................. 14
     S.   Does the Plan preserve Causes of Action? ...................................................... 14
     T.   Will there be releases, exculpation, and injunction granted to parties in interest as
          part of the Plan? ............................................................................................... 15
     U.   Does the Bankruptcy Code protect against discriminatory treatment? ........... 21
     V.   Will the Company retain documents after any Effective Date? ....................... 21
     W.   What is the effect of Reimbursement or Contribution? ................................... 21
     X.   What is the effect of the Plan on the Debtors' ongoing business? .................. 21
     Y.   Will any party have significant influence over the corporate governance and
          operations of the Reorganized Debtors? .......................................................... 22
     Z.   Do the Debtors recommend voting in favor of the Plan? ................................ 22
     AA.  Who Supports the Plan? ................................................................................... 22

IV.  CORPORATE HISTORY AND BUSINESS OPERATIONS .................................. 22

     A.   Corporate History ............................................................................................ 22
     B.   Business Operations ......................................................................................... 23

|  | C. | Hoonigan's Prepetition Capital Structure | 25 |

| V. | | **EVENTS LEADING TO THESE CHAPTER 11 FILINGS** | **29** |
| | A. | Business Challenges | 30 |
| | B. | Prepetition Initiatives | 31 |

| VI. | | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **33** |
| | A. | First Day Relief | 33 |
| | B. | Proposed Confirmation Schedule | 34 |

| VII. | | **THE DEBTORS' RSA AND PLAN** | **35** |
| | A. | Recapitalization Negotiations and the RSA | 35 |
| | B. | The Plan | 36 |

| VIII. | | **OTHER KEY ASPECTS OF THE PLAN** | **45** |
| | A. | Treatment of Executory Contracts and Unexpired Leases | 45 |
| | B. | Provisions Governing Distributions | 49 |
| | C. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | 54 |
| | D. | Conditions Precedent to Confirmation and Consummation of the Plan | 56 |
| | E. | Modification, Revocation, or Withdrawal of the Plan | 58 |
| | F. | Other Claims and Interest Classification and Treatment Features | 59 |

| IX. | | **RISK FACTORS** | **60** |
| | A. | Bankruptcy Law Considerations | 61 |
| | B. | Risks Related to Recoveries Under the Plan | 67 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Business | 69 |
| | D. | Risks Related to the Offer and Issuance of Securities Under the Plan | 73 |

| X. | | **SOLICITATION AND VOTING PROCEDURES** | **75** |
| | A. | Holders of Claims Entitled to Vote on the Plan | 75 |
| | B. | Voting Record Date | 76 |
| | C. | Ballots Not Counted | 76 |

| XI. | | **CONFIRMATION OF THE PLAN** | **76** |
| | A. | Requirements for Confirmation of the Plan | 76 |
| | B. | Best Interests of Creditors/Liquidation Analysis | 76 |
| | C. | Feasibility | 77 |
| | D. | Acceptance by Impaired Classes | 77 |
| | E. | Confirmation Without Acceptance by All Impaired Classes | 78 |
| | F. | Valuation Analysis | 79 |

| XII. | | **CERTAIN SECURITIES LAW MATTERS** | **79** |
| | A. | New Equity Interests | 79 |
| | B. | Exemption from Registration Requirements; Issuance of New Equity Interests Under the Plan | 79 |

C.      Resales of New Equity Interests; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.................................................................................... 80

**XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN............................................................................................................................ 84**

A.      Introduction....................................................................................................... 84

B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors................................................................................ 85

C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of First Lien Claims and Junior Funded Debt Claims ...................................... 89

D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of First Lien Claims and Junior Funded Debt Claims ................................... 95

E.      Information Reporting and Back-Up Withholding...................................... 101

**XIV.  RECOMMENDATION ................................................................................................ 102**

**EXHIBITS**[3]

EXHIBIT A       Plan of Reorganization

EXHIBIT B       RSA

EXHIBIT C       Financial Projections

EXHIBIT D       Valuation Analysis

EXHIBIT E       Liquidation Analysis

EXHIBIT F       Simplified Organizational Chart

---

[3]   Each Exhibit is incorporated herein by reference.

## I.        INTRODUCTION.

Wheel Pros, LLC and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Hoonigan" or the "Company"), are pursuing proposed restructuring and recapitalization transactions (the "Restructuring Transactions") pursuant to the terms and conditions set forth in that certain Restructuring Support Agreement by and among the Company and the Consenting Stakeholders (as may be amended, supplemented, or otherwise modified from time to time, and including all schedules, exhibits, and annexes thereto, the "RSA"), attached hereto as **Exhibit B**.

Pursuant to the RSA, the Debtors have launched a solicitation of votes to accept or reject the *Joint Prepackaged Plan of Reorganization of Wheel Pros, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan" and, such solicitation, the "Solicitation") to Holders of First Lien Claims and Junior Funded Debt Claims.  The Debtors intend to submit this Disclosure Statement ("Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of First Lien Claims and Junior Funded Debt Claims in connection with the Solicitation.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

In connection with the RSA, and to seek Confirmation and Consummation of the Plan, the Debtors intend to promptly commence voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

**THE DEBTORS AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RSA, ATTACHED HERETO AS EXHIBIT B, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.        PRELIMINARY STATEMENT.

The Company was founded in 1994 as "Wheel Pros" with a focused mission:  to become an industry leader in wheel design, sourcing, marketing, sales, and distribution.  Today, the Company, now known as Hoonigan, serves automotive enthusiasts worldwide, selling wheels, tires, and related accessories—as well as automotive products in the suspension, off-roading, and lighting spaces, among others.  Hoonigan's products reach millions of customers through a trusted network of thousands of dealers, distributors, retail stores, e-commerce platforms, and digital content.  Hoonigan employs over 1,750 employees worldwide and, with an established, well respected brand name and customer centric business model, the Company has solidified its position as a distinguished leader in the automotive aftermarket product space.

Over the past few years, Hoonigan has experienced a series of unprecedented headwinds and challenges.  The COVID-19 pandemic led to sharp increases in product demand, largely due to increased outdoor leisure time and governmental stimulus support provided to customers.  Indeed, heightened demand, coupled with a series of acquisitions in the automotive space, resulted in the Company's revenue almost doubling between 2019 and 2022.  During this period, the Company also acquired companies that expanded the Company's sales channels outside of the scope of its historic core business and distribution model, including retail locations and e commerce platforms, with the intention of keeping up with consumer purchasing preferences and expanding the availability of Hoonigan's products.

However, macroeconomic issues, including a rapid and dramatic rise in interest rates, persistent inflation, burdensome supply chain disruptions, a decline in customer demand well below the historical trendline, and unsustainable debt service obligations all placed significant pressure on the Company's revenue and cost structure. These factors, together with the inherent challenges of integrating the new products, brands, and operations of acquired companies resulted in significant liquidity challenges for Hoonigan in 2023.

The Company initially sought to improve its liquidity through balance sheet initiatives. In September 2023, after arm's-length negotiations, the Company entered into a financing transaction (the "FILO Transaction") with 99.7% of its existing secured term lenders, which provided a $235 million new money FILO credit facility and a $1.4 billion discounted debt exchange, allowing the Company to capture $140 million of discount on its funded debt obligations. The FILO Transaction extended the Company's liquidity runway, providing some breathing room for the Company to address legacy SG&A and operational challenges directly. While the additional liquidity supported the Company's balance sheet, the Company continued to miss near term projections, requiring the Company to consider broader initiatives.

To spearhead these initiatives, the Company brought in new executive leadership and commenced aggressive, tailored efforts to: (i) reduce costs and stabilize the Company; (ii) improve internal policies and processes, including those related to accounting and finance; (iii) transition to a product-based operating model with business divisions focused on products categories (*e.g.*, Lighting); (iv) divest non-core and underperforming assets; and (v) direct resources to drive growth in the business in certain, key areas of the enterprise. The Company's cost cutting measures produced an annualized run-rate EBITDA improvement of $39 million in FY 2023, and, as of the date hereof, the Company is continuing to invest in improving operations throughout the enterprise.

Despite the material improvements to the Company's near-term liquidity, led by management's swift turnaround efforts, the Company's operational challenges and market headwinds necessitated consideration of additional strategic alternatives. Thus, in Q2 2024, the Company again commenced discussions with its lenders and its equity sponsor, Clearlake Capital Group, L.P. (together with certain affiliates, the "Sponsor"), regarding additional solutions to address its substantial debt service obligations and significant liquidity constraints. At the time negotiations commenced, certain Holders of Hoonigan's funded debt formed a crossover ad hoc group consisting of the Company's FILO Term Loan Lenders, NewCo First Lien Lenders, and NewCo Noteholders (each as defined below) (the "Ad Hoc Group"). Strategic Value Partners, LLC and certain of its managed funds (collectively, "SVP")—the largest Holder of the Debtors' NewCo First Lien Loans and NewCo Notes—also actively engaged in such discussions. Initial discussions centered around a potential incremental financing transaction to inject additional liquidity into the business; however, in late July 2024, the parties determined that a comprehensive solution was in the best interests of the Company and pivoted to discussions around an equitization transaction.

Thereafter, following several weeks of intense, arms'-length negotiations, the Debtors and their advisors successfully bridged negotiations between the Ad Hoc Group, the ABL Lenders, and SVP to reach agreement on a consensual restructuring. On September 8, 2024, the Debtors, the Ad Hoc Group, SVP, and the Sponsor executed the RSA, attached hereto as **Exhibit B**, pursuant to which the Debtors will effectuate a recapitalization transaction through "prepackaged" Chapter 11 Cases. The RSA enjoys the support of the holders of 74% of the obligations under the FILO Loans, 99% of the obligations under the First Lien Loans, 100% of the obligations under the NewCo Notes, and 7% of the obligations under the Legacy Notes. The key terms of the RSA include:

2

- the Debtors' entry into certain debtor-in-possession financing facilities to provide funding throughout the duration of these Chapter 11 Cases in the form of (i) $175 million via continued access to the Debtors' ABL Facility subject to a "creeping" roll-up of outstanding ABL Loans into DIP ABL Loans (the "<u>DIP ABL Facility</u>"), (ii) a $110 million new money senior secured superpriority term loan facility (the "<u>DIP Term Loan Facility</u>" and, together with the DIP ABL Facility, the "<u>DIP Facilities</u>"), and (iii) access to the prepetition secured lenders' cash collateral;

- each Holder of the ABL Claims and FILO Claims will receive payment in full;

- each Holder of an Allowed First Lien Claim will receive (i) its Pro Rata share of 85% of the New Equity Interests, subject to dilution on account of the MIP Shares; and (ii) the right to fund its Pro Rata share of the Exit Term Loan Facility in accordance with the terms of the Plan;

- each Holder of an Allowed Junior Funded Debt Claim will receive its Pro Rata share of $500,000 in Cash, *i.e.*, the Junior Funded Debt Consideration;

- repayment in full or reinstatement of all General Unsecured Claims;

- the cancellation of Existing Equity Interests; and

- funding for plan distributions in the form of an exit term loan facility in the amount of $570 million (the "<u>Exit Term Loan Facility</u>"), which is backstopped by certain Consenting NewCo First Lien Lenders in exchange for the remaining 15% of the New Equity Interests, subject to dilution on account of the MIP, as well as a prospective exit ABL facility (the "<u>Exit ABL Facility</u>"), for which the Debtors will use chapter 11 to seek commitments.

The RSA and Plan are structured to support Hoonigan's ongoing commitment to its customers, business partners, and stakeholders while strengthening the business as a going-concern. With the support of their lenders and other key stakeholders, the Debtors seek authority to move through the chapter 11 process efficiently. The Debtors seek to proceed through these Chapter 11 Cases on an approximately 40-day timeline, subject to Court approval, to minimize disruption to the business and accrual of administrative expenses. The Debtors intend to use the proceeds of the DIP Facilities to, among other things, facilitate a smooth landing into chapter 11 and fund go-forward business operations in the ordinary course, thereby preserving the value inherent in the RSA without prejudicing the ability for any party to assert its rights in these Chapter 11 Cases. The Debtors will also use the time in chapter 11 to (i) continue their prepetition efforts to seek commitments for an Exit ABL Facility to further bolster the Company's go-forward liquidity, and (ii) consummate sales of certain non-core assets to generate additional liquidity to fund plan distributions and the go-forward business, including the Debtors' 4WP (as defined herein) business unit and certain assets related to Poison Spyder Customs, Inc.

The Plan includes customary debtor and third-party releases. The Special Committee (as defined herein), with the assistance of its counsel, Cole Schotz P.C., is conducting an independent investigation and assess the merits and potential value of any potential claims and Causes of Action held by the Company against any related party or otherwise related to any conflicts matter. Accordingly, the release provisions contained in the Plan remain subject to ongoing review by the Special Committee. The Debtors, acting at the direction of the Special Committee, and to the extent permitted by the RSA and subject to any consent rights set forth therein, reserve the right to revoke, withdraw, or modify the Plan in advance of the Confirmation Date pending the outcome of the investigation.

The Debtors, with broad support across their capital structure, strongly believe that the deleveraging and liquidity-enhancing Restructuring Transactions contemplated by the RSA and the Plan are in the best

interest of the Debtors' Estates and represent the best available alternative to the Company at this time. Given the Debtors' core strengths and strong customer relationships, the Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan and the RSA to ensure the Debtors' long-term viability. Ultimately, confirmation of the Plan will enable Hoonigan to eliminate approximately $1.2 billion of funded debt obligations and emerge from chapter 11 in a better position than ever to remain a global leader in the automotive aftermarket space.

The Debtors seek authority to consummate the Restructuring Transactions and move through the chapter 11 process expeditiously, with a proposed hearing to consider Confirmation of the Plan and approval of this Disclosure Statement (the "<u>Confirmation Hearing</u>") within 40 days of the Petition Date.

> **FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN <u>VOTE TO ACCEPT</u> THE PLAN**.

### III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

#### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly-situated equity holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

#### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires that the Debtors prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such Disclosure Statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

#### C.   Why are votes being Solicited prior to Bankruptcy Court approval of the Disclosure Statement?

By sending this Disclosure Statement and soliciting votes for the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases. The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement on a final basis together with Confirmation of the Plan at the same hearing, which may be scheduled as shortly

as thirty-nine (39) days after commencing the Chapter 11 Cases, all subject to the Bankruptcy Court's approval and availability.

> **D.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "<u>Class</u>."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | FILO Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | First Lien Claims | Impaired | Entitled to Vote |
| Class 6 | Junior Funded Debt Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth above in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth therein shall apply separately to each of the Debtors (except for the Class 10 Existing Equity Interests, which shall apply only to Wheel Pros Holdings, L.P.).  All of the potential Classes for the Debtors are set forth in the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

**E.      What is the deadline to vote on the Plan?**

The voting deadline with respect to the Plan (the "Voting Deadline") is October 10, 2024, at 4:00 p.m. (prevailing Eastern Time).

**F.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballots"). For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is **actually received** by the Solicitation Agent **on or before the Voting Deadline, *i.e.*, October 10, 2024 at 4:00 p.m., prevailing Eastern Time**.

**G.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. Shortly after the commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing, at which time the Debtors will seek, among other things, Confirmation of the Plan. At the Confirmation Hearing, the Debtors will also seek Bankruptcy Court approval of this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and that the Debtors shared this Disclosure Statement with all Holders of Claims whose votes on the Plan are being solicited. All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**H.      What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to seek approval of the Plan and this Disclosure Statement. If so approved, the Bankruptcy Court will have held that this Disclosure Statement has provided the Voting Classes with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**I.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Solicitation Agent, Stretto, by calling 855-371-7511 (Toll free from US / Canada) OR +1-714-716-1978 (International) or e-mailing TeamWheelPros@Stretto.com with "Hoonigan" in the subject line. Copies of the Plan, this Disclosure Statement, and any other publicly-filed documents in the Chapter 11 Cases are available free of charge, as applicable, by: (a) visiting the Debtors' restructuring website when made public; (b) email using TeamWheelPros@Stretto.com (with "Hoonigan" in the subject line); or (c) calling the

Solicitation Agent at the number(s) listed above.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at https://www.deb.uscourts.gov or the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours 8:00 a.m. to 4:00 p.m., prevailing Eastern Time.

