# Exhibit A

## Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| WHEEL PROS, LLC, *et al.*,[1] | ) | Case No. 24-11939 (JTD) |
| Debtors. | ) | (Jointly Administered) |

**AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION OF WHEEL PROS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Edward Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
tcairns@pszjlaw.com
ecorma@pszjlaw.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
Yusuf Salloum (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: asathy@kirkland.com
yusuf.salloum@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Erica D. Clark (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

[1] The last four digits of Debtor Wheel Pros, LLC's federal tax identification number are 5738. A complete list of each of the Debtors in these chapter 11 cases and each Debtor's federal tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/WheelPros. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 5347 S. Valentia Way #200, Greenwood Village, CO 80111.

# TABLE OF CONTENTS


ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ..... 1
- A. Defined Terms. ..... 1
- B. Rules of Interpretation. ..... 18
- C. Computation of Time. ..... 18
- D. Governing Law. ..... 18
- E. Reference to Monetary Figures. ..... 19
- F. Reference to the Debtors or the Reorganized Debtors. ..... 19
- G. Controlling Document. ..... 19
- H. Consultation, Notice, Information, and Consent Rights. ..... 19

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS ..... 19
- A. Administrative Claims. ..... 19
- B. Priority Tax Claims. ..... 20
- C. DIP Claims. ..... 20
- D. Professional Fee Claims. ..... 21
- E. Payment of Statutory Fees and Reporting to the U.S. Trustee. ..... 22
- F. Payment of Restructuring Expenses and Legacy Notes Trustee Fees. ..... 22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..... 22
- A. Classification of Claims and Interests. ..... 22
- B. Treatment of Claims and Interests. ..... 23
- C. Special Provision Governing Unimpaired Claims. ..... 28
- D. Elimination of Vacant Classes. ..... 28
- E. Voting Classes, Presumed Acceptance by Non-Voting Classes. ..... 28
- F. Intercompany Interests. ..... 28
- G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..... 28
- H. Controversy Concerning Impairment. ..... 29
- I. Subordinated Claims and Interests. ..... 29

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..... 29
- A. General Settlement of Claims and Interests. ..... 29
- B. Restructuring Transactions. ..... 29
- C. The Reorganized Debtors. ..... 30
- D. Sources of Consideration for Plan Distributions. ..... 30
- E. Corporate Existence. ..... 32
- F. Vesting of Assets in the Reorganized Debtors. ..... 32
- G. Cancellation of Existing Securities, Agreements, and Interests. ..... 32
- H. Corporate Action. ..... 33
- I. Corporate Governance Documents. ..... 34
- J. New Investor Agreement. ..... 34
- K. Directors and Officers of the Reorganized Debtors. ..... 34
- L. Effectuating Documents; Further Transactions. ..... 34
- M. Certain Securities Law Matters. ..... 35
- N. Section 1146 Exemption. ..... 35
- O. Private Company. ..... 36
- P. Director and Officer Liability Insurance. ..... 36
- Q. MIP. ..... 36
- R. Preservation of Causes of Action. ..... 36
- S. Cashless Transactions. ..... 37

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 37
- A. Assumption of Executory Contracts and Unexpired Leases. ..... 37

B. Indemnification Obligations. 38
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. 39
D. Insurance Policies. 39
E. Reservation of Rights. 40
F. Nonoccurrence of Effective Date. 40
G. Employee Compensation and Benefits. 40
H. Contracts and Leases Entered Into After the Petition Date. 41

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS 41
A. Timing and Calculation of Amounts to Be Distributed. 41
B. Disbursing Agent. 41
C. Rights and Powers of Disbursing Agent. 42
D. Delivery of Distributions and Undeliverable or Unclaimed Distributions. 42
E. Surrender and Cancelled Instruments or Securities 44
F. Manner of Payment. 44
G. Indefeasible Distributions. 44
H. Compliance with Tax Requirements. 44
I. Allocations. 44
J. No Postpetition Interest on Claims. 45
K. Foreign Currency Exchange Rate. 45
L. Setoffs and Recoupment. 45
M. Claims Paid or Payable by Third Parties. 45

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS 46
A. Disputed Claims Process. 46
B. Allowance of Claims. 46
C. Claims Administration Responsibilities. 46
D. Estimation of Claims. 47
E. Adjustment to Claims without Objection. 47
F. Disallowance of Claims. 47
G. No Distributions Pending Allowance. 47
H. Distributions After Allowance. 48

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS 48
A. Discharge of Claims and Termination of Interests. 48
B. Release of Liens. 48
C. Releases by the Debtors. 48
D. Releases by the Releasing Parties. 49
E. Exculpation. 50
F. Injunction. 51
G. Protections Against Discriminatory Treatment. 51
H. Document Retention. 51
I. Reimbursement or Contribution. 51

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN 52
A. Conditions Precedent to the Effective Date. 52
B. Waiver of Conditions. 53
C. Effect of Failure of Conditions. 53

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN 53
A. Modification and Amendments. 53
B. Effect of Confirmation on Modifications. 54
C. Revocation or Withdrawal of Plan. 54

ARTICLE XI. RETENTION OF JURISDICTION 54

ARTICLE XII. MISCELLANEOUS PROVISIONS ..... 56
A. Immediate Binding Effect. ..... 56
B. Additional Documents. ..... 56
C. Reservation of Rights. ..... 56
D. Successors and Assigns. ..... 56
E. Notices. ..... 57
F. Term of Injunctions or Stays. ..... 58
G. Entire Agreement. ..... 58
H. Exhibits. ..... 59
I. Nonseverability of Plan Provisions. ..... 59
J. Votes Solicited in Good Faith. ..... 59
K. Closing of Chapter 11 Cases. ..... 59
L. Waiver or Estoppel ..... 59

# INTRODUCTION

Wheel Pros, LLC and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time in accordance with its terms and the RSA (as defined below), this "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Wheel Pros, LLC, and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. The classification of Claims and Interests set forth in Article III of this Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable and set forth herein. This Plan does not contemplate substantive consolidation of any of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN (INCLUDING UNDER ARTICLE IV.M HEREOF) IN FULL.

THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF ANY INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

## ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

*A. Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1. "*4WP Buyer*" means the buyer in connection with the 4WP Sale.

2. "*4WP Purchase Agreement*" means any purchase and sale agreement entered into by the applicable Debtors in connection with the 4WP Sale.

3. "*4WP Sale*" means the sale of the Debtors' "4WP" business unit.

4. "*4WP Sale Documents*" means, collectively, the 4WP Purchase Agreement, the 4WP Sale Motion, the 4WP Sale Order, and any and all other agreements, documents, and instruments related to the 4WP Sale.

5. "*4WP Sale Motion*" means the motion seeking approval under sections 363 and 365 of the Bankruptcy Code of the 4WP Sale.

6. "*4WP Sale Order*" means the order of the Bankruptcy Court approving the 4WP Sale Motion.

7. "*ABL Agent*" means Wells Fargo Bank, National Association, in its capacity as collateral agent and administrative agent for the holders of ABL Claims under the ABL-FILO Credit Agreement.

8. "*ABL Claims*" means any Claim arising under, derived from, based on, or related to the ABL Facility, including all ABL Loans and ABL Obligations.

9. "*ABL-FILO Credit Agreement*" means that certain ABL Credit and Guarantee Agreement, dated as of May 11, 2021 and as amended from time to time, by and among Wheel Pros, Inc., as borrower, certain Company Parties as borrowers and guarantors party thereto, Wheel Pros Intermediate, Inc., as holdings, the ABL Agent, the FILO Agent, and the other lenders party thereto, as may be further amended, restated, amended and restated, or otherwise supplemented from time to time.

10. "*ABL Facility*" means the senior secured asset-based revolving loan facility providing for the ABL Loans and ABL Obligations arising under the ABL-FILO Credit Agreement.

11. "*ABL Loans*" means the "Revolving Loans," as such term is defined in the ABL-FILO Credit Agreement.

12. "*ABL Obligations*" means the "Revolving Obligations," as such term is defined in the ABL-FILO Credit Agreement and any outstanding adequate protection payments for Prepetition ABL Obligations (as such term is defined in the DIP Orders).

13. "*Ad Hoc Group*" means that certain ad hoc group of Consenting Creditors represented by the Ad Hoc Group Advisors that are signatories to the RSA.

14. "*Ad Hoc Group Advisors*" means, collectively, Akin Gump Strauss Hauer & Feld LLP, PJT Partners, Inc., Potter Anderson & Corroon LLP, and other professionals or consultants retained by the Ad Hoc Group from time to time, in connection with the Restructuring Transactions, regardless of whether such advisor was retained prior to or following the Petition Date.

15. "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors; (b) the Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

16. "*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such person were a debtor in a case under the Bankruptcy Code. "Affiliated" has a correlative meaning.

17. "*Agent*" means any administrative agent, escrow agent, collateral agent, administrator, or similar Entity under the ABL Facility (including the FILO Agent), the NewCo First Lien Facility, the Legacy First Lien Facility, the DIP ABL Facility, the Exit ABL Facility, the Exit Term Loan Facility, the Intercompany Credit Agreement, and/or the DIP Term Loan Facility, including any successors thereto.

18. "*Agents/Trustees*" means, collectively, each of the Agents and Trustees.

19. "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under this Plan and (b) the Debtors, with the consent of the Required Consenting NewCo First Lien Lenders, which shall not be unreasonably withheld, delayed, or conditioned, or the Reorganized Debtors, as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law; *provided*, *however*, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan. For the avoidance of

doubt, the foregoing consent right of the Required Consenting NewCo First Lien Lenders shall not apply to Professional Fee Claims.

20. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common Law, including fraudulent transfer Laws.

21. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

22. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

23. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

24. "*Blue-Sky Laws*" means any securities regulatory authority of any locality or any state under any local or state securities law.

25. "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

26. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items, in legal tender of the United States of America.

27. "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

28. "*Causes of Action*" means collectively, any and all Claims, cross-claims, third-party claims, Interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, loss, debt, fee or expense, judgment, accounts, defenses, offsets, powers, privileges, licenses, Liens, Avoidance Actions, indemnities, contributions, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, Law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by Law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Actions.

29. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

30. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

31. "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

32. "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*CM/ECF*" means the Bankruptcy Court's case management and electronic case filing system.

34. "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all employees of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

35. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

36. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

37. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation, as such hearing may be continued from time to time.

38. "*Confirmation Order*" means the order of the Bankruptcy Court approving the adequacy of the Disclosure Statement and confirming this Plan.

39. "*Consenting Creditors*" means, collectively, the Consenting FILO Lenders, Consenting Legacy First Lien Lenders, Consenting NewCo First Lien Lenders, and Consenting Noteholders.

40. "*Consenting Equitizing Creditors*" means, collectively, the Ad Hoc Group and SVP.

41. "*Consenting Equitizing Creditors Advisors*" means, collectively, the Ad Hoc Group Advisors and the SVP Advisors.

42. "*Consenting FILO Lenders*" means the Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, the FILO Claims that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to counsel to the Debtors.

