1                   UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE
2

3   IN RE:                      .  Chapter 11
                                .  Case No. 24-11939 (JTD)
4   WHEEL PROS, LLC, *et al.*,   .
                                .  (Jointly Administered)
5                               .
                                .
6                               .  Courtroom No. 5
                                .  824 North Market Street
7           Debtors.           .  Wilmington, Delaware 19801
                                .
8                               .  Tuesday, October 15, 2024
    . . . . . . . . . . . . . .  .  10:00 a.m.
9
                        TRANSCRIPT OF HEARING
10            BEFORE THE HONORABLE JOHN T. DORSEY
                 UNITED STATES BANKRUPTCY JUDGE
11
    APPEARANCES:
12
    For the Debtors:          Yusuf Salloum, Esquire
13                            Seth Sanders, Esquire
                              KIRKLAND & ELLIS LLP
14                            KIRKLAN & ELLIS INTERNATIONAL LLP
                              333 West Wolf Point Plaza
15                            Chicago, Illinois 60654

16  For the U.S. Trustee:     Jane Leamy, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
17                            844 King Street, Suite 2207
                              Lockbox 35
18                            Wilmington, Delaware 19801

19

20  Audio Operator:           Jermaine Cooper, ECRO

21  Transcription Company:    Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1                                  INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 12:  **DIP Motion** – Debtors' Emergency Motion        5
4              for Entry of Interim and Final Orders
               (I) Authorizing the Debtors to (A)
5              Obtain Post-Petition Financing, (B)
               Grant Senior Secured 12 Priming Liens
6              and Superpriority Administrative Expense
               Claims, and (C) Utilize Cash Collateral;
7              (II) Granting Adequate Protection to the
               Prepetition Secured Parties; (III)
8              Modifying the Automatic Stay; (IV)
               Scheduling a Final Hearing; and (V)
9              Granting Related Relief [Filed: 9/9/24]
               (Docket No. 41)
10
               Court's Ruling:                                   5
11
     Agenda
12   Item 14:  Debtors' Motion to (I) File Under Seal            6
               The Non-Released Parties Exhibit and (II)
13             Granting Related Relief [Filed: 10/3/24]
               (Docket No. 149)
14
               Court's Ruling:                                   6
15
     Agenda
16   Item 13:  **4WP Sale Motion** – Motion of Debtors for       7
               Entry of an Order (I) Authorizing and
17             Approving (A) the Assumption of and
               Performance Under the Definitive
18             Agreements, (B) the Sale of the 4WP Assets
               Free and Clear of All Liens, Claims,
19             Encumbrances and Other Interests, (C) the
               Debtors' Assumption and Assignment of All
20             Executory Contracts and Unexpired Leases,
               and (II) Granting Related Relief [Filed:
21             9/16/24] (Docket No. 103)
22             Court's Ruling:                                   13

23

24

25

1                                  INDEX

2    MOTIONS:                                          PAGE

3    Agenda
     Item 11: **Plan** – Joint Prepackaged Plan of            13
4             Reorganization of Wheel Pros, LLC and its
              Debtor Affiliates Pursuant to Chapter 11
5             of the Bankruptcy Code [Filed: 9/8/24]
              (Docket No. 5)
6
              Court's Ruling:                         27
7

8
     DECLARATIONS:                                    PAGE
9
     1) Vance Johnston                                8
10
     2) Nick Forsa                                    8
11
     3) Jonathan Foster                               13
12
     4) Matthew Braun                                 13
13
     5) Cari Turner                                   13
14
     6) Alexa Westmoreland                            13
15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 10:11 a.m.)

2    (Call to Order of the Court)

3         THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.  We're a little late getting started

5    because things are coming in late that I have to review

6    before we start.  So, other then that let's go ahead.

7         MR. SALLOUM:  Good morning, Your Honor.  Yusuf

8    Salloum from Kirkland & Ellis on behalf of the debtors.

9         Your Honor, first off, we greatly appreciate Your

10   Honor as well as the Court's staff time in reviewing our

11   materials.  We filed hundreds of pages on the docket over the

12   weekend and the holiday, no less, so we greatly appreciate

13   everyone facilitating us on this tight timeline.