**J.     What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court, or otherwise.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim / Interest** | **Projected Allowed Amount of Claims** | **Estimated % Recovery under the Plan** |
| Class 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim, at the option of the applicable Debtor or the Reorganized Debtor, either: (i)       payment in full in Cash of its Allowed Other Secured Claim; (ii)      the collateral securing its Allowed Other Secured Claim; (iii)     Reinstatement of its Allowed Other Secured Claim; or (iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $0 | 100% |
| Class 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $34,000,000 | 100% |

---

[3]     The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
| --- | --- | --- | --- | --- |
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 3 | ABL Claims | Each Holder of an Allowed ABL Claim will receive, in full and final satisfaction of such ABL Claim payment in full in Cash and the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the ABL-FILO Credit Agreement ) in accordance with the terms and in the amounts specified under the ABL-FILO Credit Agreement. | $138,000,000 | 100% |
| Class 4 | FILO Claims | Each Holder of an Allowed FILO Claim will receive, in full and final satisfaction of such FILO Claim, payment in full in Cash. | $280,000,000 | 100% |
| Class 5 | First Lien Claims | Each Holder of an Allowed First Lien Claim shall receive, in full and final satisfaction of such First Lien Claim: (i) its Pro Rata share of 85% of the New Equity Interests, subject to dilution on account of the MIP Shares; and (ii) right to fund its Pro Rata share of the Exit Term Loan Facility in accordance with the terms of the Plan. | $1,046,0000,000 | 52% |
| Class 6 | Junior Funded Debt Claims | Each Holder of an Allowed Junior Funded Debt Claim shall receive, in full and final satisfaction of such Junior Funded Debt Claim, its Pro Rata share of the Junior Funded Debt Consideration; *provided* that if Class 6 votes to accept the Plan, the Holders of First Lien Deficiency Claims shall not receive any recovery on account of such Claims. | $877,000,000 | 0.1% |
| Class 7 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, either: (i)     Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii)     payment in full in Cash on (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | $184,000,000 | 100% |
| Class 8 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting NewCo First Lien Lenders) or the Reorganized Debtor, either: (i)     Reinstated; or (ii)     adjusted, converted to equity, set off, settled, distributed, or contributed; or (iii)     discharged, cancelled, and released without any distribution on account of such Intercompany Claims. | N/A | N/A |

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim / Interest | Projected Allowed Amount of Claims | Estimated % Recovery under the Plan |
| Class 9 | Intercompany Interests | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor (with the consent of the Required Consenting NewCo First Lien Lenders) or the Reorganized Debtor, either: <br> (i)　Reinstated; or <br> (ii)　set off, settled, discharged, contributed, cancelled, and or released without any distribution on account of such Intercompany Interests, or otherwise addressed or eliminated. | N/A | N/A |
| Class 10 | Existing Equity Interests | All Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Existing Equity Interests shall receive no recovery or distribution on account of their Existing Equity Interests. | N/A | 0% |
| Class 11 | Section 510(b) Claims | All Section 510(b) Claims will be cancelled, released, discharged, extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. | N/A | 0% |

**K.**     **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, Professional Fee Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**1.**     **Administrative Claims**.

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the

Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 2.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 3.      DIP Claims.

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP ABL Facility (including the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP Orders and the DIP ABL Documents) and the DIP Term Loan Facility, as applicable, on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP ABL Claim, each Holder of an Allowed DIP ABL Claim, including the DIP ABL Agent, shall receive (i) payment in full in Cash of its Allowed DIP ABL Claim and, including the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP Orders and the DIP ABL Documents, or (ii) at the option of the applicable Debtors with the consent of the DIP ABL Agent, the DIP ABL Lenders, and the Required Consenting NewCo First Lien Lenders, conversion or the refinancing of such Allowed DIP ABL Claims into the Exit ABL Facility (including the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP Orders and the DIP ABL Documents) pursuant to the Exit ABL Facility Documents, which shall be in form and substance acceptable to the DIP ABL Agent, the DIP ABL Lenders, and the Required Consenting NewCo First Lien Lenders.

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash of its Allowed DIP Term Loan Claim.

Following such satisfaction of the Allowed DIP Claims, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Documents, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP ABL Facility or DIP Term Loan Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agents or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders.  At the expense of the Debtors or Reorganized Debtors, the DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such

termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

       **4.**       **Professional Fee Claims**.

       **(a)**       **Final Fee Applications and Payment of Professional Fee Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

       **(b)**       **Professional Fee Escrow Account**.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

       **(c)**       **Professional Fee Amount**.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than one (1) Business Day before the Effective Date; *provided, however*, that such estimates shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

       **(d)**       **Post-Confirmation Fees and Expenses**.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or

approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor or the Reorganized Debtor, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.    Payment of Statutory Fees and Reporting to the U.S. Trustee.

All Quarterly Fees, to the extent applicable, due prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, all Quarterly Fees shall be paid to the U.S. Trustee when due and payable. The Debtors shall File all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Debtors shall File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors and Reorganized Debtors, as applicable, shall remain obligated to pay Quarterly Fees to the U.S. Trustee until that particular Debtor's Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, dismissed, or closed, whichever occurs first.

### 6.    Payment of Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth in the RSA and the Exit Term Loan Facility Backstop Commitment Letter, without any requirement to File a fee application with the Bankruptcy Court or for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for time detail) from the applicable Entity entitled to such Restructuring Expenses in accordance with, if applicable, such Entity's respective engagement letter or fee letter. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses (it being understood that any difference in (a) estimated Restructuring Expenses on and including the Effective Date as compared to (b) Restructuring Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity following the Effective Date). In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course (but no later than within ten (10) Business Days of receipt of an invoice), Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for time detail).

### L.    Are any regulatory approvals required to consummate the Plan?

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**M.**     **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see Article IX.B of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit E**.

**N.**     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived before the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article VIII.D of this Disclosure Statement, entitled "Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**O.**     **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) the Debtors' Cash on hand as of the Effective Date; (2) the proceeds from the Exit Term Loan Facility; and (3) the New Equity Interests. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Equity Interests, will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Plan.

**P.**     **Are there risks to owning the New Equity Interests upon the Debtors' emergence from chapter 11?**

Yes. *See* Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**Q.**     **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation. *See* Article IX.C.6 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it

determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* <u>Article XI.E</u> of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

> **R.     What is the Management Incentive Plan ("<u>MIP</u>") and how will it affect the distribution I receive under the Plan?**

Following the Effective Date, the New Board shall adopt the MIP, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and other service providers of the Reorganized Debtors, as determined at the discretion of the New Board.  The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, shall be determined at the discretion of the New Board after the Effective Date.

> **S.     Does the Plan preserve Causes of Action?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  The Reorganized Debtors may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court.  Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**T.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, Third-Party Release, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Parties to the RSA in obtaining their support for the Restructuring Transactions pursuant to the terms of the RSA.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

You may choose to opt out of the Third-Party Release. If you opt out of the Third-Party Release, you will not receive a release.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" IN THE PLAN AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH CONSENTING STAKEHOLDER; (D) EACH MEMBER OF THE AD HOC GROUP; (E) EACH ABL LENDER AND HOLDER OF AN ABL CLAIM; (F) EACH DIP LENDER AND HOLDER OF A DIP CLAIM; (G) EACH EXIT TERM LOAN FACILITY BACKSTOP PARTY; (H) EACH OF THE EXIT FACILITY LENDERS; (I) EACH OF THE AGENTS/TRUSTEES; (J) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE DEEMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (L) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN; (O) CURRENT AND FORMER AFFILIATES OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (P); OR (P) EACH RELATED PARTY IN CLAUSE (A) THROUGH THIS CLAUSE (P); *PROVIDED* THAT EACH HOLDER OF CLAIMS OR INTERESTS THAT IS PARTY TO OR HAS OTHERWISE SIGNED THE RSA SHALL NOT OPT OUT OF THE RELEASES; *PROVIDED, FURTHER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN; (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION; OR (Z) IS A NON-RELEASED PARTY (SOLELY IN RESPECT OF THE NON-RELEASED CLAIMS).**

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

1.      **Discharge of Claims and Termination of Interests**.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, any other Definitive Document, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

2.      **Release of Liens**.

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a secured claim or any related claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents/Trustees) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns.  Any Holder of such secured claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder, including the Agents/Trustees) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or**

with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

3.    Releases by the Debtors.

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Debtors, their Estates, and if applicable, the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, and their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, Avoidance Actions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release,

or other agreement or document created or entered into in connection with the RSA, the Definitive Documents, the Plan Supplement, the Exit Term Loan Facility Participation, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.

Notwithstanding anything in the Plan to the contrary, the Debtors do not, pursuant to the releases set forth in the Plan, release (i) any Causes of Action identified in the Schedule of Retained Causes of Action; (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; or (iii) any Non-Released Claims with respect to any Non-Released Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any Claim or Cause of Action released by the Debtor Release against any of the Released Parties.

4.    **Releases by the Releasing Parties**.

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders

18

of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, and their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the decision to file the Chapter 11 Cases, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Definitive Documents, the Plan Supplement, the Exit Term Loan Facility Participation, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.

Notwithstanding anything to the contrary in the Plan, the Released Parties do not, pursuant to the releases set forth in the Plan, release:  (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, and Restructuring Transactions, or any documents, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; (ii) the rights of any Holder of Allowed Claims to receive distributions under the Plan; or (iii) any Non-Released Claims with respect to any Non-Released Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) consensual; (ii) essential to the Confirmation; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (iv) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

5.    Exculpation.

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Definitive Documents, the Plan Supplement, the Exit Term Loan Facility Participation, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective

Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the post-Effective Date Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.    **Injunction**.

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities or the Estates on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct

and indirect **Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### U.      Does the Bankruptcy Code protect against discriminatory treatment?

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### V.      Will the Company retain documents after any Effective Date?

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

### W.      What is the effect of Reimbursement or Contribution?

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### X.      What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date of the Plan means that the Debtors will **not** be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the date on which (1) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (2) the Plan is declared effective by the Debtors.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**Y.   Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Company Parties shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed in accordance with the Corporate Governance Documents. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Corporate Governance Documents and other constituent documents of the Reorganized Debtors.

Assuming that the Effective Date occurs, Holders of Allowed Claims that receive distributions representing a substantial percentage of outstanding shares of the New Equity Interests may be in a position to influence matters requiring approval by the holders of shares of New Equity Interests, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**Z.   Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Restructuring Transactions provide for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative. The Debtors believe that the Restructuring Transactions, which contemplate a significant deleveraging of the Debtors' balance sheet and will allow them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under and pursuant the Plan.

**AA.   Who Supports the Plan?**

The ***Plan is supported by the Debtors and the Consenting Stakeholders, including the Ad Hoc Group, SVP, and the Sponsor, that have executed the RSA***. Pursuant to the RSA, the Consenting Stakeholders include holders of (i) 74% of the obligations under the FILO Loans, (ii) 99% of the obligations under the First Lien Loans, (iii) 100% of the obligations under the NewCo Notes, and (iv) 7% of the obligations under the Legacy Notes; and (b) the Sponsor.

## IV.   CORPORATE HISTORY AND BUSINESS OPERATIONS.

Hoonigan is defined by performance and driven by passion. The excitement and thrill surrounding its products gives meaning to millions of automotive enthusiasts worldwide and by 2022, the Company was a global enterprise with approximately $1.5 billion in annual revenue. The success of the Company is due, in large part, to a desire to drive forward with the same excitement and enthusiasm for automotive culture as its customer base, securing the Company's position as a leading aftermarket automotive parts provider.

**A.   Corporate History**.

The Company, formerly known as "Wheel Pros," was founded in 1994 with a mission to design, market, sell, and distribute aftermarket automotive wheels, performance tires, and related accessories. Over the subsequent three decades, the Company has expanded and now serves over 30,000 retailers, warehouse distributors, and specialty builders through a global network of over 42 distribution centers. In April 2018, the Sponsor acquired the Company in recognition of the strength of the Company's unique product offerings and market position.

Having found success in its core market in aftermarket wheels and tires, the Company explored market opportunities to grow the Company further and bolster its product offerings by adding additional wheel brands, suspension, lighting, and related accessories, among other product lines, to serve automotive enthusiasts more broadly.[4]  In June 2018, the Company made certain acquisitions adjacent to its existing wheel products, including through the purchase of Amcor Industries, Inc. (d/b/a Gorilla Automotive Products), which manufactures and sells wheel accessories (including lug nuts and TPMS).  Shortly thereafter in October 2018, the Company also acquired ReadyLIFT® Suspension Inc. ("ReadyLIFT"), which produces suspension, lift, and leveling kits.  In May 2019, the Company acquired MHT Luxury Wheels, Inc., another leading designer, marketer, and distributor of branded automotive aftermarket wheels and accessories, and three months later, in August 2019, the Company acquired Mobile Hi Tech Wheels, Inc., another significant vendor in the aftermarket automotive wheels market.  Over the course of the two years that followed, the Company continued to expand into core adjacent product markets through acquisitions, including: (i) in April 2020, into the ATV and snowmobile market, through the acquisition of Zbroz Racing ("Zbroz"); and (ii) in December 2020, into the luxury and off-road markets through the acquisition of Just Wheels and Tires Co. (d/b/a TSW Alloy Wheels), which brought popular brands such as Black Rhino and TSW to the Company's customers.  Most of these acquisitions were easily integrated into the Company's sourcing and distribution structure and propelled the Company's growth efforts.

The Company further explored and consummated a series of acquisitions into new channels to build out its media, e-commerce, and retail operations.  To that end, in September 2021, the Company acquired Hoonigan.  Through a highly popular series of short videos, Hoonigan had built an enthusiastic fan base with an authentic passion for motorsports and automotive culture.  In 2021 alone, Hoonigan's videos received 40 million unique views per month and were watched for 180 million average monthly minutes.  Shortly thereafter, in December 2021, the Company acquired Throtl, Inc. ("Throtl") to help round out its media and e-commerce operations, and further establish its direct-to-consumer platform for its products.  In March 2022, the Company acquired TeraFlex, Inc. ("Teraflex"), which specialized in aftermarket suspension systems and Jeep®-related products.  In June 2022, the Company completed its acquisition of TAP Worldwide, LLC (d/b/a 4 Wheel Parts) ("4WP"), which provided the Company with a retail footprint focused on the growing off-road vehicle market and further expand the Company's e-commerce platform through the dedicated 4WP e-commerce site.

Through its commitment to an expansive product offering through consecutive brand and product line acquisitions, along with entering new channels, the Company sought to form a deeper connection with its customers and drive further interest in its products and grow sales.  In October 2023, this effort culminated in the Company rebranding as "Hoonigan" to reflect its dedication to the automotive enthusiast community.

**B.     Business Operations**.

**1.     Hoonigan's Business Units**.

Hoonigan is currently structured around five business units (collectively, the "Business Units"): (i) wheels, tires, and accessories ("Wheels, Tires, and Accessories"); (ii) suspension and accessories ("Suspension"); (iii) lighting ("Lighting"); (iv) media and e-commerce ("Media and E-Commerce"); and (v) 4WP.  This structure marks a recent shift from the Company's prior channel-based model, pursuant to which the business was primarily segmented into wholesale, retail, and e-commerce divisions.  The streamlined product-based operating model is intended to align management responsibility and

---

[4]   For the avoidance of doubt, the acquisitions discussed herein are not inclusive of all acquisitions made by the Company as of the date hereof and are intended as a demonstrative sample of the Debtors' business.

accountability by tying the corporate organizational structure to the Company's financial results. Under this new structure, business leaders have responsibility for all aspects of their respective product-based divisional businesses, including sales, marketing, pricing, distribution, product sourcing/manufacturing, customer service and inventory management, among other areas.