43. "*Consenting Legacy First Lien Lenders*" means the Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, the Legacy First Lien Claims that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to counsel to the Debtors.

44. "*Consenting Legacy Noteholders*" means the Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, the Legacy Notes Claims that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to counsel to the Debtors.

45. "*Consenting NewCo First Lien Lenders*" means the Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, the NewCo First Lien Claims that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to counsel to the Debtors.

46. "*Consenting NewCo Noteholders*" means the Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, the NewCo Notes Claims that have executed and delivered counterpart signature pages to the RSA, a Joinder, or a Transfer Agreement to counsel to the Debtors.

47. "*Consenting Noteholders*" means, collectively, the Consenting NewCo Noteholders and the Consenting Legacy Noteholders.

48. "*Consenting Stakeholders*" means, collectively, the Sponsor and the Consenting Creditors.

49. "*Consummation*" means the occurrence of the Effective Date.

50. "*Corporate Governance Documents*" means, collectively and as applicable, the organizational and corporate governance documents for Reorganized Parent, the other Reorganized Debtors, and any direct or indirect subsidiary thereof, as applicable, including the New Investor Agreement and any other charters, bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, or other organizational documents or shareholders' agreements, each consistent with the terms and conditions as set forth in the RSA (including the Governance Term Sheet and any consent rights contained therein) and section 1123(a)(6) of the Bankruptcy Code, as applicable.

51. "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

52. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers', and/or employees' liability and all agreements, documents, or instruments relating thereto.

53. "*Debtor Release*" means the release set forth in Article VIII.C of this Plan.

54. "*Debtors' Advisors*" means each of the following: (a) Kirkland & Ellis LLP; (b) Pachulski Stang Ziehl & Jones LLP; (c) Houlihan Lokey Capital, Inc.; (d) Alvarez & Marsal North America, LLP; (e) the Solicitation Agent, and (f) any other advisors retained by the Debtors.

55. "*Definitive Documents*" means, collectively and as applicable, all agreements, instruments, pleadings, orders, forms, questionnaires, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions subject, in each case, to (i) the consent rights set forth in the RSA and (ii) the reasonable consent of the Exit ABL Facility Agent, the DIP ABL Agent, the DIP Term Loan Facility Agent, or the Exit Term Loan Facility Agent, as applicable: (x) to the extent any is a party to any Definitive Document, or (y) solely with respect to any Definitive Document (or portion thereof) that materially affects the rights, remedies, or obligations of such party, including each of the following: (a) this Plan and all exhibits hereto; (b) the Plan Supplement and the documents contained therein (including the Restructuring Transactions Memorandum); (c) the Confirmation Order; (d) the Disclosure Statement (and any documents or Solicitation Materials related to the solicitation thereof, including applicable motions and orders); (e) all material pleadings Filed by the Debtors in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto; (f) all motions, orders, filings, documents, and agreements related to the Restructuring Transactions, (g) the Corporate Governance Documents; (h) the DIP Orders; (i) the DIP Documents; (j) the Exit Facility Documents; (k) the Exit Term Loan Facility Backstop Commitment Letter; (l) the 4WP Sale Documents; (m) any and all documents necessary to implement, issue, and distribute the New Equity Interests; and (n) such other agreements, instruments, and documentation as may be necessary to consummate and document the transactions contemplated by the RSA or this Plan.

56. "*DIP ABL Agent*" means Wells Fargo Bank, National Association, or any assign or successor thereto, in its capacity as administrative and collateral agent under the DIP ABL Credit Agreement.

57. "*DIP ABL Claims*" means any Claim arising under, derived from, based on, or related to the DIP ABL Facility or the Obligations (as defined in the DIP ABL Credit Agreement). The DIP ABL Claims shall include any and all ABL Claims that are rolled up into the DIP ABL Facility pursuant to the DIP Orders.

58. "*DIP ABL Credit Agreement*" means the debtor-in-possession financing credit agreement by and among certain of the Company Parties, the DIP ABL Agent, and the DIP ABL Lenders setting forth the terms and conditions of the DIP ABL Facility.

59. "*DIP ABL Documents*" means, collectively, the DIP ABL Credit Agreement, the DIP Orders, and any other documents governing the DIP ABL Facility, including the DIP ABL Fee Letter and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith and any other Loan Documents (as defined in the DIP ABL Credit Agreement).

60. "*DIP ABL Fee Letter*" means that certain fee letter entered into in connection with the DIP ABL Facility.

61. "*DIP ABL Facility*" means the up to $175 million superpriority, asset-based, senior secured, debtor in possession revolving credit facility incurred in accordance with the DIP ABL Documents and the DIP Orders.

62. "*DIP ABL Lenders*" means the lenders party from time to time to the DIP ABL Credit Agreement.

63. "*DIP ABL Loans*" means all loans provided by the DIP ABL Lenders under the DIP ABL Facility.

64. "*DIP Agents*" means, collectively, the DIP ABL Agent and the DIP Term Loan Facility Agent.

65. "*DIP Claims*" means, collectively, the DIP ABL Claims and the DIP Term Loan Claims.

66. "*DIP Documents*" means, collectively, the DIP Term Loan Facility Documents and the DIP ABL Documents.

67. "*DIP Lenders*" means, collectively, the DIP ABL Lenders and the DIP Term Loan Lenders.

68. "*DIP Motion*" means the motion filed with the Bankruptcy Court seeking approval of the DIP Term Loan Facility, the DIP ABL Facility, and entry of the DIP Orders.

69. "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

70. "*DIP Term Loan Claims*" means any Claim arising on account of the DIP Term Loan Facility or the Obligations (as defined in the DIP Term Loan Credit Agreement).

71. "*DIP Term Loan Credit Agreement*" means the debtor-in-possession financing credit agreement by and among the Debtors, the DIP Term Loan Facility Agent, and the DIP Term Loan Lenders setting forth the terms and conditions of the DIP Term Loan Facility.

72. "*DIP Term Loan Facility*" means the $110 million senior secured superpriority debtor-in-possession financing facility to be provided to the Debtors on the terms and conditions set forth in the DIP Term Loan Credit Agreement and the DIP Orders.

73. "*DIP Term Loan Facility Agent*" means Alter Domus (US) LLC, in its capacity as the administrative agent and collateral agent under the DIP Term Loan Credit Agreement and its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Loan Facility.

74. "*DIP Term Loan Facility Documents*" means, collectively, the DIP Term Loan Credit Agreement and any other documents governing the DIP Term Loan Facility, including the DIP Term Loan Fee Letter, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith and any other Loan Documents (as defined in the DIP Term Loan Credit Agreement).

75. "*DIP Term Loan Fee Letter*" means that certain fee letter entered into in connection with the DIP Term Loan Facility.

76. "*DIP Term Loan Lenders*" means the lenders party to the DIP Term Loan Credit Agreement.

77. "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with this Plan, which Entity may include the Solicitation Agent and the Agents/Trustees, as applicable; *provided* that no Agent shall be required to act as Disbursing Agent for non-Cash distributions or for distributions to Holders of Claims for which it does not act as Agent; *provided further*, that all distributions on account of the Legacy Notes Claims shall be made to, or at the direction of, the Legacy Notes Trustee, for distribution in accordance with the Plan following the procedures specified in the Legacy Notes Documents; *provided further* that all distributions made pursuant the Plan in respect of the Note Purchase Agreement shall be made by the NewCo Notes Agent as the Disbursing Agent for Holders of Allowed NewCo Notes Claims.

78. "*Disclosure Statement*" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, rule 3018 of the Bankruptcy Rules, and any other applicable Law, and all exhibits, schedules, supplements, modifications, and amendments thereto, to be approved pursuant to the Confirmation Order.

79. "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof): (a) that is not Allowed; (b) that is not disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

80. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, subject to the requirements of DTC with respect to the Allowed NewCo Notes Claims or Allowed Legacy Notes Claims, upon which the Disbursing Agent shall, as soon as reasonably practicable after receipt thereof, make distributions to Holders of Allowed Claims entitled to receive distributions under this Plan.

81. "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under this Plan, which date shall be the Effective Date, or such other date as agreed to by the Debtors and the Required Consenting NewCo First Lien Lenders. The Distribution Record Date shall not apply to Securities of the Debtors deposited with DTC or another similar securities depository, the Holders of which shall receive a distribution in accordance with Article VI of this Plan and, as applicable, the customary procedures of DTC or another similar securities depository.

82. "*DTC*" means The Depository Trust Company.

83. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan; and (c) this Plan is declared effective by the Debtors. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

84. "*Employment Agreement*" means any new and/or existing employment agreement or letter, indemnification agreement, severance agreement, or other agreement entered into with the Debtors' current and former officers and other employees by the Reorganized Debtors.

85. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

86. "*Equity Security*" has the meaning set forth in section 101(16) of the Bankruptcy Code.

87. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

88. "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a et seq, or any similar federal, state, or local Law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

89. "*Exculpated Partie*s" means, collectively, and in each case in its capacity as such, (a) the Debtors; (b) the directors, managers, and officers of the Debtors who served in such capacity during any portion of the Chapter 11 Cases; and (c) the Professionals retained by the Debtors in the Chapter 11 Cases.

90. "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

91. "*Existing Equity Interests*" means any Interests in Wheel Pros Holdings, L.P. existing immediately prior to the occurrence of the Effective Date.

92. "*Exit ABL Facility*" means the asset-backed revolving facility, if any, entered into by the Reorganized Debtors on the Effective Date in accordance with the Exit ABL Facility Documents.

93. "*Exit ABL Facility Agent*" means the agent under the Exit ABL Facility.

94. "*Exit ABL Facility Documents*" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

95. "*Exit ABL Lenders*" means those lenders from time to time party to the Exit ABL Facility Documents, solely in their capacity as such.

96. "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit Term Loan Facility.

97. "*Exit Facility Documents*" means, collectively, the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

98. "*Exit Facility Lenders*" means, collectively, the Exit Term Loan Lenders and the Exit ABL Lenders.

99. "*Exit Financing Loans*" means, as applicable, the loans provided under the Exit ABL Facility and the Exit Term Loan Facility on the terms and conditions set forth in the Exit Facility Documents.

100. "*Exit Term Loan Facility*" means a new senior secured term loan facility in an amount not to exceed $570 million entered into by the Reorganized Debtors on the Effective Date in accordance with the Exit Term Loan Facility Documents.

101. "*Exit Term Loan Facility Agent*" means the agent under the Exit Term Loan Facility.

102. "*Exit Term Loan Facility Backstop Commitment*" means the Exit Term Loan Facility Backstop Parties' commitment to backstop 100% of the exit term loan facility amount in consideration for the Exit Term Loan Facility Backstop Commitment Premium.

103. "*Exit Term Loan Facility Backstop Commitment Letter*" means that certain Exit Term Loan Facility Backstop Commitment Letter, between the Debtors and the Exit Term Loan Facility Backstop Parties, as may be further amended, modified, or supplemented from time to time, in accordance with its terms, pursuant to which the Exit Term Loan Facility Backstop Parties shall have agreed to backstop the Exit Term Loan Facility.