14        Your Honor, I will make just a few introductory

15   remarks to introduce folks that are with us in the courtroom

16   today.  Firstly, we have Mr. Vance Johnston, the debtors

17   chief executive officer.  We also have Mr. Jonathan Foster,

18   an independent director of the debtors.  Mr. Matthew Braun of

19   Houlihan Lokey.  We have Ms. Cari Turner of A&M.  And we have

20   Ms. Alexa Westmoreland of Stretto.

21        Your Honor, before getting into approval of the

22   plan and the disclosure statement there are a few other items

23   on the agenda filed at Docket No. 240.  Before jumping into

24   the plan and disclosure statement we would propose to address

25   those items first if okay with Your Honor starting with the

1  DIP which was filed at Agenda Item No. 12.  The COC was filed

2  at Docket No. 235.

3          THE COURT:  Okay.

4          MR. SALLOUM:  Your Honor, we filed a certification

5  of counsel in connection with the final order.  The

6  declaration in support of the motion was filed by Mr. Braun

7  at Docket No. 43 and the declaration of Ms. Turner in support

8  of the debtors liquidity filed at Docket No. 44.  Your Honor,

9  the final order will allow the debtors to access the

10  remaining $25 million of the DIP facility.  It will allow

11  them to continue to access their DIP ABL facility of $175

12  million, allow them to continue to access cash collateral.

13          Your Honor, access to liquidity, of course, is

14  critical in these cases.  We are close to the finish line,

15  but of course working together to get to emergence.  The

16  final form of order is substantially the same as the interim

17  order that was filed and approved by the Court at the first

18  day hearing with a couple added paragraphs to resolve

19  comments received from certain parties.

20          Unless Your Honor has any questions the debtors

21  respectfully request that the order be entered.

22          THE COURT:  Okay.  I did review the changes.

23          Does anyone else wish to be heard on the DIP

24  motion?

25      (No verbal response)

1          THE COURT:  I'm satisfied the requested relief is

2    appropriate and I will enter the order.

3          MR. SALLOUM:  Thank you, Your Honor.

4          The next item I'm proposing to address, Your

5    Honor, is the motion to seal the non-release parties.  That

6    is Agenda Item No. 14 and was filed at Docket No. 149.  Your

7    Honor, as we will discuss in a bit, the debtors have carved

8    out certain non-released parties only in respect to the non-

9    release claims.  The non-release claims are merely preserved

10   potential claims at this point.  The debtors are now

11   litigating with these parties, nor may there ever be public

12   litigation with these parties.

13         Out of an abundance of caution and to avoid

14   unnecessary public scrutiny of the non-release parties, the

15   debtors propose to file the non-release parties under seal.

16   This relief is consistent with other cases under the Third

17   Circuit such as WeWork.  The objection deadline was set for

18   the hearing, Your Honor, but we are not aware of any

19   objecting party to the motion.

20         THE COURT:  Does anyone wish to be heard?

21      (No verbal response)

22         THE COURT:  All right.  I'm satisfied the

23   requested is appropriate.  I will enter the order.

24         MR. SALLOUM:  Thank you, Your Honor.

25         There were a couple other orders filed under

1  certification, Agenda No. 8 the utilities motion, Agenda No.

2  9 the cash management motion, and Agenda No. 10 the motion to

3  seal the fee letters in connection with the DIP.   Your

4  Honor, happy to walk through any questions or take them one

5  by one, however Your Honor would like to proceed.

6          THE COURT:  I already entered those orders before

7  we came out.

8          MR. SALLOUM:  Thank you very much, Your Honor.

9          So, with that, Your Honor, I will turn the podium

10  over to my colleague, Mr. Sanders, regarding the 4 Wheel

11  Parts sale motion.

12          THE COURT:  Okay.  Thank you.

13          MR. SANDERS:  Good morning, Your Honor.  For the

14  record Seth Sanders, Kirkland & Ellis, on behalf of the

15  debtors.

16          As Mr. Salloum mentioned, I will walk through

17  Agenda Item 13, which is the debtors motion to sell the 4

18  Wheel Parts assets to ORW USA via a private sale. The motion

19  was filed at Docket No. 103.  Through the motion the debtors

20  are seeking to assume the APA and other definitive agreements

21  to sell assets of the debtors related to the 4 Wheel Parts

22  business to ORW who is also an aftermarket automotive parts

23  retailer.