### (a) Wheels, Tires, and Accessories.

The Company's historic backbone and the largest part of its business is its Wheels, Tires, and Accessories Business Unit. Wheels, Tires, and Accessories produced approximately 61% of overall Company revenue for the 2023 fiscal year. Aftermarket wheels are perhaps the most visible way to enhance a vehicle's appearance and performance, and the Company offers its customers the world's most diverse selection of industry leading and high-tech automotive wheels—including cast, forged, beadlock, multi piece, and custom wheel configurations for numerous vehicle types. The Company also offers an array of wheel-related accessories (*e.g.*, wheel locks, lug nuts, wheel caps, installation kits, and valve stems), and customization capabilities at the Company's South Carolina manufacturing facility. Prominent wheel brands include American Force, Fuel, Black Rhino, KMC, American Racing, Rotiform, Moto Metal, and U.S. Mags. The Company also distributes numerous styles of tires to match the fitment of countless standard and custom wheels. Hoonigan sells tires for various vehicles, with the primary focus being on off-road trucks. Popular tire brands include Nitto, Fuel Off-Road, and Falken Tires. Hoonigan maintains a major share of the automotive aftermarket, particularly with respect to Wheels, Tires, and Accessories. In 2023, Hoonigan's share of the entire U.S. wheels aftermarket was approximately 40-45%.

### (b) Lighting.

The Company offers a range of automotive lighting products within its Lighting Business Unit. Lighting offers HID and LED lighting kits, projectors, headlights, and associated accessories. The Company also sells premier and complete headlight and taillight upgrades, largely for the off-road market. The Company entered the lighting business in 2021 through the acquisition of Driven Lighting Group and, since that time, has added Pro Comp branded lights. The Company specializes in LED lighting bars, cubes, and headlights, under well-recognized consumer brands, such as Morimoto. The Company sells lighting products through both wholesale and direct-to-consumer channels, and utilizes Headlight Revolution, a Company-owned direct to consumer marketplace, in addition to other sales channels.

### (c) Suspension / Accessories.

Suspension systems include performance suspension systems, suspension leveling kits, as well as mid-size and complete "big lift" kit systems. These suspension systems allow clearance for bigger wheels and tires, as well as a leveled stance for factory-grade handling. The Company designs and then sources or manufactures these products, which it then sells primarily through wholesale channels, including the Company's dedicated sales and distribution network. The Company sells suspension and related products for Jeeps® and SUVs, generally through its ReadyLIFT and Teraflex brands. Additionally, the Company has manufacturing and assembly capabilities, including CNC machining as well as metal fabrication/welding. Other popular suspension-focused brands include Pro Comp, Rubicon Express, LOGIQ (Air Suspension), and Zbroz, which focuses on UTVs, ATVs, and snowmobiles. The Suspension Business Unit also manufactures and sells a diverse array of other accessories, including overland equipment, winches, and other accessories primarily through the popular Smittybilt brand.

### (d) Media / E-Commerce.

As discussed in greater detail above, the Company's Media and E-Commerce Business Unit is comprised of Hoonigan and Throtl. The Media and E Commerce Business Unit was established in 2021

with the intention of providing additional channels through which the Company could connect with its customers.

(e)    <strong>4 Wheel Parts (4WP)</strong>.

The 4WP Business Unit was acquired in 2022 and is a top retail and e-commerce provider of aftermarket parts and service for Jeeps®, light trucks, and SUVs. 4WP established a retail component to the Hoonigan brand, allowing customers to shop in store and have parts installed at the same location.

<strong>2.    Suppliers, Distribution, and Sales</strong>.

(a)    <strong>Suppliers</strong>.

Hoonigan engages with suppliers across the world to source raw materials—including aluminum, steel, and plastic—specialized component-parts, and finished goods. Approximately 80% of the Company's total suppliers are single source, often because because the supplier is the only vendor able to supply a third party's or its own branded product to the Company or the supplier manufactures specific parts for the Company under the Company's various brand names and no readily available alternative exits. Vendors that manufacture specific parts for the Company may use proprietary casts or molds, some of which the Company owns. Transitioning suppliers therefore creates significant cost and inefficiency. The Company's business features approximately 95 direct and 1,500 indirect suppliers to support its product offerings. Without continued access to, and relationships with, these suppliers, operations would be severely disrupted.

(b)    <strong>Distribution</strong>.

The Company has over 30,000 retailer relationships and 42 distribution centers, including 37 in North America and five internationally in the U.K., Australia, and Belgium. The Company also has four domestic manufacturing facilities and sixteen offices globally. Hoonigan's domestic and international operations are designed to facilitate an expeditious and seamless journey from the warehouse directly to the consumer's doorstep. In fact, North American distribution centers can deliver in-stock inventory to approximately 95% of the U.S. within 24 hours.

(c)    <strong>Sales</strong>.

Hoonigan provides a best-in-class customer experience and offers one of the best selections of premium automotive aftermarket products in the categories the Company competes in. The Company's dedicated distribution network, which enables same day or next day delivery for many of its products, provides a strong advantage when selling to dealers, wholesale distributors, e-commerce companies, and end consumers. The Company also offers sleek merchandise and entertaining digital content to its enthusiastic fans through Hoonigan.

<strong>C.    Hoonigan's Prepetition Capital Structure</strong>.

As of the Petition Date, Wheel Pros, LLC had approximately $1.75 billion in total third-party funded debt obligations (excluding the Intercompany Term Loan (as defined below)):

| Funded Debt | | |
|---|---|---|
| **Funded Debt** | **Maturity** | **Approximate Principal Amount Outstanding** |
| ABL Facility | February 2028 | $138 million |
| FILO Loans | February 2028 | $235 million |
| NewCo First Lien Loans | May 2028 | $1,004 million |
| NewCo Notes | May 2028 | $272 million |
| Legacy First Lien Loans | May 2028 | $4 million |
| **Secured Debt** | | **$1,653 million** |
| Legacy Notes | May 2029 | $93 million |
| **Total Funded Debt Obligations** | | **$1,746 million** |

     1.       **The ABL Facility**.

On May 11, 2021, the Company entered into that certain ABL Credit and Guarantee Agreement, dated as of May 11, 2021 (as amended by that certain Amendment Number One to ABL Credit and Guarantee Agreement, dated as of March 11, 2022, Amendment Number Two to ABL Credit and Guarantee Agreement, dated as of March 31, 2022, Amendment Number Three to ABL Credit and Guarantee Agreement, dated as of November 18, 2022, Amendment Number Four to ABL Credit and Guarantee Agreement, dated as of September 11, 2023 (the "Fourth ABL Amendment"), Forbearance Agreement and Amendment Number Five to ABL Credit and Guarantee Agreement, dated as of August 2, 2024, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "ABL-FILO Credit Agreement" and, the revolving credit facilities thereunder, the "ABL Facility"), by and among (a) Wheel Pros Inc., a Delaware corporation ("Wheel Pros"), as borrower, (b) Wheel Pros Intermediate, Inc., a Delaware corporation ("Wheel Pros Holdings"), (c) the other borrowers and guarantors from time to time party thereto (together with Wheel Pros and Wheel Pros Holdings, the "ABL Borrowers"), (d) each lender, swing lender, and issuing bank from time to time party thereto, (e) Deutsche Bank AG New York Branch ("DBNY"), as the joint lead arranger and joint bookrunner, and (f) Wells Fargo Bank, National Association, as the administrative agent, the collateral agent, joint lead arranger, and joint bookrunner (in such capacity, the "ABL Agent" and, together with the parties collectively in clauses (a) through (f), the "ABL Lenders" and, together with the ABL Borrowers, the "ABL Parties").

The unpaid principal amount of the ABL Facility bears interest at the *per annum* rate of SOFR plus 3.75 percent.  As of the Petition Date, the Revolver Usage (as defined in the ABL-FILO Credit Agreement) of the ABL Facility is approximately $138 million.  The ABL Facility matures on the earlier of February 10, 2028 or 91 days prior to the maturity date with respect to the NewCo First Lien Loans, NewCo Notes, and Legacy First Lien Loans.  The secured parties under the ABL Facility have Liens on substantially all the assets and property of the borrowers and guarantors with respect to the ABL Facility, including first-priority Liens on the ABL Priority Collateral (as defined in the ABL-FILO Credit Agreement, the "ABL Priority Collateral") and third-priority Liens on the Term Priority Collateral (as defined in the ABL-FILO Credit Agreement, the "Term Priority Collateral").

2.      **The FILO Loans**.

On September 11, 2023, the Company entered into the Fourth ABL Amendment by and among the ABL Parties and Alter Domus (US) LLC ("<u>Alter Domus</u>"), as agent for the FILO Term Loan Lenders (in such capacity, the "<u>FILO Term Loan Agent</u>"), pursuant to which certain financial institutions (the "<u>FILO Term Loan Lenders</u>") funded $235 million of first-in-last-out term loans (the "<u>FILO Loans</u>") pursuant to the terms set forth in the ABL-FILO Credit Agreement as amended by the Fourth ABL Amendment.

The unpaid principal amount of the FILO Loans bears interest at the *per annum* rate of SOFR plus 8.875 percent.  As of the Petition Date, the unpaid principal amount of the FILO Loans is approximately $235 million.[5]  The FILO Loans mature on the earlier of February 10, 2028 or 91 days prior to the maturity date with respect to the NewCo First Lien Loans, NewCo Notes, and Legacy First Lien Loans.  The secured parties under the FILO Loans have liens on substantially all the assets and property of the borrowers and guarantors with respect to the ABL Facility, including first-priority liens on the ABL Priority Collateral, pari passu with the ABL Facility in lien priority and subordinated to the ABL Facility via the payment waterfall in the ABL-FILO Credit Agreement with respect to such ABL Priority Collateral, and first-priority liens on the Term Priority Collateral, pari passu in lien priority with the NewCo First Lien Loans, Intercompany Term Loans, and Legacy First Lien Loans and benefiting from a turnover provision from the lenders under the NewCo First Lien Loans (the "<u>Turnover Provision</u>"), pursuant to which the lenders with respect to the NewCo First Lien Loans agree to turn over any proceeds received on account of the collateral securing the NewCo First Lien Loans until the FILO Loans are paid in full.

3.      **NewCo First Lien Loans**.

On September 11, 2023, the Company entered into that certain First Lien Term Loan Credit Agreement (as amended by that certain First Incremental Amendment to First Lien Term Loan Credit Agreement, dated as of September 22, 2023, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>NewCo First Lien Credit Agreement</u>" and, the term loans thereunder, the "<u>NewCo First Lien Loans</u>"), among WP NewCo, LLC, a Delaware limited liability company ("<u>NewCo</u>"), as borrower, WP NewCo HoldCo, LLC, a Delaware limited liability company ("<u>NewCo Holdings</u>"), as holdings, each lender from time to time party thereto (the "<u>NewCo First Lien Term Lenders</u>"), and Alter Domus, as administrative agent and collateral agent.

The unpaid principal amount of the NewCo First Lien Loans bears interest at the *per annum* rate of SOFR plus 4.5 percent.  As of the Petition Date, the unpaid principal amount of the NewCo First Lien Loans is approximately $1,004 million.  The NewCo First Lien Loans mature on May 11, 2028.  The secured parties under the NewCo First Lien Loans have (a) a first-priority Lien on substantially all assets and property of NewCo, including the Intercompany Term Loans (as defined below) (collectively, the "<u>NewCo Collateral</u>"), (b) a first-priority Lien on the Term Priority Collateral, and (c) a second-priority Lien on the ABL Priority Collateral.  The NewCo First Lien Loans are subject to the Turnover Provision. NewCo and NewCo Holdings are not guarantors of the Legacy First Lien Loans, Intercompany Term Loans, FILO Loans, or ABL Facility, and their assets, including the Intercompany Term Loans, are not included in the Term Priority Collateral or ABL Priority Collateral.

---

[5]      Pursuant to the Fourth ABL Amendment, because the Debtors commenced these Chapter 11 Cases prior to the date that is two years after September 11, 2023, the FILO Prepayment Premium (as defined in the Fourth ABL Amendment and determined in accordance therewith) also becomes due and payable as part of the outstanding obligations under the FILO Loans.

4.      **NewCo Notes**.

On September 11, 2023, the Company entered into that certain Note Purchase Agreement (as amended, supplemented or otherwise modified from time to time, the " NewCo Note Purchase Agreement" and, the notes issued thereunder, the "NewCo Notes"), among NewCo, as issuer, NewCo Holdings, as holdings, the guarantors party thereto from time to time, each Person who initially agreed to purchase the notes issued pursuant to the NewCo Note Purchase Agreement (together with subsequent holders of NewCo Notes, the "NewCo Noteholders"), and GLAS Trust Company LLC ("GLAS"), as notes agent and collateral agent.

The NewCo Notes bear interest at the fixed *per annum* rate of 6.5 percent.  As of the Petition Date, the outstanding aggregate principal amount of the NewCo Notes is approximately $272 million.   The NewCo Notes mature on May 11, 2028.  The secured parties under the NewCo Notes have (a) a second-priority Lien on the NewCo Collateral, (b) a second-priority Lien on the Term Priority Collateral, and (c) a third-priority Lien on the ABL Priority Collateral.

5.      **The Intercompany Term Loans**.

On September 11, 2023, Wheel Pros entered into that certain First Lien Intercompany Credit Agreement (as amended by that certain First Incremental Amendment to First Lien Intercompany Credit Agreement, dated as of September 22, 2023, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercompany Credit Agreement" and, the term loans thereunder, the "Intercompany Term Loans"), among Wheel Pros, as borrower, Wheel Pros Holdings, as holdings, Newco, as lender, and Alter Domus, as administrative agent and collateral agent (in such capacity, the "Intercompany Term Loan Agent").

The unpaid principal amount of the Intercompany Term Loan bears interest at the *per annum* rate of (a) SOFR plus 4.5 percent with respect to Loan Purchase Term Loans (as defined in the Intercompany Credit Agreement) and (b) 6.50 percent with respect to Note Purchase Term Loans (as defined in the Intercompany Credit Agreement).  As of the Petition Date, the unpaid principal amount of the Intercompany Term Loans is approximately $1.276 billion.  The Intercompany Term Loans mature on May 11, 2028. The secured parties under the Intercompany Term Loans have (x) a first-priority Lien on the Term Priority Collateral and (y) a second-priority Lien on the ABL Priority Collateral.

6.      **The Legacy First Lien Loans**.

On May 11, 2021, the Company entered into that certain First Lien Credit Agreement (as amended by that certain First Incremental Amendment to First Lien Term Loan Credit Agreement, dated as of September 21, 2021, that certain Amendment No. 2, dated as of June 30, 2023, that certain Amendment No. 3, dated as of September 11, 2023, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Legacy First Lien Credit Agreement" and, the term loans thereunder, the "Legacy First Lien Loans" and, together with the NewCo First Lien Loans, the "First Lien Loans"), among Wheel Pros, as borrower, Wheel Pros Holdings, as holdings, each lender from time to time party thereto, and DBNY, as administrative agent and collateral agent (in such capacity, the "Legacy First Lien Agent").[6]

---

6      DBNY has since resigned from the role of the Legacy First Lien Agent.  After DBNY's resignation, Alter Domus was appointed to handle certain administrative tasks, including processing payments pursuant to the Legacy First Lien Credit Agreement.