104. "*Exit Term Loan Facility Backstop Commitment Premium*" means an amount equal to 15.0% of the New Equity Interests as of the Effective Date, subject to dilution on account of the MIP Shares, allocated in accordance with the Exit Term Loan Facility Backstop Commitment Letter.

105. "*Exit Term Loan Facility Backstop Parties*" means the Consenting NewCo First Lien Lenders providing the Exit Term Loan Facility Backstop Commitment in accordance with the Exit Term Loan Facility Backstop Commitment Letter.

106. "*Exit Term Loan Facility Required Backstop Parties*" means, as of the relevant date, Exit Term Loan Facility Backstop Parties that are Consenting Equitizing Creditors which collectively hold at least 75% of the Exit Term Loan Facility Backstop Commitments held by the Exit Term Loan Facility Backstop Parties as of such date; *provided* that if there are three or more non-Affiliated Exit Term Loan Facility Backstop Parties that are Consenting Equitizing Creditors as of the applicable date, then the Exit Term Loan Facility Required Backstop Parties must also include at least three non-Affiliated Exit Term Loan Facility Backstop Parties that are Consenting Equitizing Creditors.

107. "*Exit Term Loan Facility Documents*" means the documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

108. "*Exit Term Loan Facility Participant*" means each Holder of a First Lien Claim that has executed and delivered a signature page to the RSA, a Joinder, or a Transfer Agreement to counsel to the Debtors, and that elects in its Solicitation Materials to commit to fund its Pro Rata portion of the Exit Term Loan Facility.

109. "*Exit Term Loan Facility Participation*" means the right of each Exit Term Loan Facility Participant to fund, for Cash, its Pro Rata share of the Exit Term Loan Facility.

110. "*Exit Term Loan Lenders*" means each Holder of a First Lien Claim that has delivered a signature page to the RSA, a Joinder, or a Transfer Agreement to counsel to the Debtors that elects in its Solicitation Materials to fund its Pro Rata portion of the Exit Term Loan Facility and actually funds the Exit Term Loan Facility.

111. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

112. "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. "Filed" and "Filing" shall have correlative meanings.

113. "*FILO Agent*" means Alter Domus (US) LLC, in its capacity as collateral agent and administrative agent for the holders of FILO Claims under the ABL-FILO Credit Agreement.

114. "*FILO Claims*" means Claims arising on account of FILO Loans or FILO Obligations (including, for the avoidance of doubt, any and all interest, fees, costs, and prepayment premiums, including the FILO Prepayment Premium).

115. "*FILO Loans*" means the "FILO Term Loan" under the ABL-FILO Credit Agreement.

116. "*FILO Obligations*" means the "FILO Obligations" under the ABL-FILO Credit Agreement.

117. "*FILO Prepayment Premium*" has the meaning set forth in the ABL-FILO Credit Agreement.

118. "*Final DIP Order*" means one or more Final Orders entered approving the DIP ABL Facility and the DIP Term Loan Facility and authorizing the Debtors' use of Cash Collateral.

119. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified,

or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

120. "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

121. "*First Lien Claims*" means, collectively, the NewCo First Lien Claims and Legacy First Lien Claims.

122. "*First Lien Deficiency Claims*" means any deficiency Claim held by a NewCo First Lien Lender or a Legacy First Lien Lender on account of a NewCo First Lien Claim or a Legacy First Lien Claim, respectively.

123. "*First Lien Lenders*" means, collectively, the NewCo First Lien Lenders and Legacy First Lien Lenders.

124. "*Funded Debt Documents*" means, collectively, the ABL-FILO Credit Agreement, the Legacy First Lien Credit Agreement, the NewCo First Lien Credit Agreement, the Intercompany Credit Agreement, the Notes Purchase Agreement and the Legacy Notes Indenture, in each case, together with any other documents governing such facilities and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

125. "*General Unsecured Claim*" means any Claim that is not: (a) paid in full prior to the Effective Date; (b) an Administrative Claim; (c) a Professional Fee Claim; (d) a Priority Tax Claim; (e) a Secured Tax Claim; (f) a DIP Claim; (g) an Other Secured Claim; (h) an Other Priority Claim; (i) an ABL Claim; (j) a FILO Claim; (k) a First Lien Claim; (l) a First Lien Deficiency Claim; (m) a NewCo Notes Claim; (n) a Legacy Notes Claim; (o) an Intercompany Claim; and (p) a Section 510(b) Claim.

126. "*Governance Term Sheet*" means the term sheet attached to the RSA as Exhibit H.

127. "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors.

128. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

129. "*Holder*" means an Entity that is the record owner of a Claim against or Interest in any Debtor, as applicable.

130. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims of Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

131. "*Intercompany Claim*" means any Claim held by a Debtor or Non-Debtor against another Debtor or Non-Debtor, including, for the avoidance of doubt, any Claim arising under, derived from, based on, or related to the Intercompany Credit Agreement.

132. "*Intercompany Interest*" means an Interest in one Debtor held by another Debtor.

133. "*Intercompany Credit Agreement*" means that certain First Lien Intercompany Credit Agreement, dated as of September 11, 2023, by and among Wheel Pros, Inc., as borrower, Wheel Pros Intermediate, Inc., as holdings, WP NewCo, LLC, as lender, and Alter Domus (US) LLC, as administrative agent and collateral agent thereto, as may be further amended, restated, amended and restated, or otherwise supplemented from time to time.

134. "*Interest*" means any Equity Security, equity, ownership, profit interest, unit or share in any Debtor and any other rights, options, warrants, rights, restricted stock awards, performance share awards, performance share units, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, stock-settled restricted stock units, cash-settled restricted stock units, other securities, agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor or any other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of a Debtor as of the Petition Date and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security).

135. "*Joinder*" means a joinder to the RSA substantially in the form attached to the RSA as Exhibit J.

136. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

137. "*Junior Funded Debt Claims*" means, collectively, the NewCo Notes Claims, Legacy Notes Claims, and the First Lien Deficiency Claims.

138. "*Junior Funded Debt Consideration*" means $750,000 in Cash.

139. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

140. "*Legacy First Lien Administrator*" means Alter Domus (US) LLC in its capacity as administrator under the Legacy First Lien Credit Agreement.

141. "*Legacy First Lien Claims*" means Claims arising on account of the Legacy First Lien Credit Agreement.

142. "*Legacy First Lien Credit Agreement*" means that certain First Lien Term Loan Credit Agreement, dated as of September 11, 2021 and as amended from time to time, by and among Wheel Pros, Inc., as the borrower, Wheel Pros Intermediate, Inc., as holdings, the guarantors party thereto from time to time, and the Legacy First Lien Lenders, as may be further amended, restated, amended and restated, or otherwise supplemented from time to time, for which the Legacy First Lien Administrator serves as administrator.

143. "*Legacy First Lien Facility*" means the term loan facility arising under the Legacy First Lien Credit Agreement.

144. "*Legacy First Lien Lenders*" means the lenders party from time to time to the Legacy First Lien Credit Agreement.

145. "*Legacy Notes*" means the 6.500% Senior Notes due 2029 outstanding under the Legacy Notes Indenture.

146. "*Legacy Notes Trustee Charging Lien*" means any Lien or priority of payment to which the Legacy Notes Trustee is entitled under the Legacy Notes Indentures and/or the Legacy Notes Documents, against distributions to be made to Holders of Legacy Notes Claims, for any payment of any Legacy Notes Indenture Trustee Fees.

147. "*Legacy Notes Claims*" means Claims arising on account of the Legacy Notes Indenture.

148. "*Legacy Notes Documents*" means the Legacy Notes Indenture and all related agreements and documents, including, without limitation, any agreements executed by any of the Debtors or their Affiliates in connection with the Legacy Notes Indenture, including the Legacy Notes.

149. "*Legacy Notes Indenture*" means that certain indenture, dated as of May 7, 2021 and as amended from time to time, by and among Wheel Pros Escrow Issuer Corporation, as issuer prior to the consummation of the Merger (as defined therein), Wheel Pros, Inc., as the issuer after consummation of the Merger (as defined therein), the guarantors party thereto, the Legacy Notes Trustee, and the Holders of the Legacy Notes Claims thereunder, as may be further amended, restated, amended and restated, or otherwise supplemented from time to time.

150. "*Legacy Notes Settlement*" means that certain settlement among the Debtors, the Consenting Stakeholders, and the Legacy Notes Trustee whereby the parties agreed that (i) the Junior Funded Debt Consideration shall be increased to $750,000 in Cash; (ii) payment of the Legacy Notes Trustee Fees shall be made in accordance with Article II.F of the Plan; and (iii) all Holders of Allowed NewCo Notes Claims will waive any and all recovery solely on account of such Claims, and therefore receive no recovery that they would otherwise be entitled to as Holders of Claims in Class 6 as provided pursuant to Article III of the Plan.

151. "*Legacy Notes Trustee*" means Wilmington Trust, National Association, in its capacity as trustee under the Legacy Notes Indenture.

152. "*Legacy Notes Trustee Fees*" means the reasonable and documented compensation, costs, advances, fees, expenses, disbursements, and claims for indemnity, subrogation, and contribution, including, without limitation, attorneys' and agents' fees, expenses, and disbursements, incurred by, or owed to, the Legacy Notes Trustee under the Legacy Notes Documents, whether before or after the Petition Date and the Effective Date, in an aggregate amount not to exceed $250,000.

153. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

154. "*MIP*" means a management incentive plan providing for the issuance from time to time, of awards with respect to the New Equity interests, to be adopted by the New Board following the Effective Date, the terms and conditions of which, including any and all awards granted thereunder, shall be determined by the New Board, including with respect to the participants, allocation, timing, and the form and structure and extent of issuance and vesting.

155. "*MIP Shares*" means a pool of a to be determined percentage of New Equity Interests, as of the Effective Date, reserved for issuance under the MIP.

156. "*New Board*" means the new board of directors of Reorganized Parent, which shall be selected in accordance with the terms of the Governance Term Sheet, or each of the Reorganized Debtors (if applicable and as the context requires).

157. "*New Equity Interests*" means equity in Reorganized Parent issued on or after the Effective Date pursuant to this Plan.

158. "*New Investor Agreement*" means the definitive shareholders agreement, limited liability company agreement, or other applicable agreement (including all annexes, exhibits, and schedules thereto) governing the New Equity Interests and associated governance rights.

159. "*NewCo First Lien Agent*" means Alter Domus (US) LLC in its capacity as administrative agent and collateral agent under the NewCo First Lien Credit Agreement.

160. "*NewCo First Lien Claims*" means Claims arising on account of the NewCo First Lien Credit Agreement.

161. "*NewCo First Lien Credit Agreement*" means that certain First Lien Term Loan Credit Agreement, dated as of September 11, 2023 and as amended from time to time, by and among WP NewCo, LLC, as the borrower, WP

NewCo HoldCo, LLC, as holdings, Wheel Pros Intermediate, Inc., Wheel Pros, Inc., the NewCo First Lien Agent, and the NewCo First Lien Lenders, as may be further amended, restated, amended and restated, or otherwise supplemented from time to time.