24          In support of the motion the debtors filed two

25  declarations.  One at Docket No. 221, and that's also from

1   Mr. Vance Johnston, providing the debtors business

2   justification for the sale. The second, at Docket No. 222, is

3   the declaration from Mr. Forsa, who should be appearing

4   remotely for us today, from Stifel Financial Corp., proposed

5   financial advisor and investment banker to the debtors.  That

6   one walks through the marketing process and the negotiation

7   around the sale.

8            We are not aware that anyone has raised any issues

9   with those declarations.  At this point we would like to move

10  both of those declarations into evidence.

11           THE COURT:  Is there any objection?

12       (No verbal response)

13           THE COURT:  They're admitted without objection.

14       (Johnston declaration received into evidence)

15       (Forsa declaration received into evidence)

16           MR. SANDERS:  Thank you, Your Honor.

17           Also, since we filed the sale motion on September

18  16th, we have been in constant dialog or continue to be in

19  dialogue with the buyer and also parties who have reached out

20  with comments, both informal comments and a few objections

21  filed to the sale motion.  We have been working constantly

22  with each one of those parties.  As of now, and as we

23  understand it, it supported the sale order as revised at

24  Docket No. 220. Its supported by the lenders party to the

25  RSA, the buyer, and each of the parties that provided the

1  informal comments and the objections.

2          So, by way of background real quick, Your Honor, 4

3  Wheel Parts came into the business back in 2022. Its sort of

4  independent, but in parallel with the restructuring

5  transactions that we're dealing with here in the Chapter 11

6  cases.  The debtors sought to divest of those assets

7  alongside some other discreet assets, given liquidity reasons

8  and the need for short-term cash infusions.

9          So, Stifel was retained in connection with those

10 and conducted a marketing process beginning in June of this

11 year for the 4 Wheel Parts assets.  To that end, they reached

12 out to a number of strategic buyers, received five

13 indications of interest, worked with each one of those partis

14 and ultimately arrived at ORW as the highest and best

15 available offer.

16         Just to walk through the key terms of the

17 transaction it's a $30 million top line consideration,

18 ultimately with transaction costs and potential price

19 adjustments we are looking at around just over $27 million

20 net.  The purchase -- the actual assets being purchased are

21 the 42 4 Wheel Parts retail locations, that is what the

22 business is.  They operate in California, Texas, Florida.

23 That is the primary set of assets, alongside those are the

24 trademarks, e-commerce assets.  There is a termination fee in

25 association with the APA, $500,000. The sale is free and

1    clear of liens, which the DIP liens, etc., would attach to

2    the proceeds of the sale.  There is a general assumption of

3    liabilities by the buyer.

4              Just to quickly walk through ORW and the process

5    by which we arrived at the private sale method.  We thought

6    that that made the most sense given that we had conducted the

7    marketing process before we filed and entered into the APA

8    before we filed.  So, we had already done all of the work

9    leading up to the Chapter 11 and all that was left was the

10   assumption of the definitive agreements.

11             So, with that, Your Honor, unless you have any

12   questions, happy to walk through any changes to the order or

13   any other questions on the sale.  We would respectfully

14   request entry of the order.

15             THE COURT:  What expressions of interest were

16   there prepetition other then the buyer?  Were there other

17   people interested?

18             MR. SANDERS:  There were four other parties who --

19   well, there were actually eight who signed confidentiality

20   agreements and we sent them confidential information.  Then

21   there were four aside from the buyer who submitted

22   indications of interest.

23             THE COURT:  Nobody submitted a bid?

24             MR. SANDERS:  I believe it was limited to

25   indications of interest only.

1        THE COURT:  What is the reason for not holding an

2   auction if you had other people interested?

3        MR. SANDERS:  What was the reason for not holding

4   an auction --

5        THE COURT:  For not holding an auction.

6        MR. SANDERS:  -- within the Chapter 11 cases.

7        THE COURT:  Yeah.

8        MR. SANDERS:  Because we had already determined

9   prior to filing, essentially, that that was the highest and

10  best offer based off of the indications of interest received.

11  Also, just to note, the universe of potential buyers here is

12  limited given the size of what they would be purchasing and

13  in each market.  Strategics as reflected in the Forsa

14  declaration, strategics was what made the most sense in terms

15  of outreach given that a platform would be necessary, a

16  prerequisite, essentially, to actually purchasing these

17  assets and (indiscernible) efficiently.

18       THE COURT:  All right.  Anyone else wish to be

19  heard?