The unpaid principal amount of the Legacy First Lien Loans bears interest at the *per annum* rate of SOFR plus 4.5 percent.  As of the Petition Date, the unpaid principal amount of the Legacy First Lien Loans is approximately $4 million.  The Legacy First Lien Loans mature on May 11, 2028.  The secured parties under the Legacy First Lien Loans have a first-priority Lien on the Term Priority Collateral and a second-priority Lien the ABL Priority Collateral.  In September 2023, 99.7 percent of the Legacy First Lien Loans were exchanged for NewCo First Lien Loans in connection with the FILO Transaction, as discussed in greater detail herein.

### 7.     Legacy Notes.

On May 7, 2021, the Company entered into that certain Indenture (as amended, supplemented or otherwise modified from time to time, the "Legacy Notes Indenture" and, the notes issued thereunder, the "Legacy Notes"), by and between Wheel Pros, as issuer, the guarantors party thereto from time to time, and Wilmington Trust, National Association as trustee.

The Legacy Notes bear interest at the *per annum* rate of 6.5 percent.  As of the Petition Date, the outstanding aggregate principal amount of the Legacy Notes is approximately $93 million.  The Legacy Notes mature on May 15, 2029.

### 8.     Preferred Equity Interests.

The equity of Wheel Pros, LLC is 100% owned by Wheel Pros, whose ultimate parent entity is Wheel Pros Holdings, L.P., a Delaware limited partnership ("Wheel Pros Parent").  As of the Petition Date, approximately 1,018,451 of Wheel Pros Parent's Class A-1 preferred equity units (the "Class A-1 Preferred Units") and 154,859 of its Class A-2 preferred equity units (the "Class A-2 Preferred Units" and, together with the Class A-1 Preferred Units, collectively, the "Preferred Units") were issued and outstanding.  As of the Petition Date, all of the Class A-1 Preferred Units were held by the Sponsor.  Certain of the now-outstanding Class A-1 Preferred Units were issued in 2021 in connection with an approximately $120 million capital infusion provided by the Sponsor to the Company to fund certain M&A acquisitions.  Class A-2 Preferred Units were primarily held by former equityholders of the companies that were acquired by Hoonigan who "rolled over" their equity interests or re-invested their sale proceeds into Hoonigan and by current or former directors or employees that co-invested in the Company.

The Preferred Units are the most senior class of equity interests issued by Wheel Pros Parent and accrue a preferred yield at the rate of 8% per annum.

### 9.     Common Equity Interests.

As of the Petition Date, Wheel Pros Parent had approximately 97,775 Class B common units issued and outstanding (collectively, the "Common Units").  The Common Units are not listed on a national securities exchange.  All of the vested and unvested Common Units are held by current or former directors, employees, and other service providers of Hoonigan and were issued as part of Hoonigan's incentive equity plan.

## V.     EVENTS LEADING TO THESE CHAPTER 11 FILINGS.

After experiencing growth through the COVID-19 pandemic and significantly expanding its product offerings and sales channels through acquisitions and the establishment of certain new Business Units, the Company began to experience a downturn in demand in late 2021.  At the same time, the Company's cost structure was stressed by supply chain distortions and certain tariffs being placed on the Company's products.  Further, the Company's rapid series of acquisitions strained its ability to effectively

manage operations and operating costs, resulting in liquidity depleting at a higher-than-expected rate.  To navigate these macroeconomic and business challenges, the Company engaged in a series of efforts to bolster its liquidity and position itself for improved sales volumes when the post-COVID-19 demand slump and other challenges subsided.

### A.    Business Challenges.

#### 1.    Macroeconomic Shocks.

Historically, the U.S. automotive aftermarket, particularly for wheels and related products, experienced steady, controlled growth.  During the COVID-19 pandemic, however, demand spiked.  This spike, combined with Hoonigan's acquisition activity, caused the Company's revenue to grow from $844 million in 2019 to approximately $1.5 billion in 2022.  Despite manufacturing inflation and higher input costs, the overall automotive aftermarket experienced significant growth during the COVID-19 pandemic. Flushed with increased discretionary cash from COVID-19 relief, more time for leisure activity, and evolving social norms that encouraged time outside, a myriad of new consumers entered the automobile aftermarket and existing customers became remarkably active.  The COVID-19 pandemic cemented a period of substantial organic and inorganic growth for the Company, as the Company not only capitalized on interest in the sector but also sought to elevate itself as a market leader. [7]

However, as the COVID-19 pandemic abated and gave way to a sustained period of high interest rates and inflation, customer demand weakened; specifically, overall customer purchase volumes decreased across the board, and, where demand remained, it shifted to lower-market products.  Although the Company initially expected that this trend would turn around by the end of the 2023 fiscal year, the ongoing inflationary pressures and high interest rates have continued to challenge the Company's ability to effectively generate demand.

#### 2.    Supply Pressures.

During and after the COVID-19 pandemic, the Company also experienced significant strains on its supply chain infrastructure and a corresponding increase in costs.  Specifically, the COVID-19 pandemic resulted in interruptions in the production and supply of the Company's products, particularly given its large Chinese supplier base.  The COVID-19 pandemic resulted in worldwide supply chain disruptions and shortages in the availability of raw materials and labor, and a corresponding increase in related manufacturing and ocean-freight costs.  For example, between 2020 and 2022 the cost of aluminum, a vital product ingredient, almost doubled, and ocean freight costs nearly quintupled.  Further, in 2019, the U.S. government imposed 25% tariffs on wheels sourced from China, which impacted the business.  While these increased costs were born by the Company in the context of booming demand, they became unsustainable for the Company as demand waned.

#### 3.    Corporate Organization and Internal Controls.

While the Company expanded via a series of rapid brand segment acquisitions as discussed above, a challenging integration process led to certain internal inefficiencies and challenges, including related to corporate costs, culture, operating models and organizational structure, and internal controls and record-keeping processes.  Although the Company was initially able to successfully grow sales, expand its product base, and enter new sales channels, the Company struggled to integrate such acquisitions with its existing

---

[7]    According to a July 2024 third-party consumer survey, which captured approximately 700 purchasers of aftermarket wheels, 40% of respondents were Hoonigan customers.

business infrastructure, limiting the Company's visibility into detailed operational and financial performance metrics.

### 4.    On-Shoring Challenges.

In 2018 and 2020, the Company, in an effort to increase the speed at which it could bring its products to market and to reduce reliance on overseas manufacturing and ocean freight, purchased two facilities in York, South Carolina and Auburn, Alabama, respectively.  On top of the combined purchase price of approximately $12 million for these facilities, the Company invested additional capital to restart, refit, or otherwise improve operations.  However, due to operational challenges and high costs, these two facilities were never able to provide sufficient value to make them financially viable.  Ultimately, the Company was forced to divest a significant portion of its manufacturing facilities in the York location in late 2021 and close its plant in Auburn entirely in early 2023.  The costs associated with the closure of the Auburn facility also contributed to the Company's liquidity challenges.

Due to the above-mentioned factors, the Company experienced significant financial performance deterioration and liquidity constraints.  Following a banner sales year for the Company in 2022 where the Company achieved $1.5 billion in revenue, revenue fell to approximately $1.34 billion in 2023.  Between fiscal years 2021 and 2022, the Company's adjusted EBITDA dropped by $152 million and in fiscal year 2023, adjusted EBITDA dropped by an additional $23 million.

Accordingly, as of the Petition Date, the Debtors do not have sufficient liquidity to sustain operations, service funded debt obligations, and continue as a going concern without additional incremental financing and a more comprehensive deleveraging transaction to maximize the value of the enterprise for the benefit of all creditors and other key stakeholders.

### B.    Prepetition Initiatives.

### 1.    FILO Transaction.

Against the backdrop of these market challenges, significant cash interest obligations, declining liquidity, and near-term maturities, the Company viewed a comprehensive debt restructuring as the necessary next step to best position the Company for long-term success.  In connection therewith, the Company retained, among others, Kirkland & Ellis LLP ("Kirkland & Ellis") and Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to advise on potential transactions.  During the Q3 of 2023, the Company and its advisors evaluated various strategic alternatives, including balance sheet enhancement transactions.  In mid-2023, the Company and its advisors engaged with its secured lenders in earnest, providing the Company's lenders with insight into the Company's revised business plan and go-forward strategy.  The Debtors' ABL Lenders retained Morgan Lewis & Bockius LLP and Berkeley Research Group LLC as advisors.  Soon after, the Ad Hoc Group retained Akin Gump Strauss Hauer & Feld LLP and PJT Partners, Inc. as advisors.  The Company and its advisors began facilitating a due diligence process and engaged in extensive restructuring discussions with the Ad Hoc Group to build consensus around a deleveraging solution.

In September 2023, after months of arm's-length negotiations, the Company entered into the FILO Transaction.  This involved both a discounted exchange of $1.4 billion of existing funded debt obligations and $235 million of new-money financing in the form of the FILO Loans. The FILO Transaction provided the Company with both maturity relief and significant incremental liquidity.

### 2.    Operational Restructuring.

Despite bolstering its balance sheet through the FILO Transaction, the Company's operational challenges continued, as noted above, and EBITDA significantly underperformed projections.  In an effort to right the ship, the Company installed new executive leadership, which leveraged their substantial experience to address (i) the market conditions that developed in the post-pandemic era, (ii) the Company's internal challenges integrating acquired businesses, and (iii) significant liquidity challenges.  The Company implemented several operational changes to strengthen its internal controls—particularly with respect to accounting—and to maintain key business relationships to position itself for success once demand returned to pre-COVID-19 levels.  The Company aggressively curtailed costs (including both discretionary and budgeted expenses) to stabilize the Company while focusing on improving internal processes, switching the Company's operating model to a product-based model, divesting non-core and underperforming assets, and directing resources to a few key growth areas.  These initiatives built on the Company's previous efforts to simplify its real estate portfolio, including by consolidating the former 4WP headquarters and warehouse in Los Angeles with another warehouse in Buena Park, and divesting approximately 70 4WP locations.  These efforts, collectively, generated an annualized run-rate EBITDA improvement of $39 million in FY 2023.

Additionally, in the months following the FILO Transaction, the Company implemented certain changes to its products and sales channels to improve and broaden its offerings and generate customer demand.  In March 2024, it launched a revamped Dealerline online order platform to (a) boost sales through an improved customer experience and (b) lower operating costs.  Dealerline allows retailers and installers to view inventory levels and conveniently research, acquire, and pay for products, along with managing their account.  The Company also implemented a strategy to revitalize certain dormant and underinvested brands (*e.g.*, Smittybilt, Pro Comp, and Rubicon Express) to improve sales and brand affinity.

These initiatives culminated in increased gross margins across the Company's Business Units.  The improvements in gross margins have been aided by steady reductions in aluminum and ocean freight prices, and other reduced input costs, as supply chain distortions have lessened and the rate of inflation has decreased.  Hoonigan's operating costs are also projected to further decline due to the potential divestment of certain underperforming Business Units.

However, despite the positive momentum in the Company's performance, the prolonged market downturn and heightened operating expenses contributed to the need for additional liquidity sooner than expected despite the FILO Transaction, and it was not certain that the Company could timely satisfy all upcoming interest payments.  In April 2024, the Company began passively negotiating with certain of its stakeholders, including the Sponsor, regarding a liquidity-enhancing transaction.  Ultimately, the Company zeroed-in on negotiations with the Ad Hoc Group, a crossover group holding debt across the capital structure; SVP, the largest Holder of NewCo First Lien Loans and NewCo Notes; and the other Consenting Stakeholders regarding the terms of a capital infusion and/or alternative liability management exercise.  The Company and its stakeholders also held preliminary discussions about non-core asset sales.  However, despite extensive discussions and diligence provision, the Company and its stakeholders were unable to agree on certain material transaction terms at this time.  Accordingly, the Company and its stakeholders pivoted to considering a potential in-court or alternative out-of-court restructuring.

### 3.    Formation of the Special Committee.

On July 2, 2024, to ensure a thorough and fair process with respect to the Debtors' review of strategic alternatives and potential conflict matters, the board of directors of Wheel Pros Holdings and the board of directors of Wheel Pros. Inc. (the "Boards" and, each, a "Board") each formed a special committee (each a "Special Committee"), comprised of the disinterested director (the "Disinterested Director").

Jonathan F. Foster joined the Boards as the Disinterested Director in July 2024. On that same day, Mr. Foster was further appointed to the newly created Special Committee. The Special Committee was formed to consider, evaluate, and negotiate financing transactions, restructuring transactions, and/or other strategic alternatives for the Company and its stakeholders, including the possibility of undertaking a strategic restructuring, financing, and/or any sale transaction. The Boards delegated to the Special Committee the authority to review, develop, investigate, negotiate, and to the extent of any conflicts, approve entry into the Restructuring Transactions on behalf of the Company. The Boards further delegated to the Special Committee the authority to conduct an independent investigation and assess the merits and potential value of any potential claims and Causes of Action held by the Company against any related party or otherwise related to any conflicts matter. The Special Committee has retained Cole Schotz P.C. to assist with its independent investigation.

**4.** **Forbearance Agreement**.

To facilitate further solution-oriented discussions between the parties, on August 2, 2024, (i) the Debtors and the lenders party thereto entered into that certain Forbearance Agreement and Amendment Number Five to ABL Credit and Guarantee Agreement with respect to ABL-FILO Credit Agreement, and (ii) the Debtors and the lenders party thereto entered into that certain Forbearance Agreement with respect to the NewCo First Lien Credit Agreement and the Intercompany Credit Agreement (each, a "Forbearance Agreement" and, together, the "Forbearance Agreements"), whereby the parties agreed to forbear from the exercise of any rights and remedies through and including August 28, 2024 with respect to any existing defaults or events of default, such as with respect to the non-payment of interest under the ABL-FILO Credit Agreement and NewCo First Lien Credit Agreement, among other things. The lenders continued to provide forbearance relief by agreeing to extend deadlines and waive other requirements though the Petition Date. Further, the Forbearance Agreements set forth (a) enhanced reporting requirements and information rights, including the provision of substantial Company information related to operations to certain of the Company's lenders; (b) certain budget, variance, and financial disbursement mandates and restrictions; (c) further information rights related to any prospective 4WP sale; and (d) certain milestones related to the Restructuring Transactions.

With the Forbearance Agreements in-hand, the Company, with the assistance of its advisors and the support of the Sponsor, diligently engaged in further advanced turnaround discussions and arms-length negotiations with the ABL Lenders, the Ad Hoc Group, and SVP, among certain other stakeholders. The goal of such discussions remained exploring out-of-court restructuring alternatives centered around a liquidity-enhancing and balance sheet-strengthening transaction. Unfortunately, any out-of-court restructuring or incremental financing raise remained unactionable, and the Company fully pivoted toward a comprehensive in-court restructuring transaction. This pathway culminated in execution of the RSA.

**VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES**.

**A.    First Day Relief**.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors intend to file several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge upon written or other request to the Solicitation Agent by: (a) emailing the Solicitation Agent at TeamWheelPros@Stretto.com with a reference to "Hoonigan" in the subject line; (b) visiting the Debtors' restructuring website when made public;

or (c) calling the Solicitation Agent toll-free at (855)-371-7511 or (714)-716-1978 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases by visiting the Bankruptcy Court's website at https://www.deb.uscourts.gov or the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours 8:00 a.m. to 4:00 p.m., prevailing Eastern Time.

       **B.**       **Proposed Confirmation Schedule**.

       Under the RSA, the DIP ABL Credit Agreement, and the DIP Term Loan Credit Agreement, the Debtors agreed to certain case milestones to ensure an orderly and timely implementation of the Restructuring Transactions.  It is imperative that the Debtors proceed swiftly to Confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs.  Expeditious Confirmation of the Plan and Consummation of the Restructuring Transactions is in the best interests of the Debtors, their Estates, and their stakeholders.