162. "*NewCo First Lien Facility*" means the term loan facility arising under the NewCo First Lien Credit Agreement.

163. "*NewCo First Lien Lenders*" means the lenders party from time to time to the NewCo First Lien Credit Agreement.

164. "*NewCo Notes Agent*" means GLAS Trust Company LLC, in its capacity as notes agent and collateral agent under the Notes Purchase Agreement.

165. "*NewCo Notes Claims*" means Claims arising on account of the Note Purchase Agreement.

166. "*Non-Debtor*" means direct and indirect subsidiaries of Wheel Pros Holdings, L.P. that are not Debtors.

167. "*Non-Released Claims*" means, exclusively, any claims or Causes of Action of the Debtors against the Non-Released Parties arising within the calendar years of 2021–2023 based solely on any actual fraud or willful misconduct; *provided* that any liability on such Non-Released Claims, including by way of settlement or judgment, shall only be enforced or collected from, and to the extent of, available insurance proceeds.

168. "*Non-Released Parties*" means the parties listed on the Non-Released Parties Exhibit.

169. "*Non-Released Parties Exhibit*" means the exhibit setting forth the Non-Released Parties, which shall be included in the Plan Supplement.

170. "*Note Purchase Agreement*" means that certain Note Purchase Agreement, dated as of September 11, 2023 and as amended from time to time, by and among WP NewCo, LLC as the issuer, WP NewCo HoldCo, LLC, as holdings, Wheel Pros Intermediate, Inc., Wheel Pros, Inc., the guarantors party thereto, the NewCo Notes Agent, and the Holders of the NewCo Notes Claims thereunder, providing for the issuance of senior second lien notes due 2028 on the terms and subject to the conditions set forth therein, as may be further amended, restated, amended and restated, or otherwise supplemented from time to time.

171. "*Nut Tree*" means the investment funds and accounts managed, directly or indirectly, by Nut Tree Capital Management LP and its affiliates in their capacities as Holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold FILO Claims, NewCo First Lien Claims, Legacy First Lien Claims, NewCo Notes Claims, and/or Legacy Notes Claims that are Consenting Stakeholders.

172. "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

173. "*Other Secured Claim*" means any Secured Claim other than any DIP Claim, any ABL Claim, any FILO Claim, any First Lien Claim, and any NewCo Notes Claim.

174. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

175. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

176. "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under and in accordance with this Plan.

177. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan to be Filed with the Bankruptcy Court, and any additional documents Filed as amendments to the Plan Supplement (in each case, as may be altered, modified, or supplemented from time to time in accordance

with the terms hereof and subject to (i) the reasonable consent of the Exit ABL Facility Agent, the DIP ABL Agent, the DIP Term Loan Facility Agent, or the Exit Term Loan Facility Agent, as applicable: (x) to the extent any is a party to any Plan Supplement document, or (y) solely with respect to any Plan Supplement document (or portion thereof) that materially affects the rights, remedies, or obligations of such party and (ii) the applicable consent rights set forth in the RSA and the Exit Term Loan Facility Backstop Commitment Letter), including the following, as applicable: (a) the Corporate Governance Documents (including the New Investor Agreement); (b) the Exit Facility Documents; (c) the Exit Term Loan Facility Backstop Commitment Letter; (d) to the extent known, the identities of the members of the New Board; (e) the Rejected Executory Contracts and Unexpired Leases Schedule, if any; (f) the Schedule of Assigned Contracts; (g) the Schedule of Retained Causes of Action; (h) the Restructuring Transactions Memorandum; (i) the Non-Released Parties Exhibit; and (j) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement in accordance with this Plan on or before the Effective Date. The Plan Supplement shall be deemed incorporated into and part of this Plan as if set forth herein in full; *provided* that in the event of a conflict between this Plan and the Plan Supplement, the Plan Supplement shall control in accordance with Article I.G hereof.

178. "*Poison Spyder Buyer*" means the buyer in connection with the Poison Spyder Sale.

179. "*Poison Spyder Sale*" means the sale of the Debtors' "Poison Spyder" intellectual property and related assets.

180. "*Poison Spyder Sale Motion*" means the motion seeking approval under sections 363 and 365 of the Bankruptcy Code of the Poison Spyder Sale.

181. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

182. "*Pro Rata*" means, unless otherwise specified, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class or the proportion of the Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claims under this Plan.

183. "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

184. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of this Plan.

185. "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred by such Professionals through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

186. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

187. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

188. "*Quarterly Fees*" means all fees payable pursuant to section 1930 of the Judicial Code, together with the statutory rate of interest set forth in section 3717 of title 31 of the United States Code.

189. "*Reinstate*" means with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

190. "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors on behalf of the applicable Debtor pursuant to this Plan.

191. "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

192. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Group; (e) each ABL Lender and Holder of an ABL Claim; (f) each DIP Lender and Holder of a DIP Claim; (g) each Exit Term Loan Facility Backstop Party; (h) each of the Exit Facility Lenders; (i) each of the Agents/Trustees; (j) current and former Affiliates of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k); *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases described in Article VIII.D hereof; (y) timely objects to the releases contained in Article VIII.D hereof and such objection is not resolved prior to Confirmation; or (z) with respect to Non-Released Claims, is a Non-Released Party.

193. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each member of the Ad Hoc Group; (e) each ABL Lender and Holder of an ABL Claim; (f) each DIP Lender and Holder of a DIP Claim; (g) each Exit Term Loan Facility Backstop Party; (h) each of the Exit Facility Lenders; (i) each of the Agents/Trustees; (j) all Holders of Claims or Interests that vote to accept this Plan; (k) all Holders of Claims or Interests who are deemed to accept this Plan and do not affirmatively opt out of the releases provided for in this Plan; (l) all Holders of Claims who abstain from voting on this Plan and who do not affirmatively opt out of the releases provided for in this Plan; (m) all Holders of Claims or Interests who vote to reject this Plan and who do not affirmatively opt out of the releases provided for in this Plan; (n) current and former Affiliates of each Entity in clause (a) through the following clause (o) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable Law or that have otherwise received proper notice of the Plan; and (o) each Related Party in clause (a) through this clause (o) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable Law or that have otherwise received proper notice of the Plan; *provided* that each Holder of Claims or Interests that is party to or has otherwise signed the RSA shall be bound by the releases; *provided*, *further*, that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in Article VIII.D hereof; (y) timely objects to the releases contained in Article VIII.D hereof and such objection is not resolved before Confirmation; or (z) is a Non-Released Party (solely in respect of the Non-Released Claims).

194. "*Reorganized Debtors*" means the Debtors as reorganized under this Plan, including Reorganized Parent, or any successor or assign thereto, by transfer, merger, consolidation, or otherwise, including any new Entity established in connection with the implementation of the Restructuring Transactions.

195. "*Reorganized Parent*" means, as determined by the Required Consenting NewCo First Lien Lenders in their sole discretion, reorganized Wheel Pros Parent II, Inc., any successor or assign thereto, by merger, consolidation, or otherwise (including any subsidiary of Wheel Pros Parent II, Inc.), or any new corporation, limited liability

company, partnership, or other Entity that may be formed to, among other things, directly or indirectly own and hold all or substantially all of the assets and/or stock (including share capital) of the Debtors (other than the share capital of Wheel Pros Parent II, Inc.), as applicable, in accordance with the RSA and this Plan, and issue the New Equity Interests to be distributed pursuant to the Restructuring Transactions and this Plan.

196. "*Required Consenting NewCo First Lien Lenders*" means, as of the relevant date, Consenting NewCo First Lien Lenders that are Consenting Equitizing Creditors which collectively hold at least 75% of the aggregate outstanding principal amount of the NewCo First Lien Loans (as defined in the RSA) that are held by the Consenting NewCo First Lien Lenders as of such date; *provided* that, so long as Nut Tree holds at least 10% of the aggregate outstanding principal amount of the NewCo First Lien Loans (as defined in the RSA), the Required Consenting NewCo First Lien Lenders must include Nut Tree; *provided*, *further*, that, with respect to any consent provided for under this Plan related to approval of the forms and/or substance of any of the Definitive Documents (or any amendment, modifications, or supplements thereto), or conditions precedent related to the form and/or substance of any of the Definitive Documents, Nut Tree's consent shall be required solely to the extent that such Definitive Document contains terms or conditions inconsistent with this Plan in a manner that (i) materially and adversely affects the rights, obligations, or treatment (other than as provided in clause (ii) below) of Nut Tree under the Restructuring Transactions, (ii) adversely affects the releases or economic treatment (including under this Plan, the Exit Term Loan Facility, or DIP Term Loan Facility) being provided to Nut Tree under the Restructuring Transactions, or (iii) affects governance terms provided for in the Governance Term Sheet (it being understood that the form and substance of the Corporate Governance Documents shall require Nut Tree's consent); *provided*, *further*, that Nut Tree's consent shall not be unreasonably withheld, conditioned, or delayed).

197. "*Restructuring Expenses*" means the reasonable and documented fees and expenses of the Consenting Equitizing Creditors, including the reasonable and documented fees and expenses of (i) the Consenting Equitizing Creditors Advisors (subject to the terms of any applicable engagement letter or reimbursement letter with any of the Debtors (in the case of Lazard Frères & Co. LLC, as in effect as of the date of execution of the RSA), as the case may be); and (ii) the Sponsor and the Sponsor Advisors in connection with the Restructuring Transactions, each subject to the terms and conditions in the RSA (including any limitations therein).

198. "*Restructuring Transactions*" means the transactions described in Article IV of this Plan.

199. "*Restructuring Transactions Memorandum*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with this Plan and the RSA, and as set forth in the Plan Supplement, and otherwise in a manner consistent with the Definitive Documents.

200. "*RSA*" means that certain Restructuring Support Agreement, dated as of September 8, 2024, by and among the Company Parties and the Consenting Stakeholders, including all exhibits, schedules, and other attachments thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the Disclosure Statement as Exhibit B.

201. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time, which, for the avoidance of doubt, shall not include any Causes of Action that are settled, released, or exculpated under this Plan.

202. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

203. "*Secured Claim*" means a Claim that is: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

204. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

205. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local Law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

206. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

207. "*Solicitation Agent*" means Stretto, Inc., the Claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

208. "*Solicitation Materials*" means, as applicable, any documents, forms, ballots, notices and other materials provided in connection with the solicitation of votes on this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

209. "*Sponsor*" means, collectively, Clearlake Capital Group, L.P. and its affiliates that hold Claims against or Interests in one or more of the Debtors.

210. "*Sponsor Advisors*" means, collectively, Katten Muchin Rosenman LLP and one local counsel retained by the Sponsor from time to time, in connection with the Restructuring Transactions, regardless of whether such advisor was retained prior to or following the Petition Date.