20      (No verbal response)

21       THE COURT:  I'm satisfied the requested relief is

22  appropriate and I will enter the order.

23       MR. SANDERS:  Thank you, Your Honor.  I will turn

24  the podium back over to Mr. Salloum.

25       MR. SALLOUM:  Your Honor, we will turn to Agenda

1  Item No. 11 which is the debtors plan and disclosure

2  statement. Your Honor, again, we filed a lot of material over

3  the last 36 to 48 hours.  We greatly appreciate Your Honor

4  facilitating us over the holiday weekend to be able to meet

5  this tight timeline.  Your Honor, I will just make a few

6  remarks regarding the plan up front.

7           This plan is a significant achievement and

8  maximizes value for the benefit of all stakeholders.  We will

9  deliver the business by approximately $1.2 billion, saving

10 the company approximately $100 million a year of debt service

11 costs.  As part of the deal, trade and unimpaired creditors

12 are riding through unimpaired.  This global resolution was

13 only possible because our stakeholders worked with us in good

14 faith to reach this result and we are thankful that they are

15 supportive of the result we have reached today.

16          Your Honor, the voting results bear this out.  As

17 loud out in Ms. Westmoreland's declaration.  Every single

18 creditor that submitted a ballot voted in favor of the plan.

19 And as far as engagement goes, those creditors represent

20 approximately 90 percent plus of the creditors that were

21 eligible to vote.  So, we have very high engagement from

22 creditors and every creditor that was eligible to submit a

23 ballot voted in favor of the plan.

24          Your Honor, before going into further detail

25 regarding the plan I would propose to start with the

1   evidentiary portion. The debtors submitted five declarations

2   in support of the disclosure statement and confirmation.

3   First, the declaration of Mr. Vance Johnston, the CEO of the

4   company, in support of confirmation; that was filed at Docket

5   No. 218.  The declaration of Mr. Jonathan Foster, independent

6   director of the debtors in support of the debtors

7   investigation and the releases; that was filed at Docket No.

8   224.  The declaration of Mr. Braun of Houlihan Lokey in

9   support of the debtors valuation and exit financing process;

10  that was filed at Docket No. 219.  Ms. Cari Turner of A&M,

11  whose declaration was filed at Docket No. 217, in support of

12  the best interest test.  Lastly, Ms. Alexa Westmoreland of

13  Stretto regarding the voting results.

14          Your Honor, the debtors respectfully request to

15  move these declarations into evidence at this time.

16          THE COURT:  Is there any objection?

17      (No verbal response)

18          THE COURT:  They're admitted without objection.

19      (Johnston declaration received into evidence)

20      (Foster declaration received into evidence)

21      (Braun declaration received into evidence))

22      (Turner declaration received into evidence)

23      (Westmoreland declaration received into evidence)

24          MR. SALLOUM:  Thank you, Your Honor.

25          Since the petition date the debtors have worked to

1  further obtain support for the plan. The revised plan filed

2  at Docket No. 214 reflects the settlement with the legacy

3  notes trustee.  That settlement reflects an increased amount

4  of junior funded debt consideration from $500,000 to

5  $750,000.  Further, the holders of the NewCo Note claims have

6  agreed to waive their recovery in this class allowing further

7  recovery of the $750,000 to go to the legacy creditors.  As

8  part of this resolution the legacy notes trustee supports

9  confirmation of the plan.

10        Additionally, Your Honor, we worked closely with

11  Ms. Leamy and we appreciate her and her team working with us

12  very closely to resolve as many issues as possible ahead of

13  the hearing today.  We do have a couple open issues that we

14  will need Your Honor's help with, but otherwise we were able

15  to resolve a number of issues to changes to the plan with Ms.

16  Leamy including by limiting exculpation provisions to the

17  time period between the petition date and the effective date

18  limiting the scope of the discharge and settlement provisions

19  of the plan.  We are no longer seeking a waiver of the 14 day

20  stay period and the amended language in the plan regarding

21  the payment of statutory fees.

22        Your Honor, we received a few other informal

23  comments and objections.  As of this morning we believe all

24  of those are resolved with the exception of the United States

25  Trustees objection that I just referenced.  We incorporated

1 those revisions into the plan or, otherwise, into the

2 confirmation order.