       Pursuant to the agreed upon milestones, the Debtors must obtain Confirmation of the Plan within sixty (60) days of the Petition Date.  Accordingly, the Debtors have proposed the following key case dates, subject to Court approval and availability:[8]

---

[8]    The key case dates set forth in the table below are illustrative and subject to change based on the Petition Date.

| Event | Date/Timing |
|---|---|
| Voting Record Date | September 4, 2024 |
| Commencement of Solicitation | September 8, 2024 |
| Petition Date | September 8, 2024 |
| Plan, Disclosure Statement, and Solicitation Materials to be filed with the Bankruptcy Court | September 8, 2024 |
| First Day Hearing | September 10, 2024 |
| Entry of the Interim DIP Order | September 12, 2024 |
| Initial Plan Supplement Deadline | October 3, 2024 |
| Voting Deadline<br>Objection Deadline<br>Opt-Out Deadline<br>Election Deadline<br>Initial Registration Deadline | October 10, 2024, at 4:00 p.m., prevailing Eastern Time |
| Confirmation Hearing | October 17, 2024 |
| Entry of the Final DIP Order | October 17, 2024 |
| Effective Date | December 9, 2024 (Outside Date) |

## VII.    THE DEBTORS' RSA AND PLAN.

### A.    Recapitalization Negotiations and the RSA.

#### 1.    Recapitalization Negotiations.

As discussed above, despite the positive momentum in the Company's performance, the Company needed additional support from its stakeholders to get through the 2024 trough.  On April 11, 2024, the Debtors retained Houlihan Lokey, as investment banker, and on July 25, 2024, the Debtors retained Kirkland & Ellis, as legal counsel, to advise on prospective solutions.  The Company's preliminary engagement with the Ad Hoc Group and other stakeholders centered around the terms of a capital infusion and/or alternative financing transaction, including potential sales of non-core assets to inject additional liquidity into the business and extend runway.  Ultimately, the Company and its stakeholders were unable to agree on terms of an incremental financing raise, and given the Company's constrained liquidity position, pivoted to considering an equitization transaction.

Since the pivot to restructuring discussions, the Debtors, with the assistance of their advisors and the support of the Sponsor, have diligently engaged in detailed turnaround discussions and arms'-length negotiations with the ABL Lenders, the Ad Hoc Group, and SVP.  As such negotiations progressed, as further discussed above, the Company entered into respective forbearance agreements with the ABL Lenders, the Ad Hoc Group, and SVP, pursuant to which the applicable lenders committed to forbear from exercising certain remedies through the Petition Date.

#### 2.    The RSA.

These efforts culminated in the RSA, attached hereto as **Exhibit B**, which the Debtors, the Ad Hoc Group, SVP, and the Sponsor executed on September 8, 2024.  Pursuant to the RSA, the Consenting Stakeholders and the Debtors agreed, subject to the terms and conditions thereof, to support a recapitalization transaction that will:  (a) allow the Debtors to successfully emerge from chapter 11 with a

rightsized balance sheet and poised to capitalize on their operational initiatives; (b) resolve Company liabilities in a manner that maintains the Debtors' ability to deliver their valuable products and content to their customer base, including by paying trade claims in full through the duration of the Chapter 11 Cases; and (c) provide DIP financing and exit capital to support the Company during the chapter 11 proceedings and as a going-concern upon emergence.  Such Restructuring Transactions are embodied in the Plan—on which the Company will launch solicitation contemporaneously with the delivery of this Disclosure Statement to the Voting Classes.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan shall govern.

With a deal in hand, the Debtors will commence these Chapter 11 Cases to gain access to the DIP ABL Facility and DIP Term Loan Facility and implement the terms of the RSA.  The Debtors are committed to consummating the comprehensive recapitalization transaction embodied in the RSA and emerging from these Chapter 11 Cases with a stronger balance sheet and the financial flexibility to continue providing their customers with top-tier service into the future.  This transaction is supported by creditors throughout the Debtors' capital structure and would allow the Debtors to emerge quickly from chapter 11.  It is critical that the Debtors move through their chapter 11 process as efficiently as possible to limit the administrative cost and burden on the Debtors' businesses imposed by the chapter 11 process.  Upon emergence from chapter 11, the Debtors will have a stronger balance sheet and increased flexibility to conduct their operations and invest in the enterprise going forward.  For detailed information on the terms of the RSA, see Article II of this Disclosure Statement.

## B. The Plan.

The Plan contemplates the following key terms, among others described herein and therein:

### 1. General Settlement of Claims and Interests.

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  To the greatest extent permissible under the Bankruptcy Code, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.  Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall be deemed to release, waive, compromise, settle, impair, or enjoin any Non-Released Claims against any Non-Released Party.

### 2. Restructuring Transactions.

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors (with the consent of the Required Consenting NewCo First Lien Lenders) or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and are authorized in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of

36

merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the RSA; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable Corporate Governance Documents; (4) the issuance and distribution of the New Equity Interests; (5) reservation of the MIP Shares (only if determined prior to the Effective Date by the Required Consenting NewCo First Lien Lenders); (6) the consummation of the Exit Facilities, including the execution, delivery, and filing of all Exit Facility Documents; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (8) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

To the extent not previously authorized pursuant to a Final Order, the Debtors shall consummate the 4WP Sale and Poison Spyder Sale. The Debtors or the Reorganized Debtors, as applicable, may take any additional action as may be necessary or appropriate to effectuate the 4WP Sale and Poison Spyder Sale, and any transactions described in, approved by, contemplated by, or necessary to effectuate the 4WP Sale and Poison Spyder Sale.

The Confirmation Order shall, and shall be deemed to, pursuant to both sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Stakeholders, as applicable, to undertake the Restructuring Transactions contemplated by the Plan, the RSA, and the other Definitive Documents.

### 3.      The Reorganized Debtors.

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Corporate Governance Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein or as otherwise provided for in the Restructuring Transactions Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital, including issuing additional New Equity Interests and obtaining additional financing, subject to, the terms of the Corporate Governance Documents, as the New Board deems appropriate.

4.        **Sources of Consideration for Plan Distributions**.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with:  (1) the Debtors' Cash on hand as of the Effective Date; (2) the proceeds from the Exit Term Loan Facility; and (3) the New Equity Interests.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Equity Interests, will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Plan.

(a)        **Use of Cash**.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Exit Facilities to fund distributions to Holders of Allowed Claims, consistent with the terms of the Plan.

(b)        **New Equity Interests**.

(i)        *Issuance of the New Equity Interests*.

Reorganized Parent shall be authorized to issue the New Equity Interests pursuant to its Corporate Governance Documents.  The issuance of the New Equity Interests, including equity awards reserved for the MIP, shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors.  On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Restructuring Transactions Memorandum pursuant to, and in accordance with, the Plan.

All of the shares (or comparable units) of New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of New Equity Interests (including the New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium and, to the extent determined prior to the Effective Date by the Required Consenting NewCo First Lien Lenders, the MIP) shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Corporate Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  As a condition to receiving the New Equity Interests, all recipients of New Equity Interests pursuant to the MIP and the Exit Term Loan Facility, shall be required to execute and deliver the New Investor Agreement; *provided*, *however*, that acceptance of such New Equity Interests constitutes deemed acceptance and consent to the terms of the New Investor Agreement, without the need for execution by any party thereto.  For the avoidance of doubt, the Reorganized Debtors, with the consent of the Required Consenting NewCo First Lien Lenders, may waive the requirement to receive an executed signature page to the New Investor Agreement.  The New Investor Agreement will be effective as of the Effective Date, and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Equity Interests will be bound thereby in all respects.  The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of DTC.  Additional information relating to the applicability of the securities law is available in Article IV.M of the Plan.

       **(c)**       **Exit Facilities and Exit Term Loan Facility Participation**.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, as applicable, pursuant to the Exit Facility Documents. Confirmation of the Plan shall constitute (a) approval of the Exit Facilities and the Exit Facility Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Exit Facilities, including executing and delivering the Exit Facility Documents, in each case, without any further notice to or order of the Bankruptcy Court.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the Exit Facility Documents:  (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  To the extent provided in the Exit Facility Documents, the Exit Term Loan Facility Agent and the Exit ABL Facility Agent, as applicable, are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Exit Term Loan Facility Agent and the Exit ABL Facility Agent, as applicable, shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The guarantees granted under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

The Exit Term Loan Facility Participation shall be backstopped by the Exit Term Loan Facility Backstop Parties on the terms set forth in the Exit Term Loan Facility Backstop Commitment Letter, which shall provide for, among other things, on a Pro Rata basis to each Exit Term Loan Facility Backstop Party, the Exit Term Loan Facility Backstop Commitment Premium.  In exchange for consideration consisting of the Exit Term Loan Facility Backstop Commitment Premium and in accordance with the Exit Term Loan Facility Backstop Commitment Letter, the Exit Term Loan Facility Backstop Parties have committed to fully backstop, severally and not jointly, the Exit Term Loan Facility.  Each Exit Term Loan Facility Participant shall fund its Pro Rata share of the Exit Term Loan Facility and receive its Pro Rata share of the Exit Term Loan Facility.  The Exit Term Loan Facility shall be used to satisfy, among other things: distributions pursuant to the Plan.

       **5.**       **Corporate Existence**.

Except as otherwise provided in the Plan, the Confirmation Order, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction

in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the RSA and the consent rights therein, the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**6.      Vesting of Assets in the Reorganized Debtors**.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

**7.      Cancellation of Existing Securities Agreements, and Interests**.

On the Effective Date, except to the extent otherwise provided in the Plan or the Confirmation Order (including to the extent any DIP ABL Claim is, with the consent of the DIP ABL Agent, the DIP ABL Lenders, and the Required Consenting NewCo First Lien Lenders, refinanced and/or converted into the Exit ABL Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (other than those Reinstated Claims) or Existing Equity Interests, shall, be cancelled, and all present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), and any non-Debtor Affiliates thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action, and the Agents/Trustees and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder.

Holders of or parties to such cancelled instruments, Existing Equity Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancellation thereof, except the rights provided for or reserved pursuant to the Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI of the Plan, the Funded Debt Documents and DIP Documents shall continue in effect after the Effective Date to the extent necessary to:  (a) permit Holders of Claims under the Funded Debt Documents and DIP

Documents to receive and accept their respective distributions on account of such Claims, if any; (b) permit the Disbursing Agent or the Agents/Trustees, as applicable, to make distributions on account of the Allowed Claims under the Funded Debt Documents and DIP Documents; (c) preserve any rights of the Agents/Trustees, to maintain, exercise, and enforce any applicable rights of indemnity, expense reimbursement, priority of payment, contribution, subrogation, or any other similar claim, or entitlement (whether such claims accrued before or after the Effective Date), and preserve any exculpations of the Agents/Trustees, all of which shall remain fully enforceable against the Reorganized Debtors and all other applicable Persons under the Funded Debt Documents and DIP Documents; (d) permit the Agents/Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce the respective obligations owed to them under the Plan and to enforce any obligations owed to their respective Holders of Claims under the Plan in accordance with the applicable Funded Debt Documents and DIP Documents; and (e) permit the Agents/Trustees to perform any functions that are necessary to effectuate the foregoing; *provided, however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan (including clause (c) of the preceding proviso), and (2) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions made under the Plan.  For the avoidance of doubt, the DIP Documents shall continue in full force and effect (other than any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any contingent or unsatisfied obligations and any other provisions that expressly survive the termination of the DIP ABL Facility or the DIP Term Loan Facility in accordance with the terms of the DIP Documents.

If the record holder of any NewCo Notes Claims or Legacy Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and such underlying Securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of NewCo Notes Claims or Legacy Notes Claims shall be deemed to have surrendered such Holder's Securities underlying such NewCo Notes Claims or Legacy Notes Claims upon surrender of such global security by DTC or such other securities depository or custodian thereof.

**8.**      **Corporate Action**.

Upon the Effective Date, all actions contemplated under the Plan (including the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable:  (1) adoption or assumption, as applicable, of the Compensation and Benefits Programs and all obligations related thereto; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Corporate Governance Documents, including the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions; (5) the entry into the Exit Facility Documents and the execution, delivery, and filing of any documents pertaining thereto; (6) the consummation of the Exit Term Loan Facility Participation; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the Corporate Governance Documents (including the New Investor Agreement); (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (10) the reservation of the MIP Shares; and (11) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members

41

directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Exit Financing Loans, the Corporate Governance Documents, any other Definitive Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

**9.      Corporate Governance Documents**.

On or immediately prior to the Effective Date, except as otherwise provided in the Plan and subject to local Law requirements, the Corporate Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet, and as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy, each of the Reorganized Debtors will file its Corporate Governance Documents with the Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The Corporate Governance Documents will, among other things (a) authorize the issuance of the New Equity Interests and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the Laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, Reorganized Parent shall enter into and deliver the New Investor Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Holders of New Equity Interests shall be deemed to have executed the New Investor Agreement and be parties thereto, without the need to deliver signature pages thereto.

**10.     New Investor Agreement**.

From and after the Effective Date, all holders of New Equity Interests shall be subject to the terms and conditions of the New Investor Agreement.

**11.     Directors and Officers of the Reorganized Debtors**.

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Company Parties shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the Corporate Governance Documents.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Corporate Governance Documents and other constituent documents of the Reorganized Debtors.

12.    **Effectuating Documents; Further Transactions**.

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit Facility Documents entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

13.    **Certain Securities Law Matters**.

Before the Petition Date the offering of any New Equity Interests shall be exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

After the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Equity Interests as contemplated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The shares of New Equity Interests to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Equity Interests in the Corporate Governance Documents.

The shares of New Equity Interests that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Equity Interests in the Corporate Governance Documents.

Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Equity Interests.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the New Equity Interests) with respect to the treatment of the New Equity Interests to be issued under the Plan under applicable securities laws.  DTC and any transfer agent for the New Equity Interests shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry

delivery, settlement, and depository (to the extent applicable). Notwithstanding anything to the contrary in the Plan, no Entity (including DTC and any transfer agent for the New Equity Interests) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity Interests to be issued under the Plan are exempt from registration.

14.    **Section 1146 Exemption**.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Equity Interests, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities, or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

15.    **Private Company**.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Equity Interests shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Equity Interests on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the Corporate Governance Documents.

16.    **Director and Officer Liability Insurance**.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise adversely affect the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.  The New Equity Interests underlying the MIP will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and will be considered "restricted securities."  For additional information, see Article IV.M of the Plan.