211. "*SVP*" means various investment funds and accounts managed, directly or indirectly, by Strategic Value Partners LLC and its affiliates in their capacities as holders (or beneficial holders) of, or nominees, investment advisors, sub advisors, or managers of discretionary accounts that hold FILO Claims, NewCo First Lien Claims, NewCo Notes Claims, and Legacy Notes Claims that have executed and delivered counterpart signatures to the RSA.

212. "*SVP Advisors*" means, collectively, Davis Polk & Wardwell LLP, Lazard Frères & Co. LLC, and the other professionals or consultants retained by SVP from time to time, in connection with the Restructuring Transactions, regardless of whether such advisor was retained prior to or following the Petition Date.

213. "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

214. "*Transfer Agreement*" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the RSA, substantially in the form attached as Exhibit I to the RSA.

215. "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar Entity under the Note Purchase Agreement and/or Legacy Notes Indenture, including any successors thereto.

216. "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

217. "*Unclaimed Distribution*" means any distribution under this Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 180 calendar days of receipt; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution within 180 calendar days of receipt; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

218. "*Unexpired Lease*" means a lease of non-residential, real property to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

219. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

*B. Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto as provided for in the RSA; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, charter, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (9) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval, of the Bankruptcy Court or any other Entity; (10) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (11) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (12) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (13) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (14) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (15) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (16) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail.

*C. Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

*D. Governing Law.*

Except to the extent a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code or the Bankruptcy Rules) and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed, implemented, and enforced in accordance with, the Laws of the State of New York, without giving effect to the principles of conflict of Laws (other than section 5 1401 and section 5 1402 of the New York General Obligations Law); *provided* that corporate governance matters relating to the Debtors or the

Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

*E. Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*F. Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*G. Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan or the Disclosure Statement, the Confirmation Order shall control.

*H. Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all respective consultation, information, notice, and consent rights set forth in the RSA (including the Governance Term Sheet) and the Exit Term Loan Facility Backstop Commitment Letter, with respect to the form and substance of this Plan, all exhibits to this Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

Failure to reference in this Plan the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the RSA (including the Governance Term Sheet) or the Exit Term Loan Facility Backstop Commitment Letter, as applicable, shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A. Administrative Claims.*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order allowing such Administrative Claim

becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

*B.* *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

C. *DIP Claims*.

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP ABL Facility (including the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP Orders and the DIP ABL Documents) and the DIP Term Loan Facility, as applicable, on such date, (ii) all interest accrued and unpaid thereon to the date of payment, and (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP ABL Claim, each Holder of an Allowed DIP ABL Claim, including the DIP ABL Agent, shall receive (i) payment in full in Cash of its Allowed DIP ABL Claim and, including the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP Orders and the DIP ABL Documents, or (ii) at the option of the applicable Debtors with the consent of the DIP ABL Agent, the DIP ABL Lenders, and SVP, conversion or the refinancing of such Allowed DIP ABL Claims into the Exit ABL Facility (including the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP Orders and the DIP ABL Documents) pursuant to the Exit ABL Facility Documents, which shall be in form and substance acceptable to the DIP ABL Agent, the DIP ABL Lenders, and the Required Consenting NewCo First Lien Lenders.

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash of its Allowed DIP Term Loan Claim.

Following such satisfaction of the Allowed DIP Claims, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Documents, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP ABL Facility or DIP Term Loan Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agents or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders. At the expense of the Debtors or Reorganized Debtors, the DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

D. *Professional Fee Claims.*

1. Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of this Plan.

2. Professional Fee Escrow Account.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than one (1) Business Day before the Effective Date; *provided*, *however*, that such estimates shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

4. Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor or the Reorganized Debtor, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Payment of Statutory Fees and Reporting to the U.S. Trustee.*

All Quarterly Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of the Debtors' cases being closed, dismissed or converted to cases under chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

*F. Payment of Restructuring Expenses and Legacy Notes Trustee Fees.*

The Restructuring Expenses and the Legacy Notes Trustee Fees incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and, if applicable, subject to, the terms set forth in the RSA and the Exit Term Loan Facility Backstop Commitment Letter, without any requirement to File a fee application with the Bankruptcy Court or for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for time detail) from the applicable Entity entitled to such Restructuring Expenses or Legacy Notes Trustee Fees, as applicable, in accordance with, if applicable, such Entity's respective engagement letter or fee letter. All Restructuring Expenses and Legacy Notes Trustee Fees to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses and Legacy Notes Trustee Fees (it being understood that any difference in (a) estimated Restructuring Expenses and Legacy Notes Trustee Fees, as applicable, on and including the Effective Date as compared to (b) Restructuring Expenses and Legacy Notes Trustee Fees, as applicable, actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity following the Effective Date). In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course (but no later than within ten (10) Business Days of receipt of an invoice), Restructuring Expenses and Legacy Notes Trustee Fees related to implementation, Consummation, and defense of this Plan, whether incurred before, on, or after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for time detail).

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A. Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors (except for the Class 10 Existing Equity Interests, which shall apply only to Wheel Pros Holdings, L.P.). All of the potential Classes for the Debtors are set forth herein. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | FILO Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | First Lien Claims | Impaired | Entitled to Vote |
| Class 6 | Junior Funded Debt Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

*B. Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to in writing by the Debtors with the consent of SVP and, solely as to Class 5 (First Lien Claims) and Class 6 (Junior Funded Debt Claims), the Required Consenting NewCo First Lien Lenders or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1. <u>Class 1 – Other Secured Claims</u>.

(a) *Classification*: Class 1 consists of all Allowed Other Secured Claims against any Debtor.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured

Claim shall receive, in full and final satisfaction of such Other Secured Claim, at the option of the applicable Debtor or the Reorganized Debtor, either:

(i) payment in full in Cash of its Allowed Other Secured Claim;

(ii) the collateral securing its Allowed Other Secured Claim;

(iii) Reinstatement of its Allowed Other Secured Claim; or

(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 1 is Unimpaired under this Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2. <u>Class 2 – Other Priority Claims</u>.

(a) *Classification*: Class 2 consists of all Allowed Other Priority Claims against any Debtor.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c) *Voting*: Class 2 is Unimpaired under this Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3. <u>Class 3 – ABL Claims</u>.

(a) *Classification*: Class 3 consists of all Allowed ABL Claims against any Debtor.

(b) *Treatment*: Except to the extent that a Holder of an Allowed ABL Claim agrees to less favorable treatment of its Allowed Claim, on the Effective Date, each Holder of an Allowed ABL Claim will receive, in full and final satisfaction of such ABL Claim payment in full in Cash and the replacement or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the ABL-FILO Credit Agreement ) in accordance with the terms and in the amounts specified under the ABL-FILO Credit Agreement.

(c) *Voting*: Class 3 is Unimpaired under this Plan. Holders of Allowed ABL Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

4. <u>Class 4 – FILO Claims</u>.

(a) *Classification*: Class 4 consists of all Allowed FILO Claims against any Debtor.

(b) *Allowance*: The FILO Claims shall be deemed Allowed in the aggregate principal amount under the ABL-FILO Credit Agreement, plus accrued and unpaid interest (including

interest accrued after the Petition Date) on such principal amount and any other premiums (including the FILO Prepayment Premium), fees, costs, or other amounts due and owing pursuant to the ABL-FILO Credit Agreement and the other Funded Debt Documents in respect of the FILO Loans.

(c) *Treatment*: Except to the extent that a Holder of an Allowed FILO Claim agrees to less favorable treatment of its Allowed Claim, on the Effective Date, each Holder of an Allowed FILO Claim will receive, in full and final satisfaction of such FILO Claim, payment in full in Cash.

(d) *Voting*: Class 4 is Unimpaired under this Plan. Holders of FILO Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

5. <u>Class 5 – First Lien Claims</u>.

(a) *Classification*: Class 5 consists of any First Lien Claims against any Debtor.

(b) *Allowance*: The First Lien Claims shall be deemed Allowed in the aggregate principal amount under the NewCo First Lien Credit Agreement and Legacy First Lien Credit Agreement, as applicable, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Funded Debt Agreements in respect of the First Lien Claims.

(c) *Treatment*: Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment of its Allowed Claim, on the Effective Date, each Holder of an Allowed First Lien Claim shall receive, in full and final satisfaction of such First Lien Claim: (i) its Pro Rata share of 85% of the New Equity Interests, subject to dilution on account of the MIP Shares; and (ii) right to fund its Pro Rata share of the Exit Term Loan Facility in accordance with the terms of this Plan.

(d) *Voting*: Class 5 is Impaired under this Plan and Holders of Allowed First Lien Claims are entitled to vote to accept or reject this Plan.

6. <u>Class 6 – Junior Funded Debt Claims</u>.

(a) *Classification*: Class 6 consists of any Junior Funded Debt Claims against any Debtor.

(b) *Allowance*: The Junior Funded Debt Claims shall be deemed Allowed in the aggregate principal amount under the NewCo First Lien Credit Agreement, Legacy First Lien Credit Agreement, Note Purchase Agreement, or Legacy Notes Indenture, as applicable, plus accrued and unpaid interest on such principal amount (inclusive of the amount of $94,561,745.82 in principal and accrued and unpaid prepetition interest on such principal amount under the Legacy Notes Indenture) and any other premiums, fees, costs, or other amounts due and owing pursuant to the Funded Debt Agreements in respect of the Junior Funded Debt Claims.

(c) *Treatment*: Except to the extent that a Holder of an Allowed Junior Funded Debt Claim agrees to less favorable treatment of its Allowed Claim, on the Effective Date, each Holder of an Allowed Junior Funded Debt Claim shall receive, in full and final satisfaction of such Junior Funded Debt Claim, and subject to the rights and terms of the Legacy Notes Documents and the rights of the Legacy Notes Indenture Trustee to assert the Legacy Notes Trustee Charging Lien, its Pro Rata share of the Junior Funded Debt Consideration; *provided* that if Class 6 votes to accept the Plan, the Holders of First Lien Deficiency

Claims and NewCo Notes Claims shall not receive any recovery on account of such Claims pursuant to the Legacy Notes Settlement.

(d) *Voting*: Class 6 is Impaired under this Plan and Holders of Allowed Junior Funded Debt Claims are entitled to vote to accept or reject this Plan.

7. Class 7 – General Unsecured Claims.

(a) *Classification*: Class 7 consists of all Allowed General Unsecured Claims against any Debtor.

(b) *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, either:

(i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or

(ii) payment in full in Cash on (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c) *Voting:* Class 7 is Unimpaired under this Plan. Holders of Allowed Claims in Class 7 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8. Class 8 – Intercompany Claims.

(a) *Classification:* Class 8 consists of all Intercompany Claims.

(b) *Treatment:* Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of SVP) or the Reorganized Debtor, either:

(i) Reinstated; or

(ii) adjusted, converted to equity, set off, settled, distributed, or contributed; or

(iii) discharged, cancelled, and released without any distribution on account of such Intercompany Claims.