3       Your Honor, the debtors briefed, and the evidence

4 lays out the support of the debtors case in chief,

5 satisfaction of 1125, 1126, and 1129.  Your Honor, happy to

6 walk through that in detail; otherwise, I am happy to jump

7 ahead to the issues at hand that are contested.

8       THE COURT:  I did review it before I came on the

9 bench.  So, you can go forward with the objections.

10       MR. SALLOUM:  Thank you, Your Honor.

11       Your Honor, the debtors responded to the United

12 States Trustees objection in detail in the brief.  So, I will

13 limit my presentation to three key points.

14       First, what is the applicable standard post <u>Purdue</u>

15 in regards to consensual third-party releases.  We believe

16 Your Honor has answered that question and that opt-out

17 releases remain a valid way for a debtor to obtain consensual

18 third-party releases. This is consistent with other cases

19 post <u>Purdue</u> both in the Third Circuit and elsewhere.

20       The United States Trustees objection analogizes to

21 and distinguishes from certain consumer protection law cases

22 as well as class action suits; however, looking at the case

23 law collectively we believe that this distills down and

24 demonstrates that with the appropriate framework parties can

25 be bound in certain contexts unless they act.  So, I think

1  the question is what is that framework, Your Honor. I believe

2  Your Honor has answered that for us too; it is notice of the

3  release provisions and the scope of the release provisions.

4  Those are the second and third points that I will walk Your

5  Honor through.

6          With regards to notice, the debtors have

7  implemented a noticing regime similar to other large Chapter

8  11 cases employing opt outs. The debtors gave approximately

9  30 days for parties to review and opt-out or object to the

10 third-party release.  The applicable notices of impaired or

11 unimpaired status included the opt-out. The publication

12 notice was published in the New York Times.  Additionally,

13 50,000 and greater then 50,000 parties received notice of the

14 confirmation hearing.  We think this notice regime actually

15 worked, Your Honor; 15 parties have opted out.

16         Additionally, with respect to those voting

17 creditors the disclosure statement sufficiently explained the

18 releases and the contributions made by the release parties to

19 the debtors restructuring efforts.  All voting creditors have

20 to certify that they read and understood the elections they

21 were making on their ballot.  Again, all of those voting

22 creditors voted in favor of the plan.

23         Additionally, Your Honor, this case has had

24 significant publicity.  There is over 700 articles that are

25 in the public domain relating to these cases.  If a party has

1  not received notice, we are aware, and Your Honor has

2  mentioned many times, that Your Honor would work with that

3  party if someone were to make a case around how they did not

4  receive notice and the debtors accept that.

5          The third point, Your Honor, is in regards to

6  scope, the scope of the releases.  In the revised plan that

7  we filed, the debtors made a few changes to narrow the scope

8  of the release.  First, the parties who were deemed rejecting

9  classes are not giving the releases, they are not releasing

10  parties.  They are not getting consideration under the plan

11  and they are not going to be releasing parties.  Number two,

12  we added some language in connection with the related parties

13  definition to clarify that its only to the extent that such

14  entity is legally able to bind those related parties or that

15  such related parties have, otherwise, received notice.

16          The last item I will address in connection with

17  the scope of the releases is the fraud and gross negligence

18  carve out that the U.S. Trustee proposes should be added to

19  the releases.  Your Honor, first and foremost the debtors

20  would say the releases are consensual.  We have applied and

21  followed the post Purdue holdings by this Court and others

22  that opt out mechanism is an acceptable manner to have

23  consensual releases.  Further, with respect to the debtors

24  release, the debtors release is a valid exercise of their

25  business judgment.  As we laid out in the briefing, Your

1  Honor, we believe we have satisfied the Zenith factors.  The

2  releases are robust and reflect the debtors investigation and

3  are supported by an overwhelming majority of creditors.

4       Further, the debtors investigation here is not one

5  that results in a blanket release for everyone. As we

6  discussed earlier, Your Honor, there are certain non-release

7  parties that are deemed not released in connection with

8  certain claims.  So, from the debtors perspective, Your

9  Honor, the debtor release just reflects the debtors business

10  judgment around what should be preserved to maximize the

11  value of the estate and what should be released in connection

12  with reaching the broad resolutions, maximizing value for

13  creditors overall that are embodied in the plan today.

14       With respect to the third-party release, in

15  addition to being consensual, this matter has come before

16  this Court before.  In the Energy Future Holdings case where

17  the Judge held -- where the Court held that they're not

18  actually required for the Court to approve the release.