### 17.   Cashless Transactions.

Notwithstanding anything to the contrary set forth in the Plan, the treatment of Claims, distributions, and other transactions contemplated in the Plan including, without limitation, the funding of the Exit Term Loan Facility, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

## VIII.   OTHER KEY ASPECTS OF THE PLAN.

### A.   Treatment of Executory Contracts and Unexpired Leases.

### 1.   Assumption of Executory Contracts and Unexpired Leases.

Each Executory Contract and Unexpired Lease shall, subject to the consent of the Required Consenting NewCo First Lien Lenders be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease was (a) previously assumed, amended and assumed, assumed and assigned, or rejected by the applicable Debtors; (b) previously expired or terminated pursuant to its own terms; or (c) is the subject of a motion to reject such Executory Contract or Unexpired Lease that is pending on the Effective Date; *provided, however*, that neither the Restructuring nor the transactions contemplated by the Plan will constitute a change of control or other acceleration event for purposes of any Executory Contract or Unexpired Lease of the Debtors.  The assumption of Executory Contracts and Unexpired Leases under the Plan may include the assignment of certain of such contracts to Affiliates, the 4WP Buyer, or the Poison Spyder Buyer.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise specifically set forth in Article V.A of the Plan, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided in the Plan or agreed to by the Debtors (with the consent of the Required Consenting NewCo First Lien Lenders, which consent shall not be unreasonably withheld, delayed, or conditioned) and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related

thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

## 2.     Indemnification Obligations.

Subject to the treatment of Section 510(b) Claims under the Plan, and to the fullest extent permitted under applicable Law (including being subject to the limitations of the Delaware General Corporation Law, including the limitations contained therein on a corporation's ability to indemnify officers and directors), with the exception of any indemnification obligations owed to any Non-Released Party owed in respect of the Non-Released Claims, all indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date; *provided* that nothing in the Plan shall expand any of the Debtors' indemnification obligations in place as of the Petition Date or constitute a finding or conclusion that any party that may seek indemnification is entitled to indemnification under the terms of such indemnification provisions or is intended to effectuate the survival of any indemnification obligations for any party other than the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors; *provided, further*, that indemnification obligations of Non-Released Parties with respect to the Non-Released Claims shall not be honored. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. Notwithstanding anything

to the contrary in the Plan, if any Releasing Party (including its successors and assigns, including, without limitation, any estate, receiver, trustee, debtor in possession, or other Person), including the Reorganized Debtors, seeks to pursue any Non-Released Claim against a Non-Released Party which results in any Claim, including a Claim for indemnification, against any Released Party, each Releasing Party, including the Reorganized Debtors, agrees that it shall not pursue or recover any funds, property, or other value received, awarded, or arising from settlement, judgment, or other resolution of such actual or threatened Non-Released Claim and if so pursued or recovered shall assign any such recoveries exclusively to, and hold them in trust exclusively for, such Released Party,

### 3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before twenty (20) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however,* that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to File such request for payment of such Cure costs. The Reorganized Debtors also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. Any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or such other setting as requested by the Debtors for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after (1) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (2) as may be agreed upon by the Debtors (with the consent of the Required Consenting NewCo First Lien Lenders) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors (with the consent of the Required Consenting NewCo First Lien Lenders) and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and**

**expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases (if any).

          **4.**       **Insurance Policies**.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

          **5.**       **Reservation of Rights**.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors (with the consent of the Required Consenting NewCo First Lien Lenders) or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

          **6.**       **Nonoccurrence of Effective Date**.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

          **7.**       **Employee Compensation and Benefits**.

          **(a)**       **Compensation and Benefits Programs**.

Except as otherwise set forth in the Plan, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall assume all Employment Agreements, which shall thereafter be assigned to Reorganized Parent. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for: (a) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests, Existing Equity Interests, or New Equity Interests, which shall not constitute or

be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (b) Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and (c) Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

A counterparty to a Compensation and Benefits Program assumed pursuant to the Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)); *provided*, *however*, that any assumption of Compensation and Benefits Programs pursuant to the Plan or any of the Restructuring Transactions shall not (i) trigger or be deemed to trigger any change of control, change in control immediate vesting, termination, or similar provisions therein or (ii) trigger or be deemed to trigger an event of "Good Reason" (or a term of like import) as a result of the Consummation of the Restructuring Transactions or any other transactions contemplated by the Plan.

**(b)      Workers' Compensation Programs**.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided, further*, that nothing in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy Law.

**8.      Contracts and Leases Entered Into After the Petition Date**.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**B.      Provisions Governing Distributions**.

**1.      Timing and Calculation of Amounts to Be Distributed**.

Unless otherwise provided in the Plan, on, or as soon as reasonably practicable thereafter, the Effective Date (or, if a Claim or Interest is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, as applicable, shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Allowed Claims shall not be

entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.B of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

### 2.      Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent. Distributions under the Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

### 3.      Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 4.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### (a)      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable). Unless otherwise provided in a Final Order from the Bankruptcy Court, if a Claim is transferred twenty or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)        **Delivery of Distributions in General**.

Except as otherwise provided in the Plan or in the Plan Supplement, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, which shall receive distributions in accordance with the applicable procedures of DTC.

(c)        **Minimum Distribution; No Fractional Distributions**.

No cash payments of less than $250 or, in the discretion of the Reorganized Debtors, a distribution and issuance of New Equity Interests to any single Holder of Allowed Claims whose aggregate sum of New Equity Interests to be distributed to such holder would be worth less than $250 value shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. No fractional shares of New Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim, as applicable, would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Equity Interests to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.

(d)        **Undeliverable Distributions and Unclaimed Property**.

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent is notified in writing of such Holder's (or its designee, as applicable) then-current address or other necessary information for delivery (including all signatures, certificates, and other documents that are required of the Holder to receive such distribution), at which time such distribution shall be made to such Holder (or its designee, as applicable) on the next Distribution Date without interest. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VI.D.4 of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution or remains undeliverable (including due to such Holder not delivering all signatures, certificates, and other documents that are required of the Holder to receive such distribution) for a period of ninety (90) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of New Equity Interests, such New Equity Interests shall be

cancelled unless determined otherwise by the New Board. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. The Disbursing Agent shall adjust the distributions of New Equity Interests to reflect any such cancellation.

### 5. **Surrender and Cancelled Instruments or Securities**.

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder (and the applicable Agents for such Holder, including the Agents/Trustees) of a certificate or instrument evidencing a Claim or an Equity Interest that has been cancelled in accordance with Article IV.G of the Plan, shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and any non-Debtor Affiliates, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under the Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in the Plan, the foregoing shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

### 6. **Manner of Payment**.

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, all distributions of the New Equity Interests to the Holders of the applicable Allowed Claims (or its designees, as applicable), in each case if any, under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

All distributions of Cash to the Holders of the applicable Allowed Claims, in each case if any, under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

At the option of the Disbursing Agent, any Cash payment to be made under to the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### 7. **Indefeasible Distributions**.

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback or turnover provisions.

### 8. **Compliance with Tax Requirements**.

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate (subject to reasonable consultation with the Required Consenting NewCo First Lien Lenders).

The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 9. Allocations.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 10. No Postpetition Interest on Claims.

Unless otherwise specifically provided for in the DIP Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### 11. Foreign Currency Exchange Rate.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Petition Date.

### 12. Setoffs and Recoupment.

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.F of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 13. Claims Paid or Payable by Third Parties.

#### (a) Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action,

order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within five (5) Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five (5) Business Day grace period specified above until the amount is fully repaid.

**(b)      Claims Payable by Third Parties**.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c)      Applicability of Insurance Policies**.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained in the Plan (including Article III of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**C.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**.

**1.      Disputed Claims Process**.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to, the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Except for Proofs of Claim permitted by the DIP Orders, all Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors or Reorganized Debtors. Except for Proofs of Claim permitted by the DIP Orders, upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in the Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided in the Plan, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 2. Allowance of Claims.

After the Effective Date and subject to the terms of the Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors, with the consent of the Required Consenting NewCo First Lien Lenders, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law.

### 3. Claims Administration Responsibilities.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable non-bankruptcy Law. If the Debtors or Reorganized Debtors, as applicable, dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all Claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

### 4. Estimation of Claims.

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions),

and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

### 5. Adjustment to Claims without Objection.

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Plan) on the Claims Register by the Reorganized Debtors or the Solicitation Agent without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 6. Disallowance of Claims.

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### 7. No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount pending resolution of the dispute.

### 8. Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### D. Conditions Precedent to Confirmation and Consummation of the Plan.

### 1. Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

- the RSA shall not have been terminated as to all parties thereto and shall be in full force and effect and all conditions shall have been satisfied or waived thereunder, and there shall be no breach that would, after the expiration of any applicable notice or cure period, give rise to a right to terminate the RSA as to all parties thereto;

- the Exit Term Loan Facility Backstop Commitment Letter shall be in full force and effect and all conditions shall have been satisfied or waived thereunder, and there shall be no breach that would, after expiration of any applicable notice or cure period, give rise to a right to terminate the Exit Term Loan Facility Backstop Commitment Letter;

- the Bankruptcy Court shall have entered the DIP Orders, and Final DIP Order shall be in full force and effect;

- the Bankruptcy Court shall have entered the Confirmation Order, which shall be consistent with the RSA and the Confirmation Order shall have become a Final Order in form and substance acceptable to (i) the Debtors, the Required Consenting NewCo First Lien Lenders, (ii) solely to the extent relating to the DIP ABL Facility and the DIP Term Loan Facility, reasonably acceptable to the DIP ABL Agent and DIP Term Loan Facility Agent, as applicable; (iii) solely to the extent relating to the Exit Facilities, reasonably acceptable to the Exit ABL Facility Agent, Exit Term Loan Facility Agent, and Exit Term Loan Facility Required Backstop Parties, as applicable; and (iv) solely relating to the releases provided pursuant to the Restructuring Transactions or any provisions that directly and adversely impact the Sponsor, reasonably acceptable to the Sponsor;

- all fees, expenses, and premiums payable pursuant to the Exit Term Loan Facility Backstop Commitment Letter and the RSA shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

- all fees, expenses, and premiums payable pursuant to the DIP Orders shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

- all fees, expenses, and premiums payable pursuant to the Exit Facility Documents shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

- the 4WP Sale shall have been consummated in accordance with the terms of the 4WP Purchase Agreement;

- the Definitive Documents shall (i) be consistent with the RSA and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the RSA, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall have been adopted on terms consistent with the RSA;

- there shall not be in effect any order by a governmental authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the Consummation of the Plan, the Restructuring Transactions, the RSA, or any of the Definitive Documents;

- the New Equity Interests, including the New Equity Interests on account of the Exit Term Loan Facility Backstop Commitment Premium, shall have been issued;

- the Debtors and the Consenting Creditors to the extent applicable shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Plan;

- the organizational documents of the Reorganized Debtors shall have been adopted in a manner consistent in all respects with the Plan and the RSA and the consent rights contained in the Plan and the RSA;

- the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the RSA and the Plan;

- the Debtors shall have paid the Restructuring Expenses; and

- all professional fees and expenses of retained professionals that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the approval of such fees and expenses by the Bankruptcy Court.

The conditions to the Effective Date set forth in Article IX of the Plan may be waived only if waived in writing (email from counsel shall suffice) by the (i) Debtors and (ii) the Required Consenting NewCo First Lien Lenders; and, solely to the extent such party's consent is required in Article IX.A of the Plan, the following:  (i) solely with respect to clause (A)(4) of Article IX of the Plan, the Sponsor; (ii) solely with respect to clauses (A)(4) and (A)(7) of Article IX of the Plan, the Exit ABL Facility Agent, Exit Term Loan Facility Agent, and Exit Term Loan Facility Required Backstop Parties; and (iii) solely with respect to clauses (A)(3), (A)(4), and (A)(6) of Article IX of the Plan and relating to the fees, expenses, and premiums arising under the DIP Orders, or the DIP Orders, the DIP Agents, or other applicable Agent (solely with respect to their own fees and expenses); each without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### 2.  Effect of Failure of Conditions.

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the RSA, the Plan, or this Disclosure Statement shall: (1) constitute a waiver or release by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

### E.  Modification, Revocation, or Withdrawal of the Plan.

### 1.  Modification and Amendments.

Except as otherwise specifically provided in the Plan and subject to the RSA and the consent rights set forth therein, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any such modification, whether material or immaterial, shall be acceptable in form and substance to (a) the Required Consenting NewCo First Lien Lenders, (b) if such modification relates to the DIP ABL Facility, the DIP ABL Agent, and (c) if such modification relates to the Exit Facilities, the Exit ABL Facility Agent and Exit Term Loan Facility Required Backstop Parties, as applicable.   Subject to those restrictions on modifications set forth in the Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to

so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### 2. Effect of Confirmation on Modifications.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the Solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal of Plan.

To the extent permitted by the RSA and subject to any consent rights set forth therein, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

### F. Other Claims and Interest Classification and Treatment Features.

### 1. Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan or the Plan Supplement shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 2. Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 3. Voting Classes, Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class votes to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### 4. Intercompany Interests.

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition

corporate structure, for the ultimate benefit of the Holders of the New Equity Interests in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, unless otherwise set forth in the Restructuring Transactions Memorandum, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

**5.  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan and the terms of the RSA and the Exit Term Loan Facility Backstop Commitment Letter (including the consent rights provided therein) to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**6.  Controversy Concerning Impairment**.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**7.  Subordinated Claims and Interests**.

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## IX.  RISK FACTORS.

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

A.      **Bankruptcy Law Considerations**.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan, but will not necessarily affect the validity of the vote of the Voting Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

1.      **There Is a Risk of Termination of the RSA**.

The RSA contains provisions that give the signatories thereto (collectively or individually, as applicable) the ability to terminate the RSA upon the occurrence of certain events or if certain conditions are not satisfied, including the Debtors' failure to use commercially reasonable efforts to achieve the Milestones set forth therein.  To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of DIP funding and/or cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.  In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

2.      **The Debtors May Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**.

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

3.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Although the Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code, once any Chapter 11 Cases have been commenced, a Holder could challenge the classification. In such event, the cost of the Plan and the time needed to confirm the Plan may increase, and the Debtors cannot be sure that the Bankruptcy Court will agree with the Debtors' classification of Claims and Interests. If the Bankruptcy Court concludes that either or both of the classification of Claims and Interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require a resolicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors classification of Claims and Interests is not appropriate.

4.      **The Bankruptcy Court Might Not Approve the Debtors' Use of Cash Collateral or the DIP Facilities**.

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the prepetition secured creditors, as applicable, and in accordance with the terms of the RSA. Such access to postpetition financing and cash collateral will provide necessary liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve the debtor-in-possession financing and/or such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

5.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur**.

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

6.      **The Debtors Could Fail to Satisfy Vote Requirements**.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other

transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 7. The Debtors Might Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them or Interests would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 8. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

63

9.      **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products, and increasing expenses. *See* Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

10.     **The Bankruptcy Court Could Find the Solicitation of Acceptances Inadequate**.

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable non-bankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the

requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**11.    The Chapter 11 Cases Could Be Converted to Cases under Chapter 7 of the Bankruptcy Code**.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**12.    One or More of the Chapter 11 Cases May Be Dismissed**.

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

**13.    The Debtors May Object to the Amount or Classification of a Claim**.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**14.    Risk of Non-Occurrence of the Effective Date**.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or met, the Effective Date will not take place.

**15.    Contingencies Could Affect Distributions to Holders of Allowed Claims**.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the

validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of re-vote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 16. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization. The Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to reductions in the amounts of their Claims against the Debtors' Estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

### 17. The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan.

Although the prepackaged Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business. A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' business.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

18.     **The Debtors May Be Unsuccessful in Obtaining First Day Orders to Permit the Debtors to Pay Their Key Suppliers and Employees, or to Continue to Perform Customer Programs, in the Ordinary Course of Business**.

The Debtors have tried to address potential concerns of their key customers, vendors, employees, and other parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan.  However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' business might suffer.

19.     **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Its Confirmation**.

The Debtors reserve the right, prior to the Confirmation or substantial Consummation thereof, subject to the provisions of Section 1127 of the Bankruptcy Code, applicable law, and the RSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

20.     **The RSA Is Subject to Significant Conditions and Milestones That May Be Difficult to Satisfy**.

There are certain material conditions that must be satisfied under the RSA, including the timely satisfaction of milestones in the Chapter 11 Cases.  The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control.

B.     **Risks Related to Recoveries Under the Plan**.

1.     **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**.

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.  Among other things, estimates will fluctuate based on general economic and business conditions, capital market conditions, and industry-specific and Company-specific factors (including the ability of the Reorganized Debtors to achieve strategic goals, objectives, and targets over applicable periods).

2. **The New Equity Interests Are Subject to Dilution**.

The ownership percentage represented by the New Equity Interests distributed to Holders of First Lien Claims on the Effective Date under the Plan will be subject to dilution by the MIP Shares.

3. **The Debtors Might Be Controlled by Significant Holders**.