This Plan and distributions contemplated thereby constitute a global settlement of any and all Intercompany Claims and Causes of Action by and between any of the Debtors that may exist as of the Effective Date. This Plan shall be considered a settlement of the Intercompany Claims pursuant to Bankruptcy Rule 9019.

(c) *Voting:* Class 8 is Unimpaired if the Allowed Intercompany Claims are Reinstated or Impaired if the Allowed Intercompany Claims in Class 8 are cancelled. Holders of Allowed Intercompany Claims in Class 8 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to

section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

9. Class 9 – Intercompany Interests.

(a) *Classification:* Class 9 consists of all Intercompany Interests.

(b) *Treatment:* Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor (with the consent of SVP) or the Reorganized Debtor, either:

(i) Reinstated; or

(ii) set off, settled, discharged, contributed, cancelled, and or released without any distribution on account of such Intercompany Interests, or otherwise addressed or eliminated.

(c) *Voting*: Class 9 is Unimpaired if the Allowed Intercompany Interests are Reinstated or Impaired if the Allowed Intercompany Interests are cancelled. Holders of Allowed Intercompany Interests in Class 9 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

10. Class 10 – Existing Equity Interests.

(a) *Classification*: Class 10 consists of all Existing Equity Interests.

(b) *Treatment*: On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Existing Equity Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest.

(c) *Voting*: Class 10 is Impaired under this Plan. Holders of Existing Equity Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

11. Class 11 – Section 510(b) Claims.

(a) *Classification*: Class 11 consists of all Section 510(b) Claims.

(b) *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c) *Treatment*: On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

(d) *Voting*: Class 11 is Impaired under this Plan. Holders of Allowed Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

*C. Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

*D. Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

*E. Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted this Plan.

*F. Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure, for the ultimate benefit of the Holders of the New Equity Interests in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, unless otherwise set forth in the Restructuring Transactions Memorandum, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

*G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Article X hereof and the terms of the RSA and the Exit Term Loan Facility Backstop Commitment Letter (including the consent rights provided therein) to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

*H. Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*I. Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

*A. General Settlement of Claims and Interests.*

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan. To the greatest extent permissible under the Bankruptcy Code, this Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies by and among the Debtors, the Consenting Stakeholders, the DIP Term Loan Lenders, the DIP ABL Lenders, the ABL Lenders, the Legacy Notes Trustee, and each of the Agents/Trustees pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final. Notwithstanding anything to the contrary herein, nothing in this Plan shall be deemed to release, waive, compromise, settle, impair, or enjoin any Non-Released Claims against any Non-Released Party.

*B. Restructuring Transactions.*

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors (in accordance with any applicable consent or approval rights under the RSA as in effect on such date) or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and are authorized in all respects to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the RSA; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable Corporate Governance Documents; (4) the issuance and distribution of the New Equity Interests; (5) the consummation of the Exit Facilities, including the execution, delivery, and filing of all Exit Facility Documents; (6) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (7) all other actions that the

applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with this Plan.

To the extent not previously authorized pursuant to a Final Order, the Debtors shall consummate the 4WP Sale and Poison Spyder Sale. The Debtors or the Reorganized Debtors, as applicable, may take any additional action as may be necessary or appropriate to effectuate the 4WP Sale and Poison Spyder Sale, and any transactions described in, approved by, contemplated by, or necessary to effectuate the 4WP Sale and Poison Spyder Sale.

The Confirmation Order shall, and shall be deemed to, pursuant to both sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan. The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Stakeholders, as applicable, to undertake the Restructuring Transactions contemplated by this Plan, the RSA and the other Definitive Documents.

*C. The Reorganized Debtors.*

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Corporate Governance Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan. Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under this Plan. Except as set forth herein or as otherwise provided for in the Restructuring Transactions Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement, the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital, including issuing additional New Equity Interests and obtaining additional financing, subject to, the terms of the Corporate Governance Documents, as the New Board deems appropriate.

*D. Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan with: (1) the Debtors' Cash on hand as of the Effective Date; (2) the proceeds from the Exit Term Loan Facility; and (3) the New Equity Interests. Each distribution and issuance referred to in Article VI shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the New Equity Interests, will be exempt from registration under the Securities Act, as described more fully in Article IV.M hereof.

1. Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Exit Facilities to fund distributions to Holders of Allowed Claims, consistent with the terms of this Plan.

2. New Equity Interests.

(a) *Issuance of the New Equity Interests.*

Reorganized Parent shall be authorized to issue the New Equity Interests pursuant to its Corporate Governance Documents. The issuance of the New Equity Interests, including equity awards reserved for the MIP, shall be authorized without the need for any further corporate action or without any further action by the Debtors or

Reorganized Debtors. On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Restructuring Transactions Memorandum pursuant to, and in accordance with, this Plan.

All of the shares (or comparable units) of New Equity Interests issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of New Equity Interests (including the New Equity Interests issued in connection with the Exit Term Loan Facility Backstop Commitment Premium) shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Corporate Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. As a condition to receiving the New Equity Interests, all recipients of New Equity Interests pursuant to the MIP and the Exit Term Loan Facility, shall be required to execute and deliver the New Investor Agreement; *provided*, *however*, that acceptance of such New Equity Interests constitutes deemed acceptance and consent to the terms of the New Investor Agreement, without the need for execution by any party thereto. For the avoidance of doubt, the Reorganized Debtors, with the consent of SVP, may waive the requirement to receive an executed signature page to the New Investor Agreement. The New Investor Agreement will be effective as of the Effective Date, and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Equity Interests will be bound thereby in all respects. The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of DTC. Additional information relating to the applicability of the securities law is available in Article IV.M.

3. Exit Facilities and Exit Term Loan Facility Participation.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, as applicable, pursuant to the Exit Facility Documents. Confirmation of this Plan shall constitute (a) approval of the Exit Facilities and the Exit Facility Documents; and (b) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the Exit Facilities, including executing and delivering the Exit Facility Documents, in each case, without any further notice to or order of the Bankruptcy Court.

As of the Effective Date, all of the Liens and security interests to be granted by the Debtors in accordance with the Exit Facility Documents: (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. To the extent provided in the Exit Facility Documents, the Exit Term Loan Facility Agent and the Exit ABL Facility Agent, as applicable, are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents. The Exit Term Loan Facility Agent and the Exit ABL Facility Agent, as applicable, shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. The guarantees granted under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

The Exit Term Loan Facility Participation shall be backstopped by the Exit Term Loan Facility Backstop Parties on the terms set forth in the Exit Term Loan Facility Backstop Commitment Letter, which shall provide for, among other things, on a Pro Rata basis to each Exit Term Loan Facility Backstop Party, the Exit Term Loan Facility

Backstop Commitment Premium. In exchange for consideration consisting of the Exit Term Loan Facility Backstop Commitment Premium and in accordance with the Exit Term Loan Facility Backstop Commitment Letter, the Exit Term Loan Facility Backstop Parties have committed to fully backstop, severally and not jointly, the Exit Term Loan Facility. Each Exit Term Loan Facility Participant shall fund its Pro Rata share of the Exit Term Loan Facility and receive its Pro Rata share of the Exit Term Loan Facility. The Exit Term Loan Facility shall be used to satisfy, among other things: distributions pursuant to this Plan.

*E. Corporate Existence.*

Except as otherwise provided in this Plan, the Confirmation Order, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under this Plan or otherwise, in each case, consistent with the RSA and the consent rights therein, this Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*F. Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum) shall be treated as being liable on any Claim that is discharged pursuant to this Plan.

*G. Cancellation of Existing Securities, Agreements, and Interests.*

On the Effective Date, except to the extent otherwise provided in this Plan or the Confirmation Order (including to the extent any DIP ABL Claim is, with the consent of the DIP ABL Agent, the DIP ABL Lenders, and SVP, refinanced and/or converted into the Exit ABL Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (other than those Reinstated Claims (collectively, the "Cancelled Instruments") or Existing Equity Interests, shall, be cancelled, and any rights of any Holder in respect thereof shall be deemed cancelled and of no force or effect, and all present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), of the Debtors and any non-Debtor Affiliates thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, and the Agents/Trustees and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action.

Holders of or parties to such Cancelled Instruments, Existing Equity Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancellation thereof, except the rights provided for or reserved pursuant to this Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, the Funded Debt Documents and DIP Documents shall continue in effect after the Effective Date to the extent necessary to: (a) permit Holders of Claims under the Funded Debt Documents and DIP Documents to receive and accept their respective distributions on account of such Claims, if any; (b) permit the Disbursing Agent or the Agents/Trustees, as applicable, to make distributions on account of the Allowed Claims under the Funded Debt Documents and DIP Documents; (c) preserve any rights of the Agents/Trustees, to maintain, exercise, and enforce any applicable rights of indemnity, expense reimbursement, priority of payment (including, as applicable, the Legacy Notes Trustee Charging Lien), contribution, subrogation, or any other similar claim or entitlement (whether such claims accrued before or after the Effective Date), and preserve any exculpations of the Agents/Trustees, all of which shall remain fully enforceable against the Reorganized Debtors and all other applicable Persons under the Funded Debt Documents and DIP Documents; (d) permit the Agents/Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce the respective obligations owed to them under the Plan and to enforce any obligations owed to their respective Holders of Claims under the Plan in accordance with the applicable Funded Debt Documents and DIP Documents; and (e) permit the Agents/Trustees to perform any functions that are necessary to effectuate the foregoing; *provided, however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan (including clause (c) of the preceding proviso), and (2) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. For the avoidance of doubt, the DIP Documents shall continue in full force and effect (other than any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any contingent or unsatisfied obligations and any other provisions that expressly survive the termination of the DIP ABL Facility or the DIP Term Loan Facility in accordance with the terms of the DIP Documents.

If the record holder of any NewCo Notes Claims or Legacy Notes Claims is DTC or its nominee or another securities depository or custodian thereof, and such underlying Securities are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of NewCo Notes Claims or Legacy Notes Claims shall be deemed to have surrendered such Holder's Securities underlying such NewCo Notes Claims or Legacy Notes Claims upon surrender of such global security by DTC or such other securities depository or custodian thereof.

*H. Corporate Action.*

Upon the Effective Date, all actions contemplated under this Plan (including the Restructuring Transactions Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (1) adoption or assumption, as applicable, of the Compensation and Benefits Programs and all obligations related thereto; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Corporate Governance Documents, including the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions; (5) the entry into the Exit Facility Documents and the execution, delivery, and filing of any documents pertaining thereto; (6) the consummation of the Exit Term Loan Facility Participation; (7) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the Corporate Governance Documents (including the New Investor Agreement); (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, and instruments

contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Exit Financing Loans, the Corporate Governance Documents, any other Definitive Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy Law.

*I. Corporate Governance Documents.*

On or immediately prior to the Effective Date, except as otherwise provided in this Plan and subject to local Law requirements, the Corporate Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet, and as may be necessary to effectuate the transactions contemplated by this Plan. To the extent required under this Plan or applicable non-bankruptcy, each of the Reorganized Debtors will file its Corporate Governance Documents with the Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The Corporate Governance Documents will, among other things (a) authorize the issuance of the New Equity Interests and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the Laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, Reorganized Parent shall enter into and deliver the New Investor Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Holders of New Equity Interests shall be deemed to have executed the New Investor Agreement and be parties thereto, without the need to deliver signature pages thereto.