19  There is nothing in the bankruptcy rules or the bankruptcy

20  code that requires that a release has to have a fraud gross

21  negligence carve out.

22       Further, with respect to the third-party release,

23  as mentioned, Your Honor, parties had the opportunity to opt-

24  out or, otherwise, object.  A party that took issue with the

25  scope of the release had the ability to opt out of the

1 release. None of this changes the rights of creditors to

2 payment in full on their claim if they are unimpaired and the

3 voting classes voted unanimously in favor of the plan.  Your

4 Honor, from the debtors perspective this point is really

5 about finality and closure as opposed to any, you know,

6 particular fraud or similar claim that the debtors are aware

7 of.

8           Your Honor, another prepackage case before this

9 Court in Appgate the Court held that when two parties are

10 agreeing to settle a dispute it is not uncommon to give,

11 essentially, general releases for claims that are both known

12 and unknown which, again, from the debtors perspective, Your

13 Honor, it goes to the finality and closure that the debtors

14 are seeking in connection with these highly consensual

15 Chapter 11 cases.

16           What is the upshot of all this.  As this Court has

17 mentioned many times, the releases should be evaluated in the

18 context of the facts and circumstances of the Chapter 11

19 cases before Your Honor.  So, these were prepackaged cases

20 and highly consensual prepackaged cases, but it was not easy

21 to get here. The company, prior to filing, was very low on

22 liquidity and was operating under short-term forbearances.

23 The company, its sponsor, and a majority of its creditors all

24 forged consensus through the RSA and the DIP and that only

25 came about through a lot of hard-fought negotiations and

1  investment decisions.

2          The releasing parties are undoubtedly

3  beneficiaries of this consensus and new investment.  Rather

4  then having a prolonged Chapter 11 case potentially mire in

5  litigation, we have a Chapter 11 case before Your Honor with

6  confirmation approximately five weeks since the petition

7  date.  We have five unimpaired classes including general

8  unsecured creditors that are arriving through these cases

9  fully unimpaired.

10          This value maximizing outcome is only possible by

11  the contribution of the release parties.  Any party that took

12  issue with the scope of the releases had the opportunity to

13  opt out or object.  Again, this, from the debtors

14  perspective, is about finality and closure more then any

15  particular fraud claim or similar claim that the debtors are

16  aware of.  Accordingly, Your Honor, the debtors submit that

17  the facts and circumstances of these Chapter 11 cases warrant

18  inclusion of the releases.

19          THE COURT:  Other then EFH are there any other

20  cases where a Court has said fraud and gross negligence do

21  not need to be included in opt out releases?

22          MR. SALLOUM:  The only other case we are aware of

23  is the Appgate case, Your Honor, another prepackaged case

24  recently heard before this Court.

25          THE COURT:  I will tell you what I'm concerned

1 about is in this particular case we've got a sealed list of

2 people who are not getting releases and so if I am a creditor

3 I am going to be saying what are you investigating with them?

4 Are you investigating fraud?  Are you investigating gross

5 negligence?  Why should I give up my claim?

6 　　　　　　MR. SALLOUM:  Your Honor, the creditors that would

7 benefit from these investigations that the debtors are

8 pursuing against non-release parties are the secured

9 creditors who will own this company, the future owners of the

10 company.  They are supportive of the release provisions in

11 the plan as drafted which do not include those carve out

12 provisions.

13 　　　　　　THE COURT:  All right.  Let me hear from Ms.

14 Leamy.  Thank you.

15 　　　　　　MR. SALLOUM:  Thank you, Your Honor.

16 　　　　　　MS. LEAMY:  Good morning, Your Honor.  Jane Leamy

17 for the U.S. Trustee.

18 　　　　　　Our office filed a confirmation objection at

19 Docket No. 192 and our objection raised two main issues with

20 the plan. Our open issues as of now are, one, does the plan

21 contain non-consensual third-party releases; two, are the

22 plan releases acceptable given they contain no carve out for

23 fraud and gross negligence.