Assuming that the Effective Date occurs, Holders of First Lien Claims will receive distributions representing a substantial percentage of the outstanding shares of the New Equity Interests. If the holders of a significant portion of the New Equity Interests were to act as a group, such holders would be in a position to control the outcome of actions requiring shareholder approval, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. Such Holders may have interests that differ from those of the other Holders of shares of New Equity Interests and may vote in a manner adverse to the interests of such other Holders. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of the New Equity Interests. In addition, a Holder of a significant number of shares of the New Equity Interest may sell all or a large portion of its shares of the New Equity Interest within a short period of time, which sale may adversely affect the trading price of the shares of the New Equity Interest. A holder of a significant number of shares of the New Equity Interest may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and, as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by Holders of a significant number of shares of the New Equity Interest may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

4. **Estimated Valuations of the Debtors and the New Equity Interests, and Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values**.

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

5. **The Terms of the Corporate Governance Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**.

The terms of the Corporate Governance Documents are subject to change based on negotiations between the Debtors and the Consenting Stakeholders. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in Reorganized Parent following the Effective Date.

6. **The Terms of the Exit Facility Documents Are Subject to Change Based On Negotiations and the Approval of the Bankruptcy Court**.

The terms of the Exit Facility Documents are subject to change based on negotiations between the Debtors and the Consenting Stakeholders. Holders of Claims that are not the Consenting Stakeholders will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in Reorganized Parent following the Effective Date.

7. **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt**.

The Debtors' or the Reorganized Debtors' credit ratings, as applicable, could be lowered, suspended, or withdrawn entirely, at any time by the rating agencies if, in each rating agency's judgment, circumstances warrant such action, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt, if any, and increase the cost of any debt that they may incur in the future.

8. **Certain Tax Implications of the Plan**.

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the U.S. federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

C. **Risks Related to the Debtors' and the Reorganized Debtors' Business**.

1. **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately

predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

## 2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.

While the Debtors intend the prepackaged chapter 11 process to be short, the Debtors' future results will be dependent upon the successful Confirmation and Consummation of the Plan.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  The chapter 11 proceedings also require the Debtors to seek debtor-in-possession financing to fund operations.  If the Debtors are unable to obtain final approval of such financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Facilities, the chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

## 3. Financial Results May Be Volatile and May Not Reflect Historical Trends.

The Financial Projections attached hereto as **Exhibit C** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Equity Interests and the ability of the Debtors to make necessary payments. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur. The information included in this Disclosure Statement does not necessarily conform to the information, including with respect to the Financial Projections, that would be required if the Solicitation was made pursuant to a registration statement filed with the SEC or another securities regulator.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses and Claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting may be different from historical trends. The Financial Projections contained herein do not currently reflect the impact of "fresh start" accounting.

### 4.      The Reorganized Debtors May Not Be Able to Implement the Business Plan.

While the Debtors believe that Consummation of the Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan. In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and growing their customer base. Given the nature of the Debtors' customer arrangements, there can be no assurance that the Reorganized Debtors will maintain and grow their customer base. The erosion of the Reorganized Debtors' customer base may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

### 5.      The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.

The Debtors' operations are subject to various federal, state, and local laws and regulations. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

### 6.      The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

### 7.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because

competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' business and the results of operations.

8.      **The Debtors Face Significant Competition and May Lose Market Share to Their Competitors**.

The market for automotive aftermarket products is competitive and characterized by rapid changes in technology, customer preferences, industry standards, and frequent introductions of new products and improvements of existing products.  The Debtors compete with many established automotive aftermarket vendors, as well as new entrants.  As customer preferences evolve, and as new products, services, and technologies are introduced, if the Debtors are unable to anticipate or effectively react to these competitive challenges, the Debtors' competitive position could weaken, and they could experience a decline in revenue or growth rate that could materially and adversely affect their business and results of operations.

9.      **The Debtors Could Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results**.

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products.  This is particularly important, given that a significant portion of Hoonigan's revenue is derived from current market participant purchases.  Existing customers may purchase fewer products and new customers may avoid entry into the marketplace, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, content, and merchandise, the level of customer spending for automotive aftermarket parts, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products and services desired by customers, and the Debtors' ability to integrate and manage any acquired business.  Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.  The Debtors' revenue comes from the sale of the Debtors' products, as well as merchandise, content, and related offerings.  It is impossible to predict with perfect accuracy what market demand for such offerings will be.  Further, the Debtors' business is highly tied to discretionary consumer spending habits, and interest rates, tariffs, employment, fuel costs, and general economic conditions may impact customers' finances and therefore willingness to spend on the Debtors' products.

10.     **The Cyclical Nature of the Automotive Parts Sector May Lead to Volatility**.

The Debtors business is highly cyclical.  With respect to seasonality, the spring and summer are generally the Debtors' busiest seasons with substantially less sales volume and revenue during the rest of the year.  Additionally, the Debtors' business operations are volatile and highly susceptible to a downturn in market conditions.

      **11.**    **Deteriorations in Business Relationships May Impact the Ability to Source Parts**.

The Debtors' success depends in part on their ability to source various parts, materials, and equipment necessary to sell the Debtors' automotive products. These parts are sourced from a broad range of suppliers. As a result, the Debtors' business depends on maintaining productive business relationships with their national and dispersed network of third-party suppliers. The Debtors' operations could be disrupted if such business relationships decline, for whatever reason, or if such suppliers go out of business or are unable to provide parts to the Debtors as they have on a historical basis. There is a risk that economic conditions could lead to financial, operational, production, labor, regulatory, or quality assurance difficulties that could result in a reduction or interruption in the Debtors' parts, material, and equipment supply.

      **12.**    **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service All of Their Indebtedness and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful**.

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

    **D.**    **Risks Related to the Offer and Issuance of Securities Under the Plan**.

      **1.**    **Holders of New Equity Interests May Be Restricted in Their Ability to Transfer or Sell Their Securities**.

Before the Petition Date the offering of any New Equity Interests shall be exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

After the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Equity Interests as contemplated herein shall be exempt from, among other things, the registration requirements of section 5

of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The shares of New Equity Interests to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Equity Interests in the Corporate Governance Documents.

The shares of New Equity Interests that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Equity Interests in the Corporate Governance Documents.

Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Equity Interests.

*See* Article XII of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

### 2.    A Liquid Trading Market for the Shares of New Equity Interests May Not Develop.

Although the Debtors may apply to relist the New Equity Interests on a national securities exchange, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Equity Interests will develop.  The liquidity of any market for New Equity Interests will depend upon, among other things, the number of Holders of shares of New Equity Interests, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Equity Interests will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell shares of New Equity Interests may be substantially limited, and the price for shares of the New Equity Interests may decline or may be considered unfavorable.  You may be required to bear the financial risk of your ownership of the New Equity Interests indefinitely.

In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Act, and Holders of the New Equity Interests will not be entitled to any information except as expressly required by the Corporate Governance Documents.  As a result, the information which the Debtors are required to provide in order to issue the New Equity Interests may be less than the Debtors would be required to provide if the New Equity Interests were registered.  Among other things, the Debtors may not be required to provide:  (a) separate financial information for any subsidiary; (b) select annual audited financial data; (c) selected quarterly financial data; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical

compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership and the marketability of the New Equity Interests.

### 3.      Certain Securities will be Subject to Resale Restrictions.

The New Equity Interests to be issued under the Plan have not been registered under the Securities Act, any state securities laws, or the laws of any other jurisdiction.  Such securities are being issued and sold pursuant to an exemption from registration under the applicable securities laws.  Accordingly, such securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act, and other applicable law.  In addition, holders of New Equity Interests will be subject to the Corporate Governance Documents.  Further, any 1145 Securities issued pursuant to section 1145(a) of the Bankruptcy Code to persons who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions.  *See* Article XII of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

### 4.      The Trading Price for the New Equity Interests May Be Depressed Following the Effective Date.

Following the Effective Date, certain shares of the New Equity Interests may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of Claims that receive the New Equity Interests may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Equity Interests available for trading could cause the trading price for the New Equity Interests to be depressed, particularly in the absence of an established trading market for the New Equity Interests.

## X.      SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to Holders of First Lien Claims and Junior Funded Debt Claims in connection with the Solicitation of votes to accept or reject the Plan.  This Disclosure Statement is accompanied by the Ballot, a ballot to be used for voting on the Plan.

### A.      Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 5 and Class 6 (collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, if the Plan is Confirmed and Consummated, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes on the Plan from Holders of Claims or Interests in Classes 1, 2, 3, 4, 7, 8, 9, 10, or 11.

B.     **Voting Record Date**.

**The Voting Record Date is September 4, 2024** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan, and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.     **Ballots Not Counted**.

**No Ballot will be counted toward Confirmation of the Plan if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the Ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to any person or entity other than the Solicitation Agent; (5) it is unsigned; (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE X OF THE DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL NOT BE COUNTED WITH RESPECT TO VOTING ON THE PLAN WITHOUT THE CONSENT OF THE COMPANY.**

## XI.     CONFIRMATION OF THE PLAN.

A.     **Requirements for Confirmation of the Plan**.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (a) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for Confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for Confirmation; and (iii) the Plan has been proposed in good faith.

B.     **Best Interests of Creditors/Liquidation Analysis**.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors.  As reflected in the Liquidation

Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going-concern value of their business, which is reflected in the New Equity Interests to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

C.      **Feasibility**.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows.  Creditors and other interested parties should review Article IX of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

D.      **Acceptance by Impaired Classes**.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[8]

---

[8]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the allowed interests in such Class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.  Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.  No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.  Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

F.      **Valuation Analysis**.

The Plan provides for the distribution of the New Equity Interests to certain Holders of Claims upon Consummation of the Restructuring Transactions contemplated by the Plan. Accordingly, Alvarez & Marsal North America, LLC, the Company's financial advisor, performed an analysis of the estimated implied equity value of the Debtors as of an assumed Effective Date (the "Valuation Analysis") at the Debtors' request. Based on the Valuation Analysis, which is attached hereto as **Exhibit D**, the enterprise value of the Reorganized Debtors will be approximately $1.1 billion to $1.25 billion, with an estimated midpoint of $1.175 billion.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with Article IX of this Disclosure Statement entitled "Risk Factors." Houlihan Lokey makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

## XII.    CERTAIN SECURITIES LAW MATTERS.

A.      **New Equity Interests**.

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Equity Interests to certain Holders of Claims against the Debtors. The Debtors believe that the class of New Equity Interests will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.

The following discussion of the issuance and transferability of the New Equity Interests relates solely to matters arising under U.S. federal and state securities laws. The rights of holders of New Equity Interests, including the right to transfer New Equity Interests, will also be subject to any restrictions in the Corporate Governance Documents to the extent applicable. Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.

B.      **Exemption from Registration Requirements; Issuance of New Equity Interests Under the Plan**.

Prior to the Petition Date, the Debtors are relying on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, and similar Blue-Sky Laws provisions, to exempt from registration under the Securities Act and Blue-Sky Laws the offer of New Equity Interests to Holders of Allowed First Lien Claims and the Exit Term Loan Facility Backstop Parties, as may be applicable. Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation S under the Securities

Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

After the Petition Date, the Debtors believe that the issuance of the New Equity Interests (other than the New Equity Interests issue in connection with the Ext Term Loan Facility Backstop Commitment Premium and any New Equity Interests underlying the MIP) will be exempt from federal registration requirements under section 1145 of the Bankruptcy Code, except in certain limited circumstances as explained in more detail in this Disclosure Statement and/or the Plan. For the avoidance of doubt, any securities (including the New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium) that may not be issued to persons pursuant to section 1145 of the Bankruptcy Code are expected to be issued in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act.

In addition, the Debtors believe that any New Equity Interests underlying the MIP will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D and Rule 701 promulgated thereunder and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of any New Equity Interests. Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

C.      **Resales of New Equity Interests; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code**.

1.      **Resales of New Equity Interests Issued Pursuant to Section 1145**.

The New Equity Interests (other than the New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium and any New Equity Interests underlying the MIP) to the extent offered, issued and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the

securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10 percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Equity Interests pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of such New Equity Interests who are deemed to be "underwriters" may be entitled to resell their New Equity Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of "control" securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Equity Interests would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Equity Interests and, in turn, whether any Person may freely trade such New Equity Interests under the federal securities laws.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 will not be available for resales of such New Equity Interests by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW EQUITY INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

2.      **Resales of New Equity Interests Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act**.

Prior the Petition Date, all New Equity Interests will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable state securities laws. In addition, any securities that may not be issued to such persons pursuant to section 1145 of the Bankruptcy Code (including the New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium and any New Equity Interests underlying the MIP) will be issued in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Equity Interests by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Equity Interests offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period, may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

All New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium, or otherwise issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, will bear a restrictive legend. Each certificate or book-entry interest representing, or issued in exchange for or upon the transfer, sale or assignment of, any New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium, or otherwise issued in reliance upon section 4(a)(2) of the Securities Act,

Regulation D promulgated thereunder and/or Regulation S under the Securities Act, shall be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION."**

The Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium, or otherwise issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act. The Debtors will also reserve the right to stop the transfer of any such New Equity Interests if such transfer (x) is not registered in compliance with Rule 144 or in compliance with another applicable exemption from registration (including section 1145 of the Bankruptcy Code) or (y) would otherwise make the Debtors subject to the periodic reporting requirements under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Equity Interests are exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Equity Interests will also be subject to any applicable transfer restrictions contained in the Corporate Governance Documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW EQUITY INTERESTS MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

### XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

#### A. Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of First Lien Claims or Junior Funded Debt Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS, as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Reorganized Debtors, or certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers, mutual funds, governmental authorities or agencies, pass-through entities (including subchapter S corporations), beneficial owners of pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). This summary does not address any aspect of state, local, estate, gift, or non-U.S. taxation or U.S. federal non-income tax considerations (including estate or gift tax or the Medicare tax imposed on certain net investment income). This summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such Claims as "capital assets" within the meaning of section 1221 of the IRC (generally, property held for investment). This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes, and that the Claims constitute Interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders of Allowed Claims (a) that hold 10 percent or more of the equity of the Debtors or that will hold 10 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan or (b) (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (ii) that are deemed to reject the Plan, or (iii) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (a) an individual that is a citizen or resident of the United States; (b) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or such beneficial owner) and the activities of the partner (or such beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.**

**1.    Characterization of the Restructuring Transactions.**

The Debtors expect that the Restructuring Transactions will be structured in one of two ways:  (a) as a taxable sale of all or substantially all of the assets and/or stock of any Debtor (a "Taxable Transaction"); or (b) as a recapitalization of the existing Debtors (a "Recapitalization Transaction").  The Debtors have not yet determined whether the Restructuring Transactions will be consummated as a Taxable Transaction or a Recapitalization Transaction.  Such decision will depend on, among other things, finalizing certain modeling and analytical determinations.

In a Taxable Transaction, the Debtors are expected to realize gain or loss in an amount equal to the difference between the fair market value of the assets or stock transferred (or deemed transferred) and the Debtors' tax basis in such assets or stock.  Any such realized gain generally will be reduced by the amount of tax attributes available for use by the Debtors (if any), and any remaining gain will be recognized by the Debtors and result in a Cash tax obligation.  If a Reorganized Debtor purchases (or is deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor is expected to take a fair market value basis in the transferred assets or stock.  However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will generally retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the IRC to treat such stock purchase as the purchase of the Debtors' assets or unless the application of certain complex "loss duplication" rules results in a reduction in the tax basis of such assets.  In a Taxable Transaction that does

not involve a purchase of stock, the Reorganized Debtors generally will not succeed to any of the Debtors' existing tax attributes.

The Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income") and, other than in a Taxable Transaction that does not involve a transfer of stock, the limitations on net operating losses ("NOLs"), deferred deductions under section 163(j) of the IRC ("163(j) Deductions") and other tax attributes.

## 2.     Cancellation of Debt and Reduction of Tax Attributes.

As a result of the Restructuring Transactions, the Debtors are expected to recognize a substantial amount of COD Income.  In such case, the U.S. tax attributes of the Debtors may, depending on certain factors, be reduced by the amount of such COD Income excluded from U.S. federal taxable income under section 108 of the IRC.

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the amount of any Cash, (ii) the issue price of any new indebtedness issued by the debtor, and (iii) the fair market value of the New Equity Interests and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.  Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the taxable income (or loss) for the year in which the debt exchange occurs has been determined.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  Deductions deferred under section 163(j) of the IRC are not subject to reduction under these rules.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of any COD Income (if any) that will be realized by the Debtors will not be determinable until the Consummation of the Plan because the amount of COD Income will depend, in part,

on the fair market value of the New Equity Interests and any other consideration given in satisfaction of any Allowed Claims, none of which can be determined until after the Plan is consummated. Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income exclusion rules will have on the Debtors and their U.S. federal income tax attributes.

As noted above, as a general matter, in a Taxable Transaction that does not involve the transfer of the stock of a Debtor, the attribute reduction rules discussed above will be inapplicable, and the Reorganized Debtors (a) will take a fair market value basis in the assets of the Debtors without any reduction from excluded COD Income and (b) will not otherwise inherit any of the Debtors' tax attributes.

### 3. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

#### (a) General Section 382 and 383 Annual Limitation.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, net unrealized built-in losses ("NUBILs"), deductions deferred under section 163(j) of the IRC, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Equity Interests pursuant to a Restructuring Transaction will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC (described below) applies.

As noted above, as a general matter, in a Taxable Transaction that does not involve the transfer of the stock of a Debtor, the rules under section 382 of the IRC discussed above and below will be inapplicable to the Reorganized Debtors.

#### (b) General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.49 percent for changes that occur in September 2024). The 382 Limitation may be

increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "Recognition Period") or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[9]  If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, unless the special 382(l)(5) Exception (described below) applies, if the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (other than any increases due to recognized built-in gains).  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

#### (c)      Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.  If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception").   Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to

---

[9]    Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation.  However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area.  Additionally, a variety of public comments have been made by government officials indicating that the proposed Treasury Regulations will not be finalized in their current form and, instead, will be "re-proposed" in modified form.  Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Reorganized Debtors with respect to any "ownership change" that occurs pursuant to the Plan.

the ownership change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  Rather, the resulting limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application so that the 382(l)(6) Exception applies.  Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

     **C.**    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of First Lien Claims and Junior Funded Debt Claims**.

          **1.**    **U.S. Federal Income Tax Consequences to U.S. Holders of the Consummation of the Restructuring Transactions:  Treatment of First Lien Claims and Exit Rights as a Security**.

The U.S. federal income tax consequences to a U.S. Holder of First Lien Claims in a Recapitalization Transaction will depend, in part, on whether for U.S. federal income tax purposes the (a) First Lien Claim surrendered by such U.S. Holder constitutes a "security" of a Debtor, (b) the New Equity Interests received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity), and (c) whether the Exit Rights (as defined below) received by such U.S. Holder constitutes a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity).  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There is uncertainty in a case such as this one, where the relevant debt instrument was deemed to be satisfied and reissued pursuant to the "significant modification" rules, with respect to whether the instrument is treated as having a length that dates back to the issuance of the "original" instrument (without regard to the deemed exchange) or whether the instrument is treated as having a length that begins on the date of the deemed exchange.  There is also significant uncertainty associated with evaluating whether the Exit Rights constitute a "security" (assuming, as discussed below, that the Exit Rights are treated as a separately-received piece of property for tax purposes).  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  While not free from doubt, the Debtors will, to the extent they are required to take a position, take the position that the First Lien Claims do not constitute "securities" of a Debtor.  The remainder of this discussion assumes such treatment is correct, and accordingly, that the exchanges pursuant to the Plan should not be treated as made pursuant to a "reorganization" within the meaning of section 368 of the IRC.

Due to the inherently factual nature of the determination of whether a debt instrument or the Exit Rights constitute "securities", U.S. Holders of First Lien Claims are urged to consult their tax advisors regarding these issues.

### 2.    Consequences to U.S. Holders of First Lien Claims; General.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a First Lien Claim will receive (i) its Pro Rata share of the New Equity Interests on the Effective Date and (ii) the right to fund its Pro Rata share of the Exit Term Loan Facility in accordance with the terms of the Plan (the "Exit Rights").

### 3.    Consequences to Holders of First Lien Claims of the Restructuring Transactions.

Regardless of whether the Restructuring Transactions are structured as a Taxable Transaction or a Recapitalization Transaction, the exchange of any First Lien Claims by a U.S. Holder is expected to be treated as a taxable exchange pursuant to section 1001 of the IRC.  In that case, a U.S. Holder of a First Lien Claim is expected to recognize gain or loss equal to (a) the fair market value of the New Equity Interests and Exit Rights received as of the date such New Equity Interest is distributed less (b) the U.S. Holder's adjusted tax basis in its First Lien Claim.  The adjusted tax basis of a U.S. Holder's First Lien Claims generally will equal such U.S. Holder's actual or deemed purchase price for such First Lien Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such First Lien Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."  Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "Market Discount."  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such First Lien Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in the New Equity Interest and Exit Rights equal to the fair market value of the New Equity Interest and Exit Rights as of the date such New Equity Interest is distributed to such U.S. Holder.  The holding period for any such New Equity Interest and Exit Rights should begin on the day following the receipt of such New Equity Interest and Exit Rights.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

### 4.    Consequences of the Restructuring Transaction to U.S. Holders of Junior Funded Debt Claims.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a Junior Funded Debt Claim shall receive its Pro Rata share of the Junior Funded Debt Consideration.  In such case, a U.S. Holder of an Allowed Junior Funded Debt Claim generally should recognize gain or loss equal to (a) the amount of Cash received, if any, less (b) the U.S. Holder's adjusted tax basis in its Junior Funded Debt Claim.  The adjusted tax basis of a U.S. Holder's Junior Funded Debt Claims generally will equal a U.S. Holder's actual or deemed purchase price for such Junior Funded Debt Claims, reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to such Junior Funded Debt Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any

amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Junior Funded Debt Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

### 5.        Accrued Interest.

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan is attributable to accrued but unpaid interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments constituting such Allowed Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest. Certain Treasury Regulations, however, allocate payments first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. ***U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received under the Plan***.

### 6.        Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim, who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a *de minimis* amount (equal 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain allocated to a U.S. Holder in connection the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property will be treated as ordinary income to the extent of such accrued, but not recognized, market discount. ***U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim***.

### 7.    Limitations on Capital Losses.

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 8.    U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Equity Interests.

#### (a)    Dividends on New Equity Interests.

Any distributions made on account of the New Equity Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent as determined under U.S. federal income tax principles. "Qualified dividend income" allocable to an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Equity Interests. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Parent has sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

(b)        **Sale, Redemption, or Repurchase of New Equity Interests**.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Equity Interests.  Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has a holding period in the New Equity Interests of more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Equity Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its First Lien Claims or recognized an ordinary loss on the exchange of its First Lien Claims for New Equity Interests.

9.        **U.S. Federal Income Tax Treatment, and Ownership, Exercise, and Disposition of, the Exit Rights**.

Although such position is not free from doubt, the Debtors intend to treat the issuance of the Exit Rights and their subsequent exercise for U.S. federal income tax purposes as an issuance and exercise of options to acquire a portion of the Exit Term Loan Facility for U.S. federal income tax purposes.

A U.S. Holder that elects to exercise its Exit Rights will generally be treated as purchasing, in exchange for its Exit Rights and the amount of Cash funded by the U.S. Holder to exercise the Exit Rights, the Exit Term Loan Facility it is entitled to fund pursuant to the Exit Rights.  In each case, such purchase will generally be treated as the exercise of an option under general tax principles and the U.S. Holder therefore should not recognize income, gain or loss for U.S. federal income tax purposes.  A U.S. Holder's aggregate tax basis in the Exit Term Loan Facility received upon exercise of the Exit Rights will generally equal the sum of (a) the amount of Cash paid by the U.S. Holder to exercise its Exit Rights plus (b) such U.S. Holder's tax basis in its Exit Rights immediately before such Exit Rights are exercised.  A U.S. Holder's holding period in the Exit Term Loan Facility, as applicable, will begin on the day after the exercise date of the Exit Term Loan Rights.

A U.S. Holder that elects not to exercise its Exit Rights and instead allows the Exit Rights to lapse may be entitled to claim a capital loss upon expiration of the Exit Rights in an amount equal to the amount of tax basis allocated to the Exit Rights, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the Exit Rights.

Each U.S. Holder should consult its own tax advisor regarding the proper characterization of the Exit Rights for U.S. federal income tax purposes and the consequences to it of such treatment given its particular circumstances.

10.        **U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Exit Term Loan Facility**.

The following discussion assumes that the "contingent payment debt instrument" rules do not apply to the Exit Term Loan Facility.  U.S. Holders should consult their own tax advisors regarding the application of these rules.

(a)    **Payments of Qualified Stated Interest**.

Payments or accruals of "qualified stated interest" (as defined below) on the Exit Term Loan Facility will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in Cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Exit Term Loan Facility, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

(b)    **Issue Price**.

As a general matter, ignoring the "Exit Term Loan Facility Backstop Commitment Premium", and assuming that the Exit Rights are treated as a separate property right received by Holders of First Lien Claims in partial satisfaction of such Claims rather than the transaction being recharacterized as Holders of First Lien Claims exchanging such Claims and Cash for New Equity Interests and the Exit Term Loan Facility, the Exit Term Loan Facility is being acquired for an investment unit composed of (a) Exit Rights and (b) Cash. The application of the "investment unit" rules is somewhat unclear where, as here, a portion of the "investment unit," the Exit Rights, is not "publicly traded" and the rest of the "investment unit" is Cash. While not free from doubt, under such circumstances, and in light of the Debtors' understanding that the terms of the Exit Term Loan Facility are generally "at the money" such that the Exit Rights do not have substantial separate value attributable to them, the Debtors would generally expect to take the position that the Cash paid for the loans under the Exit Term Loan Facility pursuant to the Exit Rights would control the determination of the "issue price."[9]

(c)    **Original Issue Discount**.

A debt instrument, such as the Exit Term Loan Facility, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in Cash at least annually. The terms of the Exit Term Loan Facility, including the extent to which they will be issued with OID, have not yet been determined; to the extent not all the interest on the Exit Term Loan Facility is unconditionally payable in Cash at least annually, or to the extent the purchase price is less than the face amount of such debt, the Exit Term Loan Facility may be considered to be issued with OID.

See the discussion above regarding the potential application of the "investment unit" rules, which could cause the loans under the Exit Term Loan Facility to be issued with additional OID.

---

[9]    The Exit Term Loan Facility Backstop Commitment Premium is payable to meaningfully more than 90 percent of the Holders of First Lien Claims. Accordingly, there is significant risk that the "investment unit" rules will be applied in a way that, in exchange for Cash and the Exit Rights, the Exit Term Loan Facility Backstop Commitment Premium is seen as having been issued as part of an "investment unit" with loans under the Exit Term Loan Facility. The Debtors are not able, at this time, to commit to a tax position regarding this issue. In the event the "investment unit" rules were to apply in this way, the "issue price" of the loans under the Exit Term Loan Facility would be reduced in an amount that would be related to the value attributable to the Exit Term Loan Facility Backstop Commitment Premium, and such reduction would constitute OID, subject to the below discussion regarding such rules. Holders of Claims should consult their own tax advisors regarding these issues.

An issuer's allocation of the issue price of a debt instrument is binding on all U.S. Holders of the debt instrument unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the debt instrument.

### (d)     Sale, Taxable Exchange or other Taxable Disposition.

Upon the disposition of the Exit Term Loan Facility by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (a) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (b) the U.S. Holder's adjusted tax basis in the Exit Term Loan Facility, as applicable.  The calculation of a U.S. Holder's adjusted tax basis in the Exit Term Loan Facility is discussed above.  A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income.  A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the Exit Term Loan Facility for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### D.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of First Lien Claims and Junior Funded Debt Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions as contemplated by the Plan and as described above, and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of First Lien Claims and Junior Funded Debt Claims.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Equity Interests.

### 1.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Restructuring Transactions.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims.  Any gain realized by a Non-U.S. Holder of an Allowed Claim on the exchange of its Allowed Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In addition, if such a Non-U.S. Holder

is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.     Accrued Interest.

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that is attributable to accrued but untaxed interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID, if any) with respect to Allowed Claims that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, *provided* that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in the Debtors within the meaning of section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Debtors, actually or constructively through the ownership rules under section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the Debtors an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest income allocable to a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," under the Plan, the aggregate consideration to be distributed in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

If interest income allocable to a Non-U.S. Holder is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, *provided* the appropriate statement is provided to Debtors) unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other

form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

3.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Equity Interests**.

(a)      **Dividends on New Equity Interests**.

Any distributions made with respect to New Equity Interests (other than certain distributions of stock of Reorganized Parent) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces such Non-U.S. Holder's basis in such New Equity Interests and then, generally, capital gain). Except as described below, dividends paid with respect to New Equity Interests that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Equity Interests that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If Reorganized Parent is considered a "U.S. real property holding corporation" (a "<u>USRPHC</u>"), distributions to a Non-U.S. Holder will generally be subject to withholding by such Reorganized Debtor at a rate of 15 percent to the extent they are not treated as dividends for U.S. federal income tax purposes. In the event the New Equity Interests are regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes New Equity Interests during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. The Debtors have not determined if they are, or whether the Reorganized Debtors will be, USRPHCs.

97

**(b)**     **Sale, Redemption, or Repurchase of New Equity Interests**.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Equity Interests unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such New Equity Interest is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the New Equity Interests.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of New Equity Interests generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of the New Equity Interests under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder. Taxable gain from a disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would be treated as effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business.  A Non- U.S. Holder would also be subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return.  The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS.  In the event the New Equity Interests are regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes New Equity Interests during a specified testing period.  Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

**4.**     **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Ownership, Exercise, and Disposition, of the Exit Rights**.

The U.S. federal income tax treatment of the Exit Rights to a Non-U.S. Holder are generally expected to be the same as those described above for U.S. Holders.

5.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of the Exit Term Loan Facility**.

The following discussion assumes that the "contingent payment debt instrument" rules do not apply to the Exit Term Loan Facility.  Non-U.S. Holders should consult their own tax advisors regarding the application of these rules.

(a)      **Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest)**.

Subject to the discussion of backup withholding and FATCA, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID, if any) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the interest in the Reorganized Debtors within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Reorganized Debtors, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Reorganized Debtors an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a non-U.S. person.

If not all of these conditions are met, interest on the Exit Term Loan Facility paid to a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If interest on the Exit Term Loan Facility is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply), *provided* the appropriate statement is provided to Reorganized Debtors unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the

applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.   Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**(b)    Sale, Taxable Exchange, or Other Disposition of the Exit Term Loan Facility**.

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the Exit Term Loan Facility (other than any amount representing accrued but unpaid interest on the loan)  unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the Exit Facility under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above.  If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

**6.    FATCA**.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest have been effectively suspended under proposed Treasury Regulations, which can be relied on until

final regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW EQUITY INTERESTS AND EXIT TERM LOAN FACILITY.**

### E.    Information Reporting and Back-Up Withholding.

The Debtors, the Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless such Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  September 8, 2024

WHEEL PROS, LLC
on behalf of itself and all other Debtors

By:  _/s/ Vance Johnston_____

Name:  Vance Johnston
Title:  Chief Executive Officer