*J. New Investor Agreement.*

From and after the Effective Date, all holders of New Equity Interests shall be subject to the terms and conditions of the New Investor Agreement.

*K. Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board and the other Governing Bodies shall be appointed in accordance with the Corporate Governance Documents. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Corporate Governance Documents and other constituent documents of the Reorganized Debtors.

*L. Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Exit Facility Documents entered into, and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

*M. Certain Securities Law Matters.*

Before the Petition Date the offering of any New Equity Interests shall be exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

After the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, and distribution of the New Equity Interests as contemplated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The shares of New Equity Interests to be issued under this Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Equity Interests in the Corporate Governance Documents.

The shares of New Equity Interests that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Equity Interests in the Corporate Governance Documents.

Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Equity Interests.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the New Equity Interests) with respect to the treatment of the New Equity Interests to be issued under the Plan under applicable securities laws. DTC and any transfer agent for the New Equity Interests shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository (to the extent applicable). Notwithstanding anything to the contrary in the Plan, no Entity (including DTC and any transfer agent for the New Equity Interests) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity Interests to be issued under the Plan are exempt from registration.

*N. Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Equity Interests, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities, or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage

tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O. *Private Company.*

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Equity Interests shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Equity Interests on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the Corporate Governance Documents.

*P. Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise adversely affect the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date. The New Equity Interests underlying the MIP will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and will be considered "restricted securities." For additional information, see Article IV.M above.

*Q. MIP.*

Following the Effective Date, the New Board shall adopt the MIP, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and other service providers of the Reorganized Debtors, as determined at the discretion of the New Board. The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, shall be determined at the discretion of the New Board after the Effective Date.

*R. Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of this Plan to the contrary, other than the Causes of Action released by the Debtors

pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in this Plan.** The Reorganized Debtors may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court. Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in this Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*S. Cashless Transactions.*

Notwithstanding anything to the contrary set forth herein, the treatment of Claims, distributions, and other transactions contemplated hereby including, without limitation, the funding of the Exit Term Loan Facility, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A. Assumption of Executory Contracts and Unexpired Leases.*

Each Executory Contract and Unexpired Lease shall, subject to the consent of SVP, be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease was (a) previously assumed, amended and assumed, assumed and assigned, or rejected by the applicable Debtors; (b) previously expired or terminated pursuant to its own terms; or (c) is the subject of a motion to reject such executory contract or unexpired lease that is pending on the Effective Date; *provided, however*, that neither the Restructuring nor the transactions contemplated by this Plan will constitute a change of control or other acceleration event for purposes of any Executory Contract or Unexpired Lease of the Debtors. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates, the 4WP Buyer, or the Poison Spyder Buyer. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

Except as otherwise specifically set forth herein, assumptions of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court

authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors (with the consent of SVP, which consent shall not be unreasonably withheld, delayed, or conditioned) and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

*B. Indemnification Obligations.*

Subject to the treatment of Section 510(b) Claims under this Plan, and to the fullest extent permitted under applicable Law (including being subject to the limitations of the Delaware General Corporation Law, including the limitations contained therein on a corporation's ability to indemnify officers and directors), with the exception of any indemnification obligations owed to any Non-Released Party owed in respect of the Non-Released Claims, all indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date or constitute a finding or conclusion that any party that may seek indemnification is entitled to indemnification under the terms of such indemnification provisions or is intended to effectuate the survival of any indemnification obligations for any party other than the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors; *provided*, *further*, that any indemnification obligations owed to Non-Released Parties with respect to the Non-Released Claims shall not be Reinstated and shall not be honored. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. Notwithstanding anything to the contrary herein, if any Releasing Party (including its successors and assigns, including, without limitation, any estate, receiver, trustee, debtor-in-possession, or other Person), including the Reorganized Debtors, seeks to pursue any Non-Released Claim against a Non-Released Party which results in any Claim, including a Claim for indemnification, against any Released

Party, each Releasing Party, including the Reorganized Debtors, agrees that it shall not pursue or recover any funds, property, or other value received, awarded, or arising from settlement, judgment, or other resolution of such actual or threatened Non-Released Claim and if so pursued or recovered shall assign any such recoveries exclusively to, and hold them in trust exclusively for, such Released Party,

*C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before 20 days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however,* that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to File such request for payment of such Cure costs. The Reorganized Debtors also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. Any objection to the assumption of an Executory Contract or Unexpired Lease under this Plan must be Filed with the Bankruptcy Court on or before the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or such other setting as requested by the Debtors for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after (1) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (2) as may be agreed upon by the Debtors (with the consent of SVP) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors (with the consent of SVP) and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise and payment of any applicable Cure pursuant to this Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases (if any).

*D. Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan. Unless otherwise provided in this Plan, on the Effective Date, (1) the

Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

*E. Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors (with the consent of SVP) or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under this Plan.

*F. Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*G. Employee Compensation and Benefits.*

1. Compensation and Benefits Programs.

Except as otherwise set forth herein, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall assume all Employment Agreements, which shall thereafter be assigned to Reorganized Parent. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for: (a) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests, Existing Equity Interests, or New Equity Interests, which shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (b) Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and (c) Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

A counterparty to a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)); *provided*, *however*, that any assumption of Compensation and Benefits Programs pursuant to this Plan or any of the Restructuring Transactions shall not (i) trigger or be deemed to trigger any change of control, change in control immediate vesting, termination, or similar provisions therein or (ii) trigger or be deemed to trigger an event of "Good Reason" (or a term of like import) as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by this Plan.

2. Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of

Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided, further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy Law.

*H. Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A. Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in this Plan, on, or as soon as reasonably practicable thereafter, the Effective Date (or, if a Claim or Interest is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, as applicable, shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in this Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.B of this Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

All distributions to Holders of Allowed Legacy Notes Claims shall be deemed completed when made to (or at the direction of) the Legacy Notes Trustee, which shall be deemed to be the Holder of all Allowed Legacy Notes Claims for purposes of distributions to be made hereunder.

*B. Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent. Distributions under this Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

*C. Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. Subject to the express written consent and direction of and with the cooperation of the Legacy Notes Trustee, as the Disbursing Agent on account of any Allowed Legacy Notes Claims, the Disbursing Agent may make distributions on account of the Allowed Legacy Notes Claims, subject in all respects to the rights of the Legacy Notes Trustee Charging Lien against all such distributions.

*D. Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1. Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable). Unless otherwise provided in a Final Order from the Bankruptcy Court, if a Claim is transferred twenty or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. For the avoidance of doubt, the Distribution Record Date shall not apply to the Legacy Notes Claims, the Holders of which shall receive a distribution in accordance with the terms of this Article VI on or as soon as practicable after the Effective Date.

2. Delivery of Distributions in General.

Except as otherwise provided herein or in the Plan Supplement, the Disbursing Agent shall make distributions to Holders of Allowed Claims, as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, which shall receive distributions in accordance with the applicable procedures of DTC.

3. Minimum Distribution; No Fractional Distributions.

No cash payments of less than $100 or, in the discretion of the Reorganized Debtors, a distribution and issuance of New Equity Interests to any single Holder of Allowed Claims whose aggregate sum of New Equity Interests to be distributed to such holder would be worth less than $100 value shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. No fractional shares of New Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to this Plan on account of an Allowed Claim, as applicable, would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be rounded as

follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Equity Interests to be distributed under this Plan shall be adjusted as necessary to account for the foregoing rounding.

4. Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent is notified in writing of such Holder's (or its designee, as applicable) then-current address or other necessary information for delivery (including all signatures, certificates, and other documents that are required of the Holder to receive such distribution), at which time such distribution shall be made to such Holder (or its designee, as applicable) on the next Distribution Date without interest. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to this Article VI.D.4, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under this Plan that is an Unclaimed Distribution or remains undeliverable (including due to such Holder not delivering all signatures, certificates, and other documents that are required of the Holder to receive such distribution) for a period of ninety (90) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of New Equity Interests, such New Equity Interests shall be cancelled unless determined otherwise by the New Board. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. The Disbursing Agent shall adjust the distributions of New Equity Interests to reflect any such cancellation.

5. Delivery of Distributions to Legacy Notes Claims.

The Legacy Notes Trustee shall hold or direct any distributions for the benefit of the Holders of the Allowed Legacy Notes Claims under the terms of the Legacy Notes Indenture. The Legacy Notes Trustee may, if applicable, transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of the Legacy Notes Claims, to the extent consistent with the customary practices of DTC. The Legacy Notes Trustee shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct. If the Legacy Notes Trustee is unable to make, or consents to the Reorganized Debtors making (such consent not to be unreasonably withheld, delayed, or conditioned), such distributions, the Reorganized Debtors, with the Legacy Notes Trustee's cooperation, shall make such distribution; *provided* that until such distributions are made, the Legacy Notes Trustee Charging Lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Legacy Notes Trustee. The Legacy Notes Trustee or the Disbursing Agent, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Legacy Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Legacy Notes Trustee shall have no duties, obligations, or responsibilities with respect to any form of distribution to Holders of Allowed Legacy Notes Claims that is not DTC eligible, and the Debtors or the Reorganized Debtors, as applicable, shall make such distributions. For the avoidance of doubt, all distributions referenced in this paragraph shall be subject to the Legacy Notes Trustee Charging Lien. For the avoidance of doubt, the Distribution Record Date shall not apply to Securities, including the Legacy Notes, held through DTC, which shall receive distributions in accordance with the applicable procedures of DTC.

*E. Surrender and Cancelled Instruments or Securities.*

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder (and the applicable Agents for such Holder, including the Agents/Trustees) of a certificate or instrument evidencing a Claim or an Equity Interest that has been cancelled in accordance with Article IV.G hereof, shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and any non-Debtor Affiliates, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in this Plan, the foregoing shall not apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

*F. Manner of Payment.*

Except as otherwise provided in this Plan, or any agreement, instrument, or other document incorporated herein, all distributions of the New Equity Interests to the Holders of the applicable Allowed Claims (or its designees, as applicable), in each case if any, under this Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

All distributions of Cash to the Holders of the applicable Allowed Claims, in each case if any, under this Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G. *Indefeasible Distributions*.

Any and all distributions made under this Plan shall be indefeasible and not subject to clawback or turnover provisions.

*H. Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate (subject to reasonable consultation with the Required Consenting NewCo First Lien Lenders). The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

*I. Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*J. No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Orders, this Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

*K. Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Petition Date.

*L. Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.F hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*M. Claims Paid or Payable by Third Parties.*

1. Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within five (5) Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five (5) Business Day grace period specified above until the amount is fully repaid.

2. Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable

for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article III of this Plan), nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

*A. Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under this Plan and as otherwise required by this Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to this Plan) the Allowed amount of such Claims shall be subject to, the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Except for Proofs of Claim permitted by the DIP Orders, all Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors or Reorganized Debtors. Except for Proofs of Claim permitted by the DIP Orders, upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under this Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of this Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, subject to Article V.C of this Plan, the rights of Holders of Claims and the Debtors' or Reorganized Debtors' defenses thereto, as applicable, are not affected by the automatic disallowance and expungement of any Proofs of Claim as provided for in this Plan.**

*B. Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors, with the consent of SVP, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law.

*C. Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or

compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable non-bankruptcy Law. If the Debtors or Reorganized Debtors, as applicable, dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all Claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D. *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

*E. Adjustment to Claims without Objection.*

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to this Plan) on the Claims Register by the Reorganized Debtors or the Solicitation Agent without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court. The Debtors shall provide any Holder of such a Claim or Interest with fourteen (14) days' notice prior to the Claim or Interest being adjusted or expunged from the Claims Register as the result of a Claim or Interest being paid, satisfied, amended, or superseded.

*F. Disallowance of Claims.*

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

*G. No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such

Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount pending resolution of the dispute.

*H. Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A. Discharge of Claims and Termination of Interests.*

Upon entry of the Confirmation Order, and except as otherwise expressly provided in the Plan, the Debtors shall be discharged to the fullest extent permitted by section 1141(d) of the Bankruptcy Code.

*B.* ***Release of Liens.***

**Except as otherwise provided in the Exit Facility Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a secured claim or any related claim that may be asserted against a non-Debtor Affiliate, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder, including the Agents/Trustees) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such secured claim or claim against a non-Debtor Affiliate (and the applicable agents for such Holder, including the Agents/Trustees) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or non-Debtor Affiliate (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, at the sole cost and expense of the Reorganized Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

*C.* ***Releases by the Debtors.***

**Notwithstanding anything contained herein or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of**

**which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Debtors, their Estates, and if applicable, the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, and their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, Avoidance Actions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Definitive Documents, the Plan Supplement, the Exit Term Loan Facility Participation, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.**

**Notwithstanding anything herein to the contrary, the Debtors do not, pursuant to the releases set forth above, release (i) any Causes of Action identified in the Schedule of Retained Causes of Action; (ii) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions; or (iii) any Non-Released Claims with respect to any Non-Released Parties.**

*D.* ***Releases by the Releasing Parties.***

**Notwithstanding anything contained herein or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and**

**their Estates), whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, and their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the decision to file the Chapter 11 Cases, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Definitive Documents, the Plan Supplement, the Exit Term Loan Facility Participation, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.**

**Notwithstanding anything to the contrary herein, the Released Parties do not, pursuant to the releases set forth above, release: (i) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, and Restructuring Transactions, or any documents, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions; (ii) the rights of any Holder of Allowed Claims to receive distributions under the Plan; or (iii) any Non-Released Claims with respect to any Non-Released Parties.**

*E.* ***Exculpation.***

**To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be exculpated from, any Claim or Cause of Action related to any act or omission occurring between the Petition Date and prior to or on the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Definitive Documents, the Plan Supplement, the Exit Term Loan Facility Participation, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the solicitation of votes for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the post-Effective Date Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan; *provided* that, and without limiting the foregoing in any respect, no Exculpated Party will have or incur, and each Exculpated Party will exculpated from, any claim or**

**Cause of Action arising prior to the Petition Date in connection with, relating to, or arising out of the solicitation contemplated by section 1125(g) of the Bankruptcy Code. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.**

*F.* ***Injunction.***

**Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff, or subrogation of any kind against any obligation due from such Entities or against the property of such Entities or the Estates on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, or filed a Proof of Claim or Interest indicating that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan.**

*G. Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H. Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

*I. Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of

the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

*A. Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1. the RSA shall not have been terminated as to all parties thereto and shall be in full force and effect and all conditions shall have been satisfied or waived thereunder, and there shall be no breach that would, after the expiration of any applicable notice or cure period, give rise to a right to terminate the RSA as to all parties thereto;

2. the Exit Term Loan Facility Backstop Commitment Letter shall be in full force and effect and all conditions shall have been satisfied or waived thereunder, and there shall be no breach that would, after expiration of any applicable notice or cure period, give rise to a right to terminate the Exit Term Loan Facility Backstop Commitment Letter;

3. the Bankruptcy Court shall have entered the DIP Orders, and Final DIP Order shall be in full force and effect;

4. the Bankruptcy Court shall have entered the Confirmation Order, which shall be consistent with the RSA and the Confirmation Order shall have become a Final Order in form and substance acceptable to (i) the Debtors, the Required Consenting NewCo First Lien Lenders, (ii) solely to the extent relating to the DIP ABL Facility and the DIP Term Loan Facility, reasonably acceptable to the DIP ABL Agent and DIP Term Loan Facility Agent, as applicable; (iii) solely to the extent relating to the Exit Facilities, reasonably acceptable to the Exit ABL Facility Agent, Exit Term Loan Facility Agent, and Exit Term Loan Facility Required Backstop Parties, as applicable; and (iv) solely relating to the releases provided pursuant to the Restructuring Transactions or any provisions that directly and adversely impact the Sponsor, reasonably acceptable to the Sponsor;

5. all fees, expenses, and premiums payable pursuant to the Exit Term Loan Facility Backstop Commitment Letter and the RSA shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

6. all fees, expenses, and premiums payable pursuant to the DIP Orders shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

7. all fees, expenses, and premiums payable pursuant to the Exit Facility Documents shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

8. the 4WP Sale shall have been consummated in accordance with the terms of the 4WP Purchase Agreement;

9. the Definitive Documents shall (i) be consistent with the RSA and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the RSA, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall have been adopted on terms consistent with the RSA;

10. there shall not be in effect any order by a governmental authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the Consummation of this Plan, the Restructuring Transactions, the RSA, or any of the Definitive Documents;

11. the New Equity Interests, including the New Equity Interests on account of the Exit Term Loan Facility Backstop Commitment Premium, shall have been issued;

12. the Debtors and the Consenting Creditors to the extent applicable shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan and each of the other transactions contemplated by this Plan;

13. the organizational documents of the Reorganized Debtors shall have been adopted in a manner consistent in all respects with this Plan and the RSA and the consent rights contained herein and therein;

14. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the RSA and this Plan;

15. the Debtors shall have paid the Restructuring Expenses; and

16. all professional fees and expenses of retained professionals that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the approval of such fees and expenses by the Bankruptcy Court.

B. *Waiver of Conditions*.

The conditions to the Effective Date set forth in this Article IX may be waived only if waived in writing (email from counsel shall suffice) by the (i) Debtors and (ii) the Required Consenting NewCo First Lien Lenders; and, solely to the extent such party's consent is required in the foregoing Article IX.A, the following: (i) solely with respect to clause (A)(4) of this Article IX, the Sponsor; (ii) solely with respect to clauses (A)(4) and (A)(7) of this Article IX, the Exit ABL Facility Agent, the Exit Term Loan Facility Agent, and Exit Term Loan Facility Required Backstop Parties; and (iii) solely with respect to clauses (A)(3), (A)(4), and (A)(6) of this Article IX and relating to the fees, expenses, and premiums arising under the DIP Orders, or the DIP Orders, the DIP Agents, or other applicable Agent (solely with respect to their own fees and expenses); each without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

*C. Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in the RSA, this Plan, or the Disclosure Statement shall: (1) constitute a waiver or release by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

*A. Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the RSA and the consent rights set forth therein, the Debtors reserve the right to modify this Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any such modification, whether material or immaterial, shall be acceptable in form and substance to

(a) the Required Consenting NewCo First Lien Lenders, (b) if such modification relates to the DIP ABL Facility, the DIP ABL Agent, and (c) if such modification relates to the Exit Facilities, the Exit ABL Facility Agent and Exit Term Loan Facility Required Backstop Parties, as applicable. Subject to those restrictions on modifications set forth in this Plan and the RSA, and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

*B. Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C. Revocation or Withdrawal of Plan.*

To the extent permitted by the RSA and subject to any consent rights set forth therein, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished (as applicable) pursuant to the provisions of this Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, discharges, exculpations, and other provisions contained in this Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.M hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

15. enter an order concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

17. consider any modifications of this Plan, to Cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22. enforce all orders previously entered by the Bankruptcy Court; and

23. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article IX to the contrary, the Corporate Governance Documents and the New Investor Agreement and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A. Immediate Binding Effect.*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims or Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

*B. Additional Documents.*

Subject to and in accordance with the RSA, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan, subject to the RSA and the consent rights set forth therein. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

*C. Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

*D. Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*E.* *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1. if to the Debtors, to:

Wheel Pros, LLC
Vance Johnston, Chief Executive Officer
E-mail address: vance.johnston@hoonigan.com

with copies to:

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attention: Anup Sathy, P.C., Yusuf Salloum
E-mail address: asathy@kirkland.com
yusuf.salloum@kirkland.com

- and –

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Steven N. Serajeddini, P.C., Erica D. Clark
E-mail address: steven.serajeddini@kirkland.com
erica.clark@kirkland.com

2. if to the Ad Hoc Group, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park, 44th Floor
New York, New York 10036
Attention: Philip C. Dublin, Zachary D. Lanier
E-mail address: pdublin@akingump.com
zlanier@akingump.com

3. if to SVP, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: Damian S. Schaible, Adam L. Shpeen, David Kratzer
E-mail address: damian.schaible@davispolk.com
adam.shpeen@davispolk.com
david.kratzer@davispolk.com

4. if to the DIP ABL Agent, to:

Morgan Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060

Attention: Stephan E. Hornung, David K. Shim
E-mail address: stephan.hornung@morganlewis.com
david.shim@morganlewis.com

- and -

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
16th Floor
Wilmington, DE 19899-1347
Attention: Derek C. Abbott, Matthew B. Harvey
E-mail address: dabbott@morrisnichols.com
mharvey@morrisnichols.com

5. if to the Sponsor, to:

Clearlake Capital Group, L.P.
233 Wilshire Boulevard, Suite 800
Santa Monica, California 90401
Attention: Josh Robinson
E-mail address: jrobinson@clearlake.com

with copies to:

Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, NY 10020
Attention: Steven J. Reisman
Cindi M. Giglio
E-mail address: sreisman@katten.com
cgiglio@katten.com

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*F. Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect from and after the Effective Date in accordance with their terms.

*G. Entire Agreement.*

Except as otherwise indicated, this Plan (including the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

*H. Exhibits.*

All exhibits and documents included in the Plan Supplement are an integral part of this Plan and are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/WheelPros or the Bankruptcy Court's website at https://www.deb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control.

*I. Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however*, any such alteration or interpretation shall be consistent with the RSA and acceptable to the Debtors and the Required Consenting NewCo First Lien Lenders. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

*J. Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan and any previous plan, and, therefore, no such parties nor individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

*K. Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, rule 3022-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*L. Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of page intentionally left blank.*]

Dated: October 13, 2024

WHEEL PROS, LLC
on behalf of itself and all other Debtors

By: */s/ Vance Johnston*
Name: Vance Johnston
Title: Chief Executive Officer