24 　　　　　　As to the first question we respectfully submit

25 that the answer is yes. Our position is that third party

1  releases that are based on inaction such as failure to opt-
2  out are non-consensual.  Third party releases that are non-
3  consensual are impermissible after the Supreme Court's ruling
4  in Purdue.  The second amended plan here, filed at Docket No.
5  214, defines releasing parties to include, one, creditors who
6  vote to accept, in other words there is no opt out option for
7  those creditors; two, creditors who are unimpaired and don't
8  opt out; three, creditors who are eligible to vote but do not
9  return a ballot or an opt out form.

10        Our position is that contract principles govern
11  whether release is consensual. Under contract law silence
12  does not equal consent except in limited circumstances that
13  are not applicable here.  As the Ninth Circuit wrote in
14  Rickert v. Rapport Investments Inc., even though the offer
15  states that silence will be taken as consent, silence on the
16  part of the offeree cannot turn the offer into an agreement
17  as the offeror cannot prescribe conditions so as to turn
18  silence into acceptance.

19        Your Honor, I acknowledge that this case is not
20  binding on Your Honor, but Judge Goldblatt recently held in
21  the Smallhold case that "After Purdue, in the absence of some
22  sort of affirmative expression of consent that would be
23  sufficient as a matter of contract law, a creditors silence
24  in the face of a plan and form of ballot can no longer be
25  sufficient."

1          Turning to the releasing parties here, so the

2 first category of those who vote to accept here creditors who

3 vote to accept do not have the option to opt out of the

4 release.  Now setting aside the RSA parties who agree to be

5 bound under the definition of releasing parties, this would

6 include Class VI, and despite language on the ballot that

7 provided if you vote to accept the plan you are also

8 consenting to the third-party release set forth in the plan

9 and copied in Item 3 below you may not opt out of such third-

10 party release.  There was an opt out box and there were,

11 according to the voting report, a few creditors that did opt

12 out in Class VI.

13          Because the plan forces non-debtor releases on

14 these parties without their affirmative consent the releases

15 are non-consensual and cannot be approved under <u>Purdue</u>.

16 Voter support only reflects approval of the plan's treatment

17 of the voters claims against the debtor.  Parties voting on

18 the plan have not manifested their intention that silence

19 operates as an acceptance of an offer to also release their

20 claims against the non-debtors.

21          In the <u>Arrowhead Development Corp.</u> case from New

22 Jersey, 1997, held that because consensual releases are

23 permitted on the parties agreement to the release its not

24 enough for a creditor to abstain from voting for a plan or

25 even to simply vote yes as to a plan.  Voting on a plan is

1  governed by the bankruptcy code and voter support only

2  reflects approval of a plan's treatment of the voters claims

3  against the debtor.  Because impaired creditors have a

4  federal right under the bankruptcy code to vote, merely

5  exercising that right to vote doesn't manifest their release

6  to the third parties.

7        Turning to the unimpaired classes, creditors in

8  unimpaired classes are not being asked to vote, rather they

9  were asked to return an opt-out form if they did not agree

10  with the releases; however, silence or inaction for these

11  parties should not also equal consent to a third-party

12  release.  As the Bankruptcy Court in the Southern District of

13  (indiscernible) wrote, 2015, its difficult to understand how

14  a creditor can be unimpaired if its releasing its claims

15  against third parties.

16        We submit the only way for creditors in unimpaired

17  classes to consent to the third-party releases is by opting

18  into them.  Lastly, we have abstaining creditors, those who

19  would be eligible to vote but did not return a ballot.

20  Again, the U.S. Trustee submits that consent should not be

21  inferred based on creditor inaction.

22        Your Honor, we are aware that recently in FTX Your

23  Honor approved a procedure where opt outs were sufficient;

24  however, there are a few differences from this case then FTX.

25  In that case the plan's third-party releases were limited to,

1  my understanding, conduct from the petition date going

2  forward.  So, they didn't cover prepetition conduct.  They

3  also did not apply to gross negligence or willful misconduct

4  as the releases here do.

5          Turning to the releases and the absence of a carve

6  out for fraud or gross negligence, our focus -- you know, the

7  focus of the objection was that the debtor made the required

8  showing and we're not necessarily taking issue with that

9  here.  We are taking issue with the third-party release and

10 the absence of the carve out for gross negligence mainly

11 because our position is that the third-party release is not

12 consensual as to the parties that I just discussed.

13         The scope of the third-party release is quite

14 broad in looking at that plan provision.  For instance, the

15 language covers -- you know, its almost a page long, it

16 covers any manner arising from in whole or in part the

17 debtors or their estates, the business, contractual

18 arrangements or interactions between or among any debtor and

19 any release party, and, you know, just goes on and on.

20         So, to conclude, Your Honor, with respect to the

21 third-party release contract principles govern whether a

22 release is consensual.  Under contact law failing to respond

23 to an offer is generally not acceptance. Similarly, failing

24 to respond to a plan solicitation is not consent.  People who

25 took no action here in response to the mailing should not be

1  considered to be deemed to consent to the third-party

2  release. If they are non-consensual its not permitted after

3  Purdue.  So, we would respectfully request that Your Honor

4  sustain the objection in that respect.

5          Unless Your Honor has any questions, that is all I

6  have with respect to the objection.

7          THE COURT:  No questions. Thank you.

8          MS. LEAMY:  Thank you.

9          THE COURT:  Response?

10          MR. SALLOUM:  Very briefly, Your Honor. With

11  respect to the voting creditors, any creditor that voted,

12  voted in favor and actually affirmatively manifested their

13  consent to the plan.  Your Honor, we think its telling that

14  none of them are here today objecting to the fact that they

15  did not have the ability to opt out of the releases if they

16  voted in favor of the plan as well.

17          Your Honor, we also --

18          THE COURT:  Did they have some creditors who voted

19  and opted out?

20          MR. SALLOUM:  Yes, Your Honor. I believe there

21  were two.

22          THE COURT:  Were they security creditors or what?

23          MR. SALLOUM:  Those were the -- in Class VI, I

24  believe they were the legacy notes.  There were two legacy

25  notes holders that submitted ballots that voted yes and opted

1  out, Your Honor.

2       THE COURT:  How are you handling those?

3       MR. SALLOUM:  Your Honor, the debtors can treat

4  those parties as opting out parties. Its unclear, of course,

5  whether they meant to vote yes and not opt out or to opt out

6  and to be voting no.  From our perspective, the debtors can

7  treat them as rejecting parties and opt them out of the

8  releases.

9       THE COURT:  Okay.

10      MR. SALLOUM:  Lastly, Your Honor, with respect to

11  the reference to FTX and the scope of the release prepetition

12  conduct, again, Your Honor, we just look to the facts and

13  circumstances of these cases.  FTX was a case that involved

14  significant government investigation, criminal indictments, a

15  lot of publicity around some of the actors involved in that

16  case. This case is a prepack, very, very different

17  circumstances and releases picking up prepetition conduct are

18  very consistent with precedent in this circuit.

19      Thank you, Your Honor.

20      THE COURT:  Thank you.  I am going to overrule the

21  objection. I think under the facts and circumstances of this

22  case the third-party releases are appropriate.  The fact that

23  unsecured creditors are being paid in full, the fact that the

24  secured creditors who are the ones who are impaired are

25  overwhelmingly in support of the plan indicates their

1  acceptance by voting for the plan accept for the two who have

2  opted out.

3          So, for those reasons and just as I said in FTX I

4  see these third-party releases more as in the context of a

5  class action litigation.  We're talking about in terms of a

6  contract -- a settlement is a contract, so if you enter into

7  a settlement in a class action situation there is still

8  notice that goes out to everybody who is not a named party

9  and they have the option to opt out. If they don't opt out

10 then they're bound by that settlement agreement which is a

11 contract.  I don't see any difference in the context of a

12 plan of reorganization.  So, for those reasons I will approve

13 the -- excuse me, I will overrule the objection.

14         MR. SALLOUM:  Thank you, Your Honor.  Your Honor,

15 with that we are happy to walk through the confirmation order

16 and the redline that we filed alongside of it or, otherwise,

17 just answer any questions from Your Honor. Otherwise, we

18 respectfully request that approval of the disclosure

19 statement and the confirmation of the plan.

20         THE COURT: I did review the redline. I don't have

21 any questions.

22         Does anyone else wish to be heard?

23     (No verbal response)

24         THE COURT:  I am satisfied the requested relief is

25 appropriate and I will enter the order.

1          MR. SALLOUM:  Thank you very much, Your Honor.

2   That concludes the agenda for today.  Again, we very much

3   appreciate Your Honor's time.

4          THE COURT:  Thank you all very much.  We are

5   adjourned.  Thank you.

6       (Proceedings concluded at 10:45 a.m.)

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.


/s/ William J. Garling                    October 15, 2024

